D9QJBIN1                        Trial

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

               v.                          12 Cr. 152 CM

MICHAEL BINDAY,
a/ka/ Sealed Defendant 1,
JAMES KEVIN KERGIL,
a/k/a Sealed Defendant 2,
and MARK RESNICK,
a/k/a Sealed Defendant 3,

               Defendants.

------------------------------x

                                          September 26, 2013
                                          10:00 a.m.


Before:

                    HON. COLLEEN McMAHON,

                                          District Judge
                                           and a jury

D9QJBIN1                        Trial

1

2

3                                    APPEARANCES

4   PREET BHARARA,
            United States Attorney for the
5           Southern District of New York
    SARAH McCALLUM,
6   ZACHARY FEINGOLD,
    EUN YOUNG CHOI,
7           Assistant United States Attorneys

8

9   MORVILLO ABRAMOWITZ GRAND IASON & ANELLO, P.C.
            Attorneys for defendant Binday
10  BY:   ELKAN ABRAMOWITZ, Esq.
            BENJAMIN SEAN FISCHER, Esq.
11          JASMINE MARIE JUTEAU, Esq.
                    Of counsel

12

13

14  GALLET DREYER & BERKEY, LLP,
            Attorneys for defendant Kergil
15  BY:   ROGER LEE STAVIS, Esq.
            ADAM MICHAEL FELSENSTEIN, Esq.
16                  Of counsel

17

18  LAW OFFICES OF JANE ANNE MURRAY
            Attorneys for defendant Resnick
19  BY:   JANEANNE MURRAY, Esq.
                    Of counsel

20

21

22

23

24

25

D9QJBIN1                              Trial

1          (Trial resumes)

2          (In open court; jury not present)

3          THE COURT:  Good morning.

4          THE CLERK:  Case on trial, the government and

5    defendants are present.  The jurors are not present.

6          THE COURT:  The jurors are not present and they're not

7    all here.  Juror No. 4, Ms. Turney --

8          THE CLERK:  No. 5.

9          THE COURT:  Juror No. 5, she called Jim -- sit down --

10   from Grand Central.  We think she is in a cab on her way down,

11   but she is sick.  So we're trying to reach her again.

12         We want to find out what kind of sick she is.  If it

13   is a stomach virus, which it sounded like, I prefer that does

14   not circulate through the entire jury.  So let's see if we can

15   reach her.  We are on hold for a few minutes.

16         (Pause)

17         THE COURT:  Jim is going to go downstairs and see if

18   she is there.

19         MS. MURRAY:  I do have an application.

20         THE COURT:  Good.  We can use the time.  Good morning,

21   Ms. Murray.

22         MS. MURRAY:  Good morning, your Honor.

23         Later today the government plans to call my client's

24   brother-in-law, Gregg Trachtenberg.  Mr. Trachtenberg had been

25   a trustee on at least one of the policies.

D9QJBIN1                          Trial

1          I believe the government maybe plans to introduce

2     Mr. Trachtenberg to discuss an investment venture that my

3     client proposed to him in 2010 which involved investing in the

4     purchase of a life insurance policy of an individual who was

5     terminally ill.

6          THE COURT:  This sounds like 404 (b).  Is that what

7     you plan to do?

8          MR. FEINGOLD:  No, your Honor.  Paragraph 17 (d) of

9     our indictment states that one of the reasons that they got

10    these straw buyers policies was to in some instances direct

11    millions of dollars of death benefits to themselves.

12         This is a STOLI policy with Mark Resnick's client.

13    After the policy was procured, Mr. Resnick, Mr. Kergil and Mr.

14    Resnick's brother-in-law invested in this policy and reaped the

15    death benefit proceeds.  We are going to get testimony today

16    from a cooperator who will testify one of his client's STOLI

17    policies was purchased by Michael Binday's family in 2009.

18         THE COURT:  I get it.

19         MS. MURRAY:  Your Honor, I submit that this is not

20    relevant to the charges in the indictment.  It is not a fraud

21    on the insurance company.  It was done with full blessing of

22    the family involved.  Everybody benefited from it.

23         THE COURT:  It sounds to me like it is perfectly

24    admissible and that you are fully able to get one of the

25    members of the family to come and testify about the fact it was

D9QJBIN1                          Trial

1   all done with their blessing, yadda, yadda, yadda.  It sounds

2   admissible to me.

3           MS. MURRAY:  I would submit it is not relevant.  If it

4   is relevant, it is prejudicial.

5           THE COURT:  If I say it is admissible, then it

6   occurred to me that it is relevant.  The one thing I do have to

7   tell you is that at 4:45 -- off the record.

8           (Off-the-record discussion)

9           THE CLERK:  No good.

10          THE COURT:  "No good," as in she is not here?

11          THE CLERK:  Do you want me to call again?

12          THE COURT:  Yes.

13          (Off-the-record discussion)

14          THE COURT:  We'll wait another 10 or 15 minutes.  I

15  just feel like I should do that.

16          (Off-the-record discussion)

17          THE COURT:  Back on the record.  Case on trial

18  continued.  The parties are present.  The jurors are not.

19          MS. McCALLUM:  The government at this time, and to

20  save time in front of the jury, could offer certain exhibits.

21          THE COURT:  Ms. Murray, I need your attention here.

22          MS. McCALLUM:  Pursuant to our stipulation,

23  anticipated stipulation, I understand there is no objection.

24          THE COURT:  And the exhibits are?

25          MS. McCALLUM:  Government Exhibits 144, 151, 154, 156,

D9QJBIN1                          Trial

1    117, 119, 134, 136, 135, 158, 159, 121, 137, 139, 161, 361,

2    162, and 362.

3           MR. FISCHER:  Your Honor, may I have a moment to

4    consult with Ms. McCallum.

5           THE COURT:  You can.  We have lots of moments here.

6           MR. FISCHER:  That is true.

7           (Off-the-record discussion)

8           MR. FISCHER:  No objection, your Honor.

9           THE COURT:  They're all admitted.

10          (Government Exhibits 144, 151, 154, 156, 117, 119,

11   134, 135, 136, 158, 159, 121, 137, 139, 161, 162, 361 and 362

12   received in evidence)

13          THE COURT:  Mr. Stavis.

14          MR. STAVIS:  I would raise this later, but since we

15   have an abundance of time.

16          THE COURT:  We have an abundance of time.

17          MR. STAVIS:  While counsel for Mr. Kergil were busy

18   stipulating in all sorts of government documents, there was one

19   document that there was a disagreement about that the

20   government is unwilling to stipulate about, and I can give the

21   10 second version and hand it up to you.

22          THE COURT:  Good, because if I see it, it makes more

23   sense.

24          MR. STAVIS:  Maybe you should see it before the 10

25   second version.

D9QJBIN1                        Trial

1              THE COURT:  Okay.  (Pause)  Okay, I see this document.

2              MR. FEINGOLD:  Do you have it marked or do you want me

3    to respond?

4              MR. STAVIS:  No.  I believe there is agreement there

5    was non-hearsay, and the problem was the date of October 15th,

6    2009 was within the time-frame of the conspiracy was posing a

7    difficulty for the government, but they can, the government can

8    speak for itself.

9              MR. FEINGOLD:  Yes, your Honor, the date of that

10   document, I think September '09, is approximately I believe two

11   years, maybe a little less than two years after the last John

12   Hancock application submitted by the defendants in this case.

13             So John Hancock's changes in underwriting -- and,

14   frankly, I don't have the document in front of me, but I am not

15   sure it applies to our types of policies.  To the extent it

16   does, it is so far past the time period in which John Hancock

17   was evaluating and deciding whether to issues policy in this

18   case it is irrelevant.

19             THE COURT:  It seems to me that that goes to the

20   weight.  It seems to me that that goes to the weight.

21             MR. FEINGOLD:  I don't have a copy.

22             THE COURT:  Here, you can take my copy.

23             MR. FEINGOLD:  Thank you.  Thanks.

24             I understand it goes to the weight, but I think under

25   403, it could be confusing to a jury.

1          THE COURT:  I don't find it confusing at all.

2          Look, as long as you guys have stipulated it is not

3     hearsay, they aren't forced to subpoena somebody from John

4     Hancock to testify it is a business record of John Hancock, it

5     is going to come in, and you can argue whatever you want to

6     argue from it, about its probative value.

7          I am not going to keep it out.  I hear what you're

8     saying, but it encompasses the period of the conspiracy.  So

9     you can certainly argue to the jury it has nothing to do with

10    the price of tomatoes because John Hancock, one of the alleged

11    victims of the conspiracy, didn't adopt this policy until after

12    Mr. Binday's and Mr. Kergil's and Mr. Resnick's policy

13    activities with respect to them.

14         But I have to tell you, the reason I think that it has

15    some probative value potentially -- I am not the trier of

16    fact -- is that if, having had these policies, having issued

17    these policies and knowing, you know, in general whatever it

18    was that the marketplace knew about these policies, John

19    Hancock decided that it was okay not to do income verification

20    for those kinds of policies.  Look, it is at least suggestive

21    that with some experience with the policies, they conclude this

22    stuff was not material.  I am not prepared to keep it out.  I

23    am not prepared to keep it out.

24         MR. FEINGOLD:  Okay.

25         THE COURT:  You have arguments on both sides about the

D9QJBIN1                        Trial

1    probative value of the document.

2            MR. FEINGOLD:  We are going to incorporate it into a

3    stipulation, your Honor.  We'll hand it up to the court later.

4            THE COURT:  Okay.

5            (Off-the-record discussion)

6            THE COURT:  Go on the record.  Case on trial

7    continued, the parties are present.  The jurors are not

8    present.  The jurors are, of course, back in the jury room

9    except for Juror No. 5, and I am actually worried about her now

10   because we cannot reach her.  The timetable is that Mario

11   DeJesus, my Deputy, got a telephone call at 9:00 o'clock this

12   morning from her saying that she felt unwell, but was going to

13   get in.  She left a message for Jim shortly thereafter saying

14   that she was at Grand Central and didn't know what to do

15   because she felt unwell.

16           She didn't know if she could try to get a cab.  Jim

17   said she sounded like she was really in distress.  We have not

18   been able to raise her on either her cell or her home phone for

19   the last hour.  Now I am actually genuinely worried about her

20   physical condition.

21           But I also assume that she feels bad enough because it

22   doesn't take an hour to get down from Grand Central by any

23   means of conveyance even during the general assembly.  My

24   suspicion is that she has gone home.  We obviously have two

25   choices.  We can suspend for the day.  I think that is a bad

D9QJBIN1                        Trial

 1  choice when we still have five alternates sitting, or we can

 2  replace her with an alternate, and when we find her, we can let

 3  her know she is excused.

 4          MR. ABRAMOWITZ:  May we confer?

 5          THE COURT:  Yes.

 6          MR. ABRAMOWITZ:  We need some time to confer among

 7  ourselves.

 8          THE COURT:  Okay.  It will be very hard to explain

 9  with five alternates if we don't hold court today.

10          MR. ABRAMOWITZ:  I understand.

11          (Off-the-record discussion)

12          MR. STAVIS:  May repair to the room?

13          THE COURT:  You may repair to anywhere you need to

14  repair to.

15          (Recess)

16          THE COURT:  Case on trial continued.  The parties are

17  present.  The jurors are not present.  We have gotten a call

18  back.  She went home.  Apparently she was throwing up all night

19  and her husband was throwing up all night.  I am very glad she

20  is not here.

21          The government?

22          MR. FEINGOLD:  No objection to dismissing her, your

23  Honor.

24          MR. ABRAMOWITZ:  No objection, your Honor.

25          MR. STAVIS:  No objection.  No objection on behalf of

D9QJBIN1                         Trial

1    Mr. Kergil, your Honor.

2              MS. MURRAY:  No objection, your Honor.

3              THE COURT:  Thank you very much.  Her husband called.

4    She is apparently not capable of calling.  That she got to

5    Grand Central again attests to the citizenship.

6              (Jury present)

7              THE COURT:  Ms. Achey, you may as well up and take a

8    seat in the front row, in Seat No. 5.  Good morning, everybody.

9              THE JURY:  Good morning.

10             THE COURT:  Ms. Turney is quite ill.

11             Apparently she has been all night and actually made it

12   as far as Grand Central before she couldn't go any farther.

13   Again it is a testament to what wonderful citizens you all are

14   that she actually tried to get here at all, because Jim has

15   spoken to her husband and she has been incredibly sick for the

16   last twelve hours, but she tried to get here.  She can't, and

17   rather than postpone for the day, the parties have agreed

18   Alternate No. 2 can become Alternate No. 5.  So you're in.

19   That is why we have you guys in the back row, the ready

20   reserve.

21             Okay, what is going to happen next?  We introduced

22   some exhibits while you were out of the room.

23             MS. CHOI:  Before the government calls its next

24   witness, the government offers into evidence Government Exhibit

25   1530, I believe without objection from the defense.

1                THE COURT:  1530?

2                MR. FELSENSTEIN:  No objection, your Honor.

3                THE COURT:  Admitted.

4                (Government Exhibit 1530 received in evidence)

5                MS. CHOI:  The government calls Susan Macauley to the

6       stand, please.

7        SUSAN MACAULEY,

8            called as a witness by the Government,

9            having been duly sworn, testified as follows:

10      DIRECT EXAMINATION

11      BY MS. CHOI:

12      Q.  Good morning, Ms. Macauley.

13      A.  Good morning.

14      Q.  Where do you work?

15      A.  Hooper Holmes.

16      Q.  How long have you worked at Hooper Holmes?

17      A.  Just under 23 years.

18      Q.  What is Hooper Holmes?

19      A.  Hooper Holmes collects medical and other information for

20      insurance companies to help them determine risk.

21      Q.  What is your present title?

22      A.  Vice president of business information services.

23      Q.  How long have you been in that present position?

24      A.  Since about 2009.

25      Q.  Before you held that title, what was your title before that

D9QJBIN1                         Macauley - direct

1   at Hooper Holmes?

2   A.  Vice president of business management.

3   Q.  During what time period did you hold that position?

4   A.  2008 to 2009.

5   Q.  What is Info-Link?

6   A.  Info-Link is one of our divisions, and they do tele-meds,

7   which is a telephone interview, inspections, and then APS,

8   which is actually attending physician statements.

9   Q.  Do you know what an inspection report is?

10  A.  I do.

11  Q.  What is an inspection report?

12  A.  An inspection report is a phone interview to the applicant

13  applying for insurance that goes over their lifestyle, where

14  they live, financials and does have some medical questions

15  also.

16  Q.  Just to clarify, during the period that you were vice

17  president of business management at Hooper Holmes, was

18  Info-Link one of the divisions that you oversaw?

19  A.  It was, yes.

20  Q.  What does an inspection report look like?

21  A.  It's a two-to-four-page document.

22         MS. CHOI:  Ms. Hayakawa, put up what is admitted into

23  evidence as Government Exhibit 1530.

24         May I approach, your Honor?

25         THE COURT:  You may.

D9QJBIN1                        Macauley - direct

1    BY MS. CHOI:

2    Q.  Ms. Macauley, I want to show you a copy of that document.

3           If you just take a look at the first five pages of

4    that document, do you generally recognize what this document

5    is?

6    A.  Yes, this is an inspection report.

7           MS. CHOI:  Ms. Hayakawa, please turn to Page 3 of the

8    document or scroll, why don't we scroll through, yes, Page 2.

9    BY MS. CHOI:

10   Q.  Page 2 and Page 3, Ms. Macauley, and would you look at your

11   monitor, or Page 3 of the document in front of you.  Do you see

12   what it says at the very top there?

13   A.  The financial profile.

14   Q.  Yes.  Do you recognize this sort of format for the

15   inspection report?

16   A.  Yes, absolutely.

17   Q.  Now, do you have an understanding as to why -- do you know

18   who requests inspection reports?

19   A.  They are requested either by the producer or the insurance

20   carrier themselves.

21   Q.  Do you have an understanding as to why the insurance

22   company would want -- by "insurance carrier," do you mean

23   insurance company?

24   A.  I do.

25           MR. FISCHER:  Objection -- sorry.  Withdrawn.

1   BY MS. CHOI:

2   Q.  Do you have an understanding why insurance companies would

3   want inspection reports?

4            MR. FISCHER:  Objection.

5            THE COURT:  Ground?

6            MR. FISCHER:  It calls for speculation.

7            THE COURT:  Why do you do what you do, ma'am?  Why

8   would insurance companies ask you to do what you do?

9            THE WITNESS:  To collect data to determine risk.

10            THE COURT:  Thank you.

11   BY MS. CHOI:

12   Q.  With regard to financials, do you know why insurance

13   companies want to know financial information with regard to

14   risk?

15   A.  Yes.  Not everybody can buy a large policy or a certain

16   value of policy, and so they want to make sure the person

17   either has enough income, assets to qualify for the policy.

18   Q.  Who prepares inspection reports at Hooper Holmes?

19   A.  The title is inspector.

20   Q.  Are Hooper Holmes inspectors employees of Hooper Holmes?

21   A.  Some are and some are independent contractors.

22   Q.  Is the process for preparing an inspection report the same

23   or different for employees versus for independent contractors?

24   A.  It's the same.

25   Q.  Do employees and independent contractor inspectors use the

D9QJBIN1                          Macauley - direct

1   same or different forms for these inspection reports?

2   A.  All the forms are the same.

3   Q.  Do you know if Hooper Holmes prepared and provided

4   inspection reports to insurance companies from 2007 to 2009?

5   A.  We did.

6   Q.  Are you aware of the way in which Hooper Holmes prepared

7   those inspection reports during that time-frame?

8   A.  Yes.

9   Q.  Now, directing your attention specifically to the 2007 and

10  2009 time-frame and Hooper Holmes practices, what did Hooper

11  Holmes inspectors do to prepare an inspection report?

12  A.  First they would call the applicant, go through the list of

13  questions that are found on the form actually in the order that

14  they were given, and then they will -- and again this depends

15  on the type of inspection we're doing because there are

16  different levels of them based on the applicant, what the

17  applicant is applying for and the dollar, face value of the

18  policy and sometimes their age.

19          The more extensive inspections will require validation

20  of the data, internet searches for residence, jobs, going to

21  CPAs, tax accountants and other financial sources such as

22  bankers to verify all the information they collected.

23  Q.  I think you mentioned just now that there were different

24  requirements depending on the age and the face value of the

25  policy that was being applied for?

D9QJBIN1                         Macauley - direct

1    A.  Correct.

2    Q.  Could you explain how those qualifications changed

3    depending upon the age and the face value.

4    A.  Every insurance carrier, company provides us with a list of

5    requirements.  So based on when an inspection is needed, based

6    on the age and amount, then it's determined what level we need

7    to complete.

8    Q.  Would the level, would you say it was more rigorous or less

9    rigorous if the age of the applicant went up?

10   A.  It is more rigorous because the risk becomes greater to the

11   insurance carrier.

12   Q.  What about the face value, was it more rigorous or less

13   rigorous when the face value went with up?

14   A.  More rigorous when the face value increased.

15   Q.  I think you talked about how inspection reports involved a

16   public search for records?

17   A.  Correct.

18   Q.  Was that something that was implemented for reports for

19   high face value and senior individuals?

20   A.  It was in all reports.

21   Q.  In all reports?

22   A.  Yes, we did a search on the internet, yeah.

23   Q.  What kind of information were they looking for in the

24   public records search?

25   A.  Validation of the house, job, just making sure nothing

D9QJBIN1                    Macauley – direct

1    comes back in the negative, really that is another piece of it.

2    Q.   Would they look at the property value of property that an

3    applicant might have?

4    A.   Yes, if they could find it, yes.

5    Q.   As well as equity, meaning if there are any mortgages or

6    encumbrances on the property?

7    A.   If they can find it, yes.

8    Q.   Did you also do other types of checks on an individual?

9    A.   Yes.  Some of them required credit checks, criminal checks,

10   a motor vehicle report, so --

11   Q.   After an inspector collected all that information, would

12   they send all of that information along, would they summarize

13   information?  What would they do with that information?

14   A.   Summarize, called a narrative, and it would be typed up

15   onto the inspection report.

16   Q.   Now, if there was a discrepancy between what the applicant

17   had said on the telephone interview, would the inspector, and

18   what the inspector had found in his or her own research, what

19   would an inspector do?

20   A.   They would continue to search to validate what they were

21   told or just report as their findings, that they could not

22   validate anything.

23   Q.   You spoke a moment ago about independent contractor

24   inspectors and employee inspectors.  How did Hooper Holmes

25   determine whether an individual was qualified to serve as an

D9QJBIN1                        Macauley - direct

1    independent contractor inspector?

2    A.  For independence, an independent contractor, they needed

3    prior experience that was verifiable.

4    Q.  You said you took over the position of overseeing Info-Link

5    in 2008?

6    A.  Yes.

7    Q.  After you took over, what changes, if any, did you

8    implement with regard to the requirements of an independent

9    contractor when that individual was preparing an inspection

10   report?

11   A.  Our employees, all of the calls were recorded, and on the

12   independent contractors, because they work from their home,

13   they're not part of being in the office, we did not have

14   recordings on inspections.  I found the need for it as

15   insurance companies periodically would ask, so I implemented

16   recording around October of 2008.

17   Q.  Sorry.  Did you say --

18   A.  I implemented recording.  They had to record every

19   interview they did on an inspection.  It was the independent

20   contractors back in 2008.

21   Q.  2008?

22   A.  Right.

23   Q.  I am having a little difficulty hearing you.

24          How much were independent contractors paid for their

25   work?

1    A.  It was all based on a percentage of what we were billing

2    out to the insurance carrier, and they ran anywhere from

3    roughly 40 to 50 percent of the billable amount.  So it all

4    varied.

5    Q.  So the billable amount, could you give us a range?  Was it,

6    you know, 10 to $50 that would go to an independent contractor?

7    A.  Probably more like 20 to $50.

8    Q.  Do you know who Fred Pellicone is?

9    A.  I am familiar with the name.

10   Q.  Have you ever met him?

11   A.  I have not.

12   Q.  How are you familiar with his name?

13   A.  He was an independent contractor for us doing inspections.

14   Q.  Do you know if he was previously an employee of Hooper

15   Holmes?

16   A.  He was back in the 70's for a while.

17   Q.  Do you know what EMSI is?

18   A.  I do.  It is Examination Management Services, Incorporated.

19   It is one of our competitors.

20              MS. CHOI:  One moment, your Honor.

21              (Off-the-record discussion)

22              MS. CHOI:  No further questions.

23              THE COURT:  A new voice heard from.

24   CROSS-EXAMINATION

25   BY MR. FELSENSTEIN:

1    Q.  Good morning, Ms. Macauley.

2    A.  Good morning.

3    Q.  My name is Adam Felsenstein.

4           You testified on direct just now you headed Info-Link

5    in 2008?

6    A.  Yes.

7    Q.  And again in 2009?

8    A.  Yes.

9    Q.  Info-Link prepared inspection reports?

10   A.  Yes.

11   Q.  And they were prepared so insurance companies could verify

12   information on an application?

13   A.  Yes -- well, the data we provided to them was used to

14   determine risk.  Whether they collected it or it is new, I

15   can't answer that.

16   Q.  They were cross-checking that data against data on the

17   application?

18           MS. CHOI:  Objection.

19           THE COURT:  I am sorry.  Ground?

20           MS. CHOI:  Foundation.  She has no knowledge.

21           THE COURT:  Go ahead and answer the question.  Do you

22   know the answer to the question?

23           THE WITNESS:  I don't know exactly what the insurance

24   companies used it for.

25           THE COURT:  Fine.

1          THE WITNESS:  If they collected everything that we did

2     and they're just verifying --

3          THE COURT:  You don't know what the insurance

4     companies did?

5          THE WITNESS:  Correct.

6          THE COURT:  Is that correct?

7          THE WITNESS:  Yes.

8          THE COURT:  Fine.  We don't want her to speculate.

9     BY MR. FELSENSTEIN:

10    Q.  Can we agree Info-Link provided insurance reports, reports

11    to insurance companies?

12    A.  Yes.

13    Q.  And it was important that the data on those reports was

14    accurate?

15    A.  Yes.

16         MR. FELSENSTEIN:  Ms. Hayakawa, can I impose on you to

17    bring up Government Exhibit 1530.  If you can turn to the

18    second page of that exhibit.

19    BY MR. FELSENSTEIN:

20    Q.  These inspection reports that Info-Link produced, they had

21    an entire page devoted to health profile.  Is that correct?

22    A.  Correct -- well, yeah, they did have health information on

23    it.

24    Q.  That profile page collected health information?

25    A.  Yes.

D9QJBIN1                          Macauley - cross

1    Q.  You testified on direct that Info-Link asked dozens of

2    medical questions.  Is that correct?

3    A.  Yes, I did say that.

4          MR. FELSENSTEIN:  Ms. Hayakawa, could you please blow

5    up the part that starts with, "Amplify all."  It is between the

6    two big boxes.

7    BY MR. FELSENSTEIN:

8    Q.  Now, Info-Link would ask questions such as what the name of

9    the subject's doctor was.  Is that correct?

10   A.  Correct.

11   Q.  And the last time they visited that doctor?

12   A.  Correct.

13   Q.  And the tests that were performed at that visit?

14   A.  Correct.  This form is asking these questions, yes.

15   Q.  And the inspector would call the applicant and ask these

16   questions to fill out the form?

17   A.  Correct.

18   Q.  In big capital letters on that form it says, "Amplify all

19   yes answers.  Give dates, complete names and addresses of all

20   doctors and hospitals."

21          Isn't that correct?

22   A.  Yes, it says that.

23   Q.  Now, Info-Link prepares reports at the request of insurance

24   companies, right?

25   A.  Yes.

1    Q.  It also prepares them at the request of an agent?

2    A.  Yes.

3    Q.  Or the request of a broker?

4    A.  Yes.

5    Q.  There is nothing unusual about an agent contacting

6    Info-Link for a report?

7    A.  Correct.

8    Q.  There is nothing unusual about a broker contacting

9    Info-Link for a report?

10   A.  Correct.

11   Q.  Info-Link reports were prepared by inspectors, you said?

12   A.  Yes.

13   Q.  Some of these inspectors work internally for Info-Link?

14   A.  "Internally," meaning?

15   Q.  Within Info-Link offices?

16   A.  Correct, the employees do.

17   Q.  The employees?  And the employees are paid a salary by

18   Info-Link?

19   A.  Hourly rate or salary, yes.

20   Q.  And other reports are prepared by independent contractors?

21   A.  Yes.

22   Q.  And these independent contractors don't work internally for

23   Info-Link?

24   A.  They do not.  They're independent contractors.  They do not

25   work in the office.

1   Q.  They work outside of the office?

2   A.  Correct.

3   Q.  And they don't receive a salary?

4   A.  Correct.

5   Q.  They're paid a percentage of the fee that is collected for

6   a report?

7   A.  Correct.

8   Q.  And they only receive that fee if the policy is issued.  Is

9   that correct?

10  A.  Yes -- well, they need to get a policy number before we

11  will accept their billing.  So each case came in with a policy

12  number and then we would pay them for that service.

13  Q.  Now, these independent contractors are contacted directly

14  by the broker.  Is that correct?

15  A.  The broker or agent, yes.

16  Q.  And the broker doesn't contact Info-Link first.  Isn't that

17  right?

18  A.  Correct.

19  Q.  The contractor would only contact Info-Link after he was

20  already engaged by a broker?

21  A.  He would contact us once it was completed and he had that

22  policy number so that he could bill it, and that was the first

23  time Info-Link would see it.

24  Q.  When that independent contractor completed their report,

25  they would send it directly to the insurance carrier.  Isn't

1   that correct?

2   A.  Correct.

3   Q.  Only some of these reports were reviewed by Info-Link.  Is

4   that right?

5   A.  We receive the report for billing.  We received every

6   report for billing.

7   Q.  You would only review it for accuracy on some cases.  Is

8   that right?

9   A.  We would not review each one of them, correct.

10  Q.  They weren't reviewed for correctness, not all of them?

11  A.  Well, there is nothing to compare it to so we could not,

12  you know, conduct a QA on it since again going back to what I

13  said earlier about the recordings that gave us the option to

14  implement the QA.

15  Q.  But despite the lack of, as you call, QA -- that is quality

16  assurance?

17  A.  Correct.

18  Q.  Only some of the reports were looked at for quality

19  assurance.  Is that right?

20  A.  Yes.

21  Q.  But all reports were on Info-Link forms.  Is that right?

22  A.  That would be the only ones we would accept, correct.

23  Q.  And that form has the Info-Link logo on the top corner of

24  it?

25  A.  Yes.

D9QJBIN1                        Macauley - cross

1   Q.   Info-Link inspectors perform interviews with the applicant.

2   Is that right?

3   A.   Yes.

4   Q.   They interview other sources as well?

5   A.   Yes, as I mentioned, for references.

6   Q.   They interview doctors, for example?

7   A.   Not to my knowledge.

8   Q.   You take attending physician statements.  Is that right?

9   A.   Yes, but that is just a copy of an applicant's medical

10  records.

11  Q.   The interviews that Info-Link employees do are recorded.

12  Is that right?

13  A.   Correct.

14  Q.   And you can listen for quality assurance purposes.  Is that

15  right?

16  A.   Yes.

17  Q.   Prior to 2008, Info-Link independent contractor interviews

18  were not recorded.

19  A.   Correct.

20  Q.   So there was no way of checking the accuracy of the data.

21  Is that right?

22  A.   That is what I said, yes.

23  Q.   Again all that data was reported on Info-Link forms, right?

24  A.   Yes.

25  Q.   And with the Info-Link logo right on it?

D9QJBIN1                        Macauley – cross

1    A.  Yes.

2    Q.  These reports were sent to insurance carriers?

3    A.  The inspector sent them to the insurance carrier.

4    Q.  Now, these insurance carriers that dealt with Info-Link,

5    they had to approve Info-Link.  Is that right?

6    A.  Exactly.

7    Q.  So there was a process by which they vetted Info-Link?

8    A.  Yes, there are contracts.

9    Q.  And they relied on Info-Link's reports.  Is that right?

10   A.  I assume so, yes.

11             MR. FELSENSTEIN:  Just a moment, your Honor.

12             (Off-the-record discussion)

13             MR. FELSENSTEIN:  I have nothing further, your Honor.

14             THE COURT:  Anything else?

15             MR. FISCHER:  I do, your Honor.

16             THE COURT:  Okay.

17   CROSS-EXAMINATION

18   BY MR. FISCHER:

19   Q.  Good morning, Ms. Macauley.

20   A.  Good morning.

21   Q.  It is true, is it not, that there was no established review

22   of the independent -- withdrawn.

23             Is true, is it not, that there was no independent

24   review -- withdrawn.

25             Is it is true, is it not, Ms. Macauley, there was no

D9QJBIN1                        Macauley - cross

1   established review of the independent inspectors, their reports

2   at Info-Link, isn't it?

3   A.   Not until we implemented the recording, and then we were

4   requesting them to send two recordings a month.

5   Q.   That was in late 2008, correct?

6   A.   Around October-ish, yes.

7   Q.   Do you recall telling the government that was in late 2008?

8   A.   Correct, October.

9   Q.   But prior to that, there was no established review of the

10  independent inspectors or reports, or their reports, correct?

11  A.   Correct.

12  Q.   And Frank Pellicone was an inspector, correct?

13  A.   He was.

14  Q.   Correct.  You testified on your direct examination about

15  some information that would be collected in connection with

16  some inspection reports, correct?  Do you recall that?

17  A.   Do you mean the verification?

18  Q.   Correct.

19  A.   Yes.

20  Q.   You said that every insurance company has a list of

21  requirements, correct?

22  A.   They provide Info-Link with a list of requirements.

23  Q.   So the information that would be collected would be driven

24  by what the insurance company was looking for, correct?

25  A.   Correct.

D9QJBIN1                         Macauley - cross

1   Q.  You said that some insurance companies for certain face

2   amount policies would request you do a public records search,

3   correct?

4   A.  Yeah.  I do believe we did public record searches on

5   everyone.  That was just standard practice to make sure that

6   their address matched, the simple -- a simple Google search is

7   what we were looking for.  Other searches got more extensive

8   when the policy amounts went up and the inspection became a

9   more extensive inspection.

10  Q.  That was a public record search to make sure their address

11  matched, correct?

12  A.  Well, and anything, the value and all of that as they got

13  to be more extensive inspections.

14  Q.  It is not your testimony here today that a valuation or

15  appraisal was done in connection with every inspection report,

16  is it?

17  A.  No, it is not.

18  Q.  In fact, the appraisal had to be done in connection with

19  whether the insurance company wanted that done.  Isn't that

20  right?

21  A.  I am not aware of any appraisals ever done for a life

22  insurance policy.

23          MR. FISCHER:  Just a moment, your Honor.

24          THE COURT:  Sure.

25          (Off-the-record discussion)

D9QJBIN1                          Macauley - cross

1    BY MR. FISCHER:

2    Q.  It is true, Ms. Macauley, is it not, that as you said, some

3    of the insurance companies -- withdrawn.

4            It is true, is it not, the requirements of what were

5    needed in connection with inspection reports for confirmation

6    were driven by insurance companies, correct?

7    A.  Correct.

8    Q.  Correct?

9            So if an insurance company said it needed certain

10   confirmation for various insurance policies, your company would

11   follow that directive, correct?

12   A.  Correct, and --

13   Q.  If an insurance company didn't need additional information,

14   you wouldn't go seeking it out, additional verification

15   information, correct?

16   A.  I want to clarify one thing.  They didn't list off --

17   Q.  Can I get a yes or no answer to that question?

18           THE COURT:  Just say yes or no.

19           THE WITNESS:  Would you ask the question again,

20   please.

21           MR. FISCHER:  Would the Court Reporter please read the

22   pending question.

23           THE COURT:  Yes.

24           (Record read)

25           THE WITNESS:  Correct.

D9QJBIN1                      Macauley - cross

1          MR. FISCHER:  Nothing further.

2          THE COURT:  Ms. Murray.

3   CROSS-EXAMINATION

4   BY MS. MURRAY:

5   Q.  Just to clarify, Ms. Macauley, was Info-Link paid by the

6   insurance company?

7   A.  Yes.

8   Q.  Is it true that Info-Link was only paid on a particular

9   inspection report if a policy was issued?

10  A.  That is not correct.  We required policy numbers on

11  independents before we would bill it.  It was just our practice

12  because the agent called that independent directly.

13  Q.  So, in other words, the policy would have to be issued to

14  pay an independent contractor.  Is that right?

15  A.  I can't say that a policy number assigned to a case means

16  it is issued.  It is a reference number the carrier, an

17  insurance company, provided to the inspector or the agent who

18  gave it to the inspector.

19         Internally, we did a lot of inspections.  We have no

20  idea -- we did not require policy numbers, so we turned them

21  into the insurance company and whether that policy was issued

22  or not I could not answer that.

23         MS. MURRAY:  No further questions.

24         THE COURT:  Ms. Choi.

25  REDIRECT EXAMINATION

D9QJBIN1                         Macauley - redirect

1    BY MS. CHOI:

2    Q.  Just briefly, you heard a lot of questions from defense

3    counsel about Info-Link not verifying its independent

4    contractors' work.

5            Did you, as head of Info-Link, inspect your employees

6    and your independent contractor inspectors to fill out

7    inspection reports accurately and truthfully?

8    A.  Absolutely.

9            MS. CHOI:  No further questions.

10           THE COURT:  Ma'am, thank you very much.

11           (Witness excused)

12           (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

D9QLBIN2

1          THE COURT:  Call your next witness.

2          MS. McCALLUM:  Your Honor, at this time we'd like to

3     call special agent Ryan Adams to read some emails.

4          THE COURT:  Come back, agent.

5          MS. McCALLUM:  And may I have permission to hand out

6     the emails to the jury?

7          THE COURT:  By the way, I should tell you, ladies and

8     gentlemen, all FBI agents are special.  That's why they're

9     called special agent.  It's not --

10          THE WITNESS:  Thank you, your Honor.

11          THE COURT:  That's just their type.  I don't know why.

12     I don't think the FBI has a regular agent.

13          MS. McCALLUM:  Ms. Hayakawa, if we can try to have

14     these up on the screen, as well, as we go along, that would be

15     helpful.

16      RYAN G. ADAMS, resumed.

17          called as a witness by the Government,

18          having previously been duly sworn, testified as follows:

19     DIRECT EXAMINATION (cont'd)

20     BY MS. McCALLUM:

21     Q.  The first email is Government Exhibit 144.  This is an

22     email dated March 23, 2007, at 10:57 p.m., from Michael Binday

23     to Ed Lynch, subject Florra Adler.

24     A.  Hi Ed.  Quick update on Florra.  U.S. Life:  Declined.

25          Phoenix:  We have a funder for a two-year program.

D9QLBIN2                         Adams - direct

1              Prudential:  We are still looking for a funder.

2              Union Central:  We have a table two offer.  Uncertain

3    whether this will land anywhere but we are trying.

4              Regards, Michael Binday.

5    Q.  The next email is Government Exhibit 151.  This is an email

6    dated July 18, 2007, at 5:43 p.m., from Michael Binday to Ann

7    B. Luke, subject, life cases review with Katherine.

8    A.  Ann, we need to discuss the cases that Katherine brought to

9    me.  My understanding was that applications are proofread in

10   advance.  Yet these came back very sloppy.  I am disappointed

11   and would like to figure out how this can be improved.  Note

12   that I don't mind picking up small issues.

13             For example, two Melnick cases were left for me to

14   sign as an agent.  Our spreadsheets clearly indicate that Glenn

15   and Denise are the agents.  This should not slip through, as it

16   is very easy to check our spreadsheet and verify.

17             Florra Adler, this must be fixed ASAP as the deadline

18   to submit Phoenix is Friday.  Ed Lynch is supposed today be the

19   agent on Phoenix.  He did not sign anywhere.  Is he appointed?

20   Michael Binday is supposed to be the agent on Prudential.  Yet

21   Ed signed in most places on the Pru application.  What's going

22   on?  Who is the agent on each policy?  I prefer to be the agent

23   on Prudential.

24             Illustrations:  I don't see submission applications on

25   either policy.  Phoenix app must be prepared by BISYS.  I can

D9QLBIN2                         Adams - direct

1    put together Prudential.  We cannot fill out the applications

2    without final illustrations.

3          Katherine has more cases to review.  We had to stop as

4    there was too much to go over.  Michael Binday.

5    Q.  The next document or series of emails is Government

6    Exhibit 154, and let's begin with the email that starts at the

7    bottom of the first page dated December 6, 2007, at 4:32 p.m.,

8    to Katherine Odom, subject, re Florra Adler Pru policy number.

9    A.  Hi Katherine.  Good news.  The underwriter has advised the

10   following.  As requested, we have reviewed this case again in

11   view of the quick quote offer that had been made on this client

12   prior to submission of an application.

13          Based on our review, we have determined that we will

14   honor our offer of nonsmoker plus that was made even though the

15   appropriate rating for client's history of cerebrovascular

16   disease and the results of her brain MRI would normally require

17   table C rates.  Currently, we await additional financial

18   information to justify the need for $4 million coverage on this

19   individual.  Keith.

20   Q.  We'll go to the email above that on the first page from

21   Michael Binday to EdLTC@optonline.net and Kevin Kergil, CC

22   Katherine Odom, Friday, December 7, 2007, at 1:18 p.m.,

23   subject, Florra Adler Pru policy number.

24   A.  Ed:  Very good news.  Florra Adler was just medically

25   approved.  This required an exception worth four tables...that

D9QLBIN2                    Adams - direct

was huge.  They require third party financials in order to
issue as requested.  Can you work on this with Kevin?

We do not have a copy of the financial worksheet.  We
have her net worth listed at 4.5 million and her income as
250,000.  We expect the policy to be issued shortly after this
requirement is satisfied.

Regards, Michael Binday.

Q.  And the email above that now from Kevin Kergil to Michael
Binday, December 11, 2007, at 1:20 p.m., subject, re Florra
Adler Pru policy number.

A.  Hi Michael.  After talking with Ed there could be an issue
with the kids as beneficiary.  It has come to light recently in
conversations with Ed and Flo that her relationship with the
son/daughter is not good.  She does not speak highly of them.
As an example, the kids don't come and visit and she has a hard
time trying to see the grandkids.  Ed has not spoken to the
kids nor has Flo.  This is not our typical family situation and
I'd venture to say it could blow up very easily.  To what
extent, I do not know.

The positive is Flo needs the money.  If you recall,
we had the earlier issue with her Merrill Lynch financial
adviser whom I believe you spoke with.  What option would you
suggest?  You want to chat if needed with kids?  If we try to
place with kids involved and a problem arises, we can switch to
Delaware.

D9QLBIN2                          Adams - direct

1          Thank you, Kevin.

2     Q.  And the email above that from Michael Binday to Kevin

3     Kergil, December 11, 2007, at 3:44 p.m., CC Ed Lynch, subject,

4     Florra Adler Pru policy number.

5     A.  Hi Kevin and Ed:  Alison Martz is the trust beneficiary.

6     The policy with Prudential is approved.  Will her daughter sign

7     off?  To change the trust at this point would be somewhat of a

8     challenge.  In fact, it could kill the deal.

9          Michael Binday.

10    Q.  Let's turn now to Government Exhibit 156 and we'll start

11    with the email at the bottom from Kevin Kergil to Michael

12    Binday, December 13, 2007, at 12:44 a.m., subject, Florra Adler

13    worksheet.

14    A.  Michael, could you give me the financial numbers on

15    Prudential application.  Thanks, Kevin.

16    Q.  And above that an email from Michael Binday to Kevin

17    Kergil, Thursday, December 13, 2007, at 12:03 p.m., subject, re

18    Florra Adler worksheet.

19    A.  Here are pages from application.

20    Q.  Let's turn to the next page, the attachment.

21         MS. McCALLUM:  And, Ms. Hayakawa, if you could just

22    blow up the bottom box, supplementary information.

23    Q.  Let's go now to Government Exhibit 117, an email dated

24    December 28, 2007, at 10:57 a.m., from Michael Binday to

25    Keith.charity@Prudential.com, CC Katherine Odom, subject,

D9QLBIN2                        Adams - direct

1    Florra Adler Prudential life application.

2    A.   Dear Keith:  In regard to premiums, the client indicated

3    that she has discussed this with her financial advisers and

4    children.  They are comfortable with this purchase.

5             Best regards, Michael Binday.

6    Q.   Go to Government Exhibit 119 now, beginning with the email

7    that starts at the bottom of the second page of the exhibit

8    from Katherine Odom to Keith.charity@Prudential.com, Tuesday,

9    January 8, 2008, at 10:18 a.m., subject, Florra Adler Pru.

10   A.   Good morning, Keith.  I just wanted to find out the current

11   status on Florra Adler-Pru.  Thank you, Katherine Odom.

12   Q.   And let's go to the email above that now which begins at

13   the bottom of the first page of the exhibit.  It's an email

14   from Keith.charity@Prudential.com to Katherine Odom, Tuesday,

15   January 8, 2008, at 10:22 a.m., subject, re Florra Adler Pru.

16   A.   Hi, Katherine.  The following was posted today.  The

17   response from Michael Binday of 12/28 indicating client's

18   financial adviser and children are comfortable with purchase

19   and premiums needed does not address these questions.  Please

20   provide full details to the following questions:

21            How did the sale come about?  How did you get the

22   insured to agree to spend 65 percent of her income on

23   insurance?  Do you feel that you can project her estate growth

24   at 7 percent going forward considering that $157,000 annually

25   will be going toward insurance premiums?  Where will the funds

1    to pay the premium come from?

2              Please advise, Keith.

3    Q.  And above that the first email on the exhibit, an email

4    from Michael Binday to Keith.charity@Prudential.com, CC

5    Katherine Odom, subject, Florra Adler.  This is January 8,

6    2008, at 12:34 p.m.

7    A.  Dear Keith:  Katherine asked me to respond to you again.  I

8    thought the note from 12/28 would be sufficient.  Please get

9    this policy issued.

10             In answer to your questions:  Sale came about through

11   a referral from a financial confidant.  Premiums are not

12   actually anticipated at 65 percent of her income.  A number of

13   scenarios were run.  Most likely is paying to keep policy to

14   age 90.  This is attached for your review.  Premium is

15   $111,000.  As UL is flexible, the more conservative

16   illustration was submitted going to age 100.  Client may change

17   her premium at any time.  Possibly she should have sent an

18   illustration going to 90 instead of to 100.

19             There is an open question whether she will pay

20   premiums.  For example, her children have the option to pay

21   premiums.  I am not privy to this entire conversation.  I have

22   been told verbally that she will likely pay premiums herself;

23   children or other trust assets could be used to pay premiums in

24   whole or in part.

25             By paying a lower premium initially, they anticipate

D9QLBIN2                          Adams - direct

1    the estate will continue to grow.

2              This should sufficiently answer all questions.  Please

3    confirm and please get this case issued.

4              Best regards, Michael Binday.

5    Q.  Let's go to Government Exhibit 134 now, beginning with the

6    email that starts at the bottom of the first page from

7    Gloria.Flattum@Prudential.com to Katherine Odom, CC

8    Kathleen.Darso@Prudential.com.  This is dated January 10, 2008,

9    at 1:20 p.m.  Subject, Adler, and then a policy number.

10   A.   Katherine.  Per our conversation, we would like to have

11   help verifying some of the financial information for the above

12   case.  We would like to reach out to the CPA who provided the

13   income and personal balance sheet to assist us in verifying the

14   proposed insured's income and assets.  His phone number was

15   listed on the information he sent us so we can just give him a

16   call.  Depending on the documents provided by the CPA, we may

17   need to ask for:

18             1.  A copy of her account statements from her IRA and

19   stocks and bonds.

20             2.  Copy of her 1040 tax forms for 2006.

21             And, 3, real estate tax appraisal value of her

22   residence for 2006.

23             I would be happy to speak with Michael regarding this

24   case since you indicated that he would be most instrumental in

25   helping us out.

D9QLBIN2                         Adams - direct

1          Thank you, Gloria.

2   Q.  And let's go to the email on the first page now from

3   Michael Binday to Lily.Levith@Prudential.com, CC

4   Keith.Charity@Prudential.com and Katherine Odom.  This is

5   January 10, 2008, at 10:13 p.m., subject, Florra Adler, and

6   then a policy number.

7   A.  Lily, the following was just sent to Katherine on my staff.

8   We are very upset.  In fact, we are ready to pull this case

9   from Prudential and move it elsewhere.  If we go back to this

10  client with empty hands, she will fire us and we will lose a

11  valuable referral source.

12          This application was sent on August 30, 2007, over

13  four months ago.  Supposedly this case was approved a month or

14  two ago.  Yet, the policy never arrived.

15          Suddenly we are receiving a multitude of inquiries on

16  her financial situation.  I answered Keith on one question at

17  the end of December.  I am somewhat perturbed at that time as

18  we expected the policy and did not understand the questions

19  much less why I had to deal with them when I was about to leave

20  for vacation.

21          Instead of an approval, we got more questions.  We

22  provided a detailed answer just emailed to you.

23          Now we get back the note below.  I am completely

24  offended by this situation and the way it is being handled.

25  She lives in Scarsdale where the average home price is

D9QLBIN2                         Adams - direct

$2 million.  She has a residence that she says is worth

1 million, modest for the area.  And they are asking for an

appraisal of her home?  My reaction is not suitable for a

lady's ears.

        Please rely on following -- please relay the

following.  Approve the policy as applied for.

        2.  If not comfortable with financials, give us

something to present the client.  If Prudential will not

approve $4 million, suggest $3.5 million or some different

amount.  That gives us something to bring to the client.

        3.  Withdraw the application.

        This policy was submitted on August 30, 2007.

Prudential had four months to ask these questions.  The fishing

expedition referred to below would take another month.  This is

completely unacceptable.  We cannot present the underwriter's

request to the client.  If we did so at this time, she would

fire us.

        Regards, Michael Binday.

Q.  Go now to Government Exhibit 136, starting with the email

that begins near the top of the first page from Michael Binday

to Kevin Kergil, January 11, 2008, at 1:41 p.m., subject,

Florra Adler.

A.  Prudential underwriting wants to call Steve Kupper.  He is

the accountant that verified Florra Adler's net worth and

income.  They are particularly concerned with her ability to

D9QLBIN2                        Adams - direct

1    spend so much of her income on insurance.

2            Their questions may include: Relationship.  We assume

3    he was referred by her financial adviser.  They may ask how

4    long they have worked together or the work he has done for her.

5    This is probably confidential and he does not need to provide.

6            Premium questions.  They are concerned about her

7    spending more than 50 percent of her income on life insurance.

8    We sent the attached illustration to show her only paying

9    111,000 per year to age 90.  This is 46 percent of her income.

10   It would help if he stated she -- she should only pay for

11   insurance until age 90 and take the chance of living beyond

12   this.

13           Children paying:  It would help if he conveyed that

14   they children may pay a substantial portion of the insurance

15   premiums.

16           They did not ask, but it would likely help if she --

17   if he states:  Lifetime exemption.  He understands that she has

18   used a substantial portion of her lifetime exemption for taxes.

19   They currently feel that $2 million would be an appropriate

20   amount of coverage.  If she used her exemption, that justifies

21   a higher amount of insurance.

22           Anxiety on finances.  She stated to her doctor that

23   she has anxiety on finances.  It may help to confirm that she

24   wants to make sure that her children are taken care of and that

25   her children are offering to pay for some of the life insurance

D9QLBIN2                        Adams - direct

1    greatly eased her anxiety.

2          Income questions:  155,000 income.  Clarify that this

3    income from both her IRA and her stocks and bonds.  It reflects

4    a 6.45 percent rate of return on her $2.4 million of assets.

5    This may not all be realized depending on amount she elects to

6    withdraw from her IRA in any year.

7          $65,000 pension.  They question where this comes from

8    and whether this is separate from her IRA.  We need to clarify

9    what her prior job was.  Does she receive a pension as a

10   retired teacher?  Or some other profession?  Or from her

11   husband's prior employer?

12         Asset questions.  Future value of pension.  They

13   noticed this is unusual.  This represent funds that she expects

14   to leave to her children.  If she died prematurely, the pension

15   income would be lost.  Therefore, it is considered as part of

16   her overall net worth.

17         Value of home:  How did she come up with $1 million

18   value of home?  As it is -- as it is a home or condo?

19   Assumption is that information came from Ms. Adler.  If she

20   felt the comparable homes sold for 700 to 1.25 million, it

21   would be reasonable for her to guess $1 million as the value.

22   It is certainly worth $750,000 minimum but could also be worth

23   more than $1 million.  1 million is nothing for Scarsdale.

24         Can you discuss this with either Steve or Ed?  Let me

25   know how you wish to proceed.  Michael Binday.

D9QLBIN2                      Adams - direct

1    Q.  Let's go near the top of the first page of that exhibit,

2    the email from Kevin Kergil to Michael Binday, Monday,

3    January 14, 2008, at 3:57 p.m., subject, re Florra Adler.

4    A.  Hello, Michael.  You can ask the underwriter to call Steve

5    Kupper or he can call underwriter.  It does not matter.

6    Thanks, Kevin.

7    Q.  And above that, from Michael Binday to Kevin Kergil,

8    January 14, 2008, at 5:26 p.m., subject, re Florra Adler.

9    A.  Please provide me with contact info for Steve Kupper.

10   Q.  Let's go to Government Exhibit 135 now, an email from

11   Michael Binday to Lily.Levith@Prudential.com and

12   Keith.Charity@Prudential.com, CC Katherine Odom, January 14,

13   2008, at 8:51 p.m., subject, Florra Adler policy number.

14   A.  Dear Lily.  The situation was discussed with the CPA.  He

15   is willing to speak with someone from Prudential.  He will

16   balance confidentiality with an attempt to answer your

17   questions.  His contact info is:  Steven S. Kupper tax CPA CFP.

18              8896 Mustang Island Circle.

19              Naples, Florida 34113.

20              Home office (866)377-1040.

21   Q.  You can jump to the text under that now.

22   A.  We are under impression that her children may pay a large

23   amount of the premiums and that she may have used up a large

24   part of her lifetime exemption.  We trust that you can discuss

25   Scarsdale real estate values with the underwriter.  I don't

D9QLBIN2                        Adams - direct

1    know if she is in a house or a condo.  But the new condo going

2    up in the village will have a $1 million plus units.  Hopefully

3    you can explain that Scarsdale is a uniquely affluent community

4    with a real estate entry point around $1 million.

5              Thank you, Michael Binday.

6    Q.  Let's go to Government Exhibit 158 now, beginning on the

7    email that starts on the third page in, which is an email

8    forwarded by Lily Levith, and it's an email I believe to Gloria

9    Flattum at Prudential -- sorry -- from Gloria Flattum at

10   Prudential to Lily Levith, and the text of the email begins on

11   the next page.

12   A.  Lily, I will put this information out on the system.  If

13   you can share this with Michael, that would be helpful.  Thank

14   you, Gloria.

15             We spoke with the CPA Mr. Kupper.  Unfortunately, the

16   CPA was not able to verify any of her assets as he did not

17   review any financial documents.  To consider further, we will

18   need the following financial documents:

19             1.  A copy of her account statements from her IRA and

20   her stocks and bonds.

21             2.  Copy of her 1040 tax returns for 2006.

22             3.  Copy of her real estate appraisal for her

23   residence for 2006.

24             Also, the CPA had mentioned the children may pay some

25   of the premium for tax advantaged purposes and she may use up

D9QLBIN2                          Adams - direct

1   some of her credit.  Please provide a cover letter addressing

2   the estate strategy and how the insurance fits into the overall

3   plan.  At this point it appears that if we can verify her

4   assets, we would be looking at a reduced amount of coverage.

5           Thank you, Gloria.

6   Q.  And then we can go to the third page.  It's an email from

7   Lily.Levith@Prudential.com to Michael Binday, Tuesday,

8   January 15, 2008, 4:22 p.m., subject, forward, policy number

9   Adler.

10  A.  Michael, please see Gloria's note below.  Give me a call on

11  my cell (617)216-6911 to discuss.  Lily.

12  Q.  And let's go to the second page now, an email from Michael

13  Binday to Lily Levith, January 15, 2008, at 6:45 p.m., CC

14  Katherine Odom, subject, re policy number Adler.

15  A.  Hi Lily:  I do not want to go back to the client with empty

16  hands.  Please see what Gloria is willing to approve, whether

17  $2 million, $3 million, etc.  Prior correspondence indicated

18  that you could go at $2 million.  That sounds as though the

19  accountant call did not help.  Please see what you can do.

20          We will add the little bit we can to the conversation.

21  We will not ask her to go get her home appraised.  That is a

22  very aggressive request and it is outside both my style and my

23  comfort level.  She is a private lady and making such requests

24  will lose the business.

25          Premiums:  Her family is interested in protection

D9QLBIN2                          Adams - direct

1    until age 90, not to age 100.  This reduces the cost.  They

2    children plan to pay for a substantial portion of the premiums.

3    Ms. Adler has anxiety about financials.  The children's

4    willingness to participate as necessary was important to her.

5           Amount of insurance:  We can convince her to accept a

6    letter amount of insurance.  She has used a substantial portion

7    of her lifetime exemption.  Because of this they want at least

8    $3 million but will consider $2 million if that is all

9    Prudential will offer.

10          Home:  You know enough about Scarsdale values.

11          Thank you, Michael Binday.

12   Q.  Let's go to the email that begins on the first page of the

13   exhibit from Lily.Levith@Prudential.com to Michael Binday,

14   Tuesday, January 15, 2008, at 7:44 p.m., subject, re policy

15   number Adler.

16   A.  Michael, Gloria asked him how he came up with the numbers.

17   He said the ins -- sorry -- the insurance agent provided

18   everything.  He stated he did not know the insured.  These are

19   red flags.  I don't think she'll approve any amount without

20   documentation.  Lily Levith.

21   Q.  And then above that on the first page, the email from

22   Michael Binday to Lily.Levith@Prudential.com, Tuesday,

23   January 15, 2008, at 9:59 p.m., subject, re policy number

24   Adler.

25   A.  Lily:  Can you verify whether she will approve coverage?

D9QLBIN2                      Adams - direct

1    Our referral source is her financial adviser.  He is also an

2    insurance guy.  I am sure that he did -- I am sure he did

3    provide the accountant with figures...after all, who else would

4    give him numbers?  Who else would even know the numbers?

5            Ms. Adler speaks through her adviser.  I don't

6    typically speak to her.  I'm sure the accountant does not

7    usually speak to her either.

8            The only thing this confirms is that we should have

9    trusted instincts and never allowed the underwriter to speak to

10   him.  I am quite distressed by this turn of events.  Michael.

11   Q.  And then the email above that from Michael Binday to Kevin

12   Kergil, Tuesday, January 15, 2008, at 9:59 p.m., subject,

13   forward policy number Adler.

14   A.  FYI:  This was my response.  Again, please kill Kupper.

15   Q.  Let's go to Government Exhibit 159 now, the email at the

16   bottom from Michael Binday to Kevin Kergil, subject, Pru Florra

17   Adler, Monday, January 28, 2008, at 12:01 p.m.

18   A.  Hi, Kevin.  Ed called.  A Prudential investigator showed up

19   at Florra Adler's home.  She will not speak with him.  It is

20   alarming that they showed up unannounced.  You may want to let

21   Steve Kupper know about this.  If anyone else from Pru calls,

22   he should not speak with them.  Michael Binday.

23   Q.  And above that the email from Kevin Kergil to Michael

24   Binday, Monday, January 28, 2008, at 12:37 p.m., subject, re

25   Pru Florra Adler.

1    A.   Thanks.  I made the call.

2    Q.   Government Exhibit 121, beginning with the email that

3    starts on the second page of the exhibit from Michael Binday to

4    Lily Levith, Monday, January 28, 2008, at 12:04 p.m., subject,

5    Adler.

6    A.   Hi Lily.  My agent just called.  It seems that a Prudential

7    SIU investigator showed up at Florra Adler's home unannounced.

8    She got pretty pissed off at this and our agent is also upset.

9    Can you make sure that the application is officially withdrawn?

10   I don't know if SIU looks at closed applications.  Clearly this

11   is the type of attention that we do not want.  I don't want

12   myself or my agents tainted at Pru.  We also don't want agents

13   upset at us, even though this is outside our control.

14            Regards, Michael Binday.

15   Q.   And to the email above that starting on page 2, from Lily

16   Levith to Michael Binday, Monday, January 28, 2008 at

17   12:13 p.m., subject Adler.

18   A.   I just spoke to Gloria Flattum concerning your note and

19   will get back to you when I've heard back from her.  Not sure

20   why we sent SIU investigator.  I do remember from his

21   presentation at the underwriting symposium that we do not

22   notify an insured in advance.  99 percent of the time nothing

23   is uncovered.  Lily.

24   Q.   And let's go to the email on the first page from Michael

25   Binday to Lily Levith, Monday, January 28, 2008, at 12:38 p.m.,

D9QLBIN2                          Adams - direct

1    subject, re Adler.

2    A.   Dear Lily:  I just spoke in person with Ms. Adler and

3    obtained more details and an official request to be left alone.

4        Christian Kanehl from SIU showed up at her door.  He

5    buzzed up and wanted to come to her come.  She was mighty

6    pissed off when he showed up unannounced.  He asked her to call

7    him and arrange a convenient time.  He wrote on his business

8    card --

9    Q.   You can jump to the text below that, the "she wants."

10   A.   She wants me to make sure that:

11        1.   He does not call back.

12        2.   He does not wait outside her door and ambush her.

13        Please consider this is an official request from her

14   to leave her alone.  I believe that NY law requires

15   investigators to honor such requests.

16        Many older people are very concerned about personal

17   security.  She may not sleep at night now that she fears a guy

18   waiting outside her door to investigate her.  I would

19   appreciate any confirmation that she will be left alone.

20        Thank you, Michael Binday.

21   Q.   Let's go now to Government Exhibit 137, an email from

22   Michael Binday to Lily Levith, January 30, 2008, at 1:07 p.m,

23   subject, Florra Adler.

24   A.   Hi, Lily.  Following up on our conversation this morning, I

25   want to make sure you know that:

D9QLBIN2                          Adams - direct

1              1.  We believe that Florra Adler case was good

2        business.

3              2.  We firmly believe this little old lady was in no

4        way being taken advantage of.

5              3.  She would have no problem paying for coverage,

6        whether it was $1 million, $2 million or $4 million.

7              4.  We were presented financial information that

8        justified this policy; we believe that information to be

9        largely accurate.

10             Clearly, Prudential concluded otherwise.  We very much

11       regret this.

12             We would never have sent this case to underwriting if

13       we did not feel it was good business.  We would not have

14       recommended a phone call to the accountant if we did not feel

15       it would verify everything we were told.

16             Best regards, Michael Binday.

17       Q.  Now Government Exhibit 139, and we'll start with the email

18       at the bottom of the first page which is forwarded by Lily

19       Levith, and it's an email I believe the subject is Adler case

20       question, and it's Friday, February 1, at -- Friday,

21       February 1, 2008 at 1:01 p.m.  The text is on the next page.

22       A.  Thanks.  Please have him explain in writing how he came to

23       write the policy and who actually met with the client.  He

24       refers to his agent being upset in his email.  We also need to

25       determine how and by whom the financial figures were obtained.

D9QLBIN2                        Adams - direct

1    I appreciate your assistance.

2    Q.  And let's go to the email on the first page now from

3    Michael Binday to Lily Levith at Prudential, February 1, 2008,

4    2:38 p.m., CC Chuck.Anderson@Prudential.com, subject, re Adler

5    case question.

6    A.  Lily:  I wish that we kept fastidious notes on every case.

7    This is not the case.  We are so busy that I need to get

8    briefed on cases that I discussed last week.  I just had a

9    phone call an hour ago and was told we discussed this last

10   week.

11        Asking for anything more is akin to asking where were

12   you on this Tuesday in 2005?

13        Our typical process:  We send an application to the

14   client.  We may prefill in part of the information -- in part

15   from information that we have in house.  The client fills in

16   the rest.

17        I remember that I spoke to the client on the phone; I

18   do not remember details of any conversation.  I do not know

19   whether she completed the application on her own or not.

20        The client provided her financial information.  Our

21   only comment is that it appears normal to low when compared to

22   our Scarsdale clientele.  I cannot add any additional facts or

23   details.  I could speculate, but do not remember and do not

24   want to guess.

25        Regards, Michael Binday.

D9QLBIN2                          Adams - direct

Q.  Let's go to Government Exhibit 161 now and we'll start with
the email on the bottom from Michael Binday to Kevin Kergil,
February 4, 2008, at 6:30 p.m., subject, Adler Prudential.
A.  Kevin, I'm going to have to call back this guy from
Prudential from their investigations unit.  I can delay a day
or two, but not by much.

     My notes to Prudential indicated that I spoke through
her financial adviser.  I'm concerned that they request us to
say who her financial adviser is and ask for his phone number.
If I don't give a number when asked, this could cause problems.

     The best answer is being honest.  Ed is her financial
adviser.  They could call Ed.  He's not currently appointed
with Prudential as far as I know.  And while they can threaten
me to cooperate, they cannot threaten Ed.  He can honestly tell
them that he provide information supplied by his client, after
which he can hang up.

     The next questions could be is he licensed?  Why am I
the agent and not him?  This does go back to August 30 and I'm
not really sure.  I'm concerned that his answers are
consistent.  Was he was not appointed and that this matter was
a matter of convenience.  Was he away when the application came
in, such as taking his children to school.

     Note that I closed this out by saying that Ms. Adler
planned to take a policy with Phoenix and asked to withdraw her
policy with Prudential.  Prudential knows that this case was

D9QLBIN2                        Adams - direct

referred to us as a GA, and that we spent a good deal of time

to work on an offer.  That the application came from the

insured filled in.  And that she has adviser who assisted her

with planning, presumably Ed.  And that we are comfortable with

the application.  And that the insured was comfortable with the

application.

I emailed Prudential after the SIU guy showed up at

her door.  She told us to make sure that he does not call back

and to make sure he does not wait outside her door to ambush

her.  And that she now has a great deal of anxiety about this.

What are your thoughts?  Please call me to discuss.

Michael Binday.

Q.  Next exhibit is Government Exhibit 361 which is a letter to

Mr. Keidel from the State of New York insurance department

dated July 27, 2009.

A.  Dear Mr. Keidel.  This department is conducting an

investigation regarding Prudential's appointment termination of

Michael Binday and R. Binday Plans & Concepts.  We have

received Prudential's full investigative report describing

Michael and Glenn Binday involvement in the sale of life

insurance to Florra Adler and Lillian Robinson.  In order to

better understand the events that took place while trying to

place this business, we ask that you provide responses to the

following questions.

1.  Please inform us of the location where each sale

D9QLBIN2                        Adams - direct

1    took place.

2            2.  Provide a schedule of all appointments that

3    Michael or Glenn Binday had with either Ms. Adler or

4    Ms. Robinson.

5            3.  Please explain how you determined a policy limit

6    of $4 million was appropriate for each policy.

7            4.  What documentation of asset or personal net worth

8    did Binday review prior to selecting the policy limit?

9            5.  Explain to our department who Ed Lynch is and his

10   involvement in the sale of these policies.

11           6.  Inform us of your agency's compensation agreement

12   with Ed Lynch.

13           7.  Explain how the premiums for these policies were

14   to be paid and by whom.

15           Please fax your written responses to the number listed

16   below.  Make reference to our department file CSB595895.

17           Thank you for your cooperation in this matter.

18   Christopher Bremer.

19   Q.  Let's go now to Government Exhibit 162.  Starting with the

20   email that begins at the bottom of page 2 of that exhibit from

21   James Keidel to Jeffrey Koslowsky and Michael Binday, July 28,

22   2009, at 8:06 a.m., subject, Prudential termination.

23   A.  Michael and Jeff, attached is letter I received yesterday

24   afternoon from the NYSID asking for additional information in

25   connection with its investigation of Prudential's termination.

D9QLBIN2                         Adams - direct

1    I will contact Mr. Bremer at NYSID and acknowledge receipt and

2    advise him we will provide a response.

3              I am moving this week and I will only be in the office

4    sporadically.  Can we possibly discuss this on Monday or

5    another day next week?  Jim.

6    Q.  Let's go to the email now that begins on the first page

7    from Michael Binday to Jeffrey Koslowsky, Tuesday, July 28,

8    2009, at 11:40 a.m., subject, Prudential quick answers.

9    A.  Jeff, if okay with you, forward to James.  Or I can discuss

10   with you first.  Obviously we want to avoid any further

11   investigation such as review of our records, questions on other

12   policies, interviews with agents, or interviews with client.

13             I'm pretty sure we did not do anything wrong, but not

14   quite as sure about agents.  And not sure what New York expects

15   from agent relationship based on agent on the application.

16             Robinson case is New Jersey app.  Makes me wonder

17   whether James Keidel can simply knock this out of any

18   discussion.

19             These are quick answers to questions.  I looked at

20   file information, but not at email records.

21             Florra Adler.  This case belonged to Ed Lynch, an

22   agent who was referred to our general agency.  Ed held all

23   meetings with Ms. Adler though we were consulted from time to

24   time on the phone.  The policy was signed when he was dropping

25   his daughter off at camp and not available.  There may have

1    been a deadline such as Prudential changing rates, etc., though

2    this is not recalled with any certainty.  As an accommodation

3    to him, we signed the application.  The plan was to change the

4    agent to him later if Prudential allowed, and regardless to

5    compensate him as agent.

6         We don't want NYSID going further and calling Ed Lynch

7    or Ms. Adler.  We don't know details of how Ed sold policy to

8    client but have a concern about this.

9         1.   Location.  App signed in Scarsdale, New York.

10        2.   Appointments by phone in supportive role as

11   general agent.

12        3.   Policy limit.  We did not determine.  It was

13   presented to us as a $4 million case.  This was reasonable

14   based on client financials as provided by the client.  This was

15   verified by a CPA who indicated income of $240,000 and assets

16   of $4.95 million.  She listed on application a net worth of

17   $4.5 million and income of $250,000.  Inspection report done

18   for Phoenix indicated net worth of $4.9 million and income of

19   $190,000.  Agent saw art collection and Mercedes and believed

20   net worth was accurate.

21        The only issue we know of is that Prudential

22   questioned the value of her home.  We thought that $1 million

23   for a home in Scarsdale was modest as we insure hundreds of

24   homes in Scarsdale and most of them worth over $1.5 million.

25        4.   Documentation of net worth prior to selecting

D9QLBIN2                    Adams - direct

policy limit.  We did not select policy limit.  Documentation
of net worth was information provided by client, accountant
letter and inspection report.

          5.  Who is Ed Lynch?  See above.  He was an agent on
the case but not on the application when submitted.

          6.  Compensation agreement.  Please see above.  Plan
was to change agent back to him and to compensate him as agent.

          7.  How would premiums be paid?  To our knowledge,
client was paying.
Q.  You can stop there.  And let's go to Government Exhibit 362
now, turning to the second page of that exhibit, a letter from
James Keidel to Mr. Christopher M. Bremer, examiner, consumer
services bureau, One Commerce Place, dated August 11, 2009, re
Prudential termination.
A.  Dear Mr. Bremer, as you are aware, we represent the
interest of Michael Binday, Glenn Binday, and R. Binday Plans &
Concepts in connection with this matter.  We are writing in
response to your July 27, 2009 correspondence which sets forth
seven questions concerning the sale of insurance to Florra
Adler and Lillian Robinson.  Below are the answers to those
questions.

          1.  The sale of insurance to Ms. Adler took place in
New York.  Ms. Robinson signed an application in New Jersey but
ultimately did not purchase the policy.

          2.  Neither Michael nor Glenn Binday had any meetings

1    with either Ms. Adler or Ms. Robinson.  There were various

2    telephone discussions between the agency and the clients.

3          3.  The $4 million policy was based on financials

4    provide by the client.

5          4.  The agency was provided with financials for

6    Ms. Adler from a CPA which showed that she had income of

7    $240,000 per year and assets of $4.95 million.  The agency was

8    provided with financials for Ms. Robinson from a CPA which

9    indicated that she had income of $200,000 per year and assets

10   of $4.7 million.  The CPAs were selected by the clients and not

11   by the agency, Michael Binday, or Glenn Binday.

12         5.  Ed Lynch is an agent who refer -- who was referred

13   to the general agency.  Mr. Lynch held meetings with Ms. Adler

14   and consulted with the agency.  He was not involved with the

15   insurance for Ms. Robinson.

16         6.  There was no written agreement between the agency

17   and Mr. Lynch.  The agency was planning on having him appointed

18   so that he could receive commission.

19         7.  It was the understanding that for both Ms. Adler

20   and Ms. Robinson, the premiums would be paid by the insureds.

21         We trust that the foregoing fully responds to your

22   questions.  If, however, you should have any additional

23   questions, please contact us.

24         Respectfully, James Keidel.

25         MS. McCALLUM:  Your Honor, at this time we have a few

D9QLBIN2                        Adams - direct

1    short excerpts to read from some testimony that was given to

2    NYSID.

3              May I approach to hand up the testimony?

4              These are excerpts from what has been marked

5    Government Exhibit 363.  The government offers the excerpts

6    that will be read into the record.

7              The first excerpt --

8              MR. ABRAMOWITZ:  No objection.

9              THE COURT:  Thank you.

10             MR. FEINGOLD:  Let's have the first page up on the

11   screen if we could, Exhibit No. 363, and if you can just

12   highlight the box at the top, please, including the date.

13             Let's turn to the page that's Bates marked 72233, not

14   on the screen, but just for the agent's benefit.

15             I'll read the questions and, Agent Adams, if you could

16   please read the answer.

17   "Q.  Can you inform us of the place where you currently work

18   and who your employer would be?

19   "A.  The employer is R. Binday Concepts Incorporated and it's

20   the same address as I gave you.

21   "Q.  What are your duties at R. Binday Plans & Concepts?

22   "A.  Combination of sales and management.

23   "Q.  Okay.  Are there any other individuals that operate that

24   business along with yourself?

25   "A.  At present it's mainly myself that's running the

D9QLBIN2                          Adams - direct

1    business."

2              MS. McCALLUM:  Now we'll go to page 72242, not on the

3    screen, but for the agent's reference, line 12.

4    "Q.  We had a question which pertained to our Prudential

5    termination investigation.  There was Edward J. Lynch

6    referenced in those files.  Can you explain your relationship

7    with Mr. Lynch?

8    "A.  Yes.  Mr. Lynch was an agent who was interested in doing

9    business with us and, you know, we assisted him with one of the

10   cases in question that Chris's letter referred to, Ms. Adler,

11   and that's the basis of our relationship, yeah."

12             MS. McCALLUM:  And now to page 72293, line 13.

13   "Q.  Okay.  Let me ask you a question:  Is there any reason why

14   you would sign the application for the coverage if Mr. Lynch

15   was a Prudential agent also?

16   "A.  Yes.  And what I remember is that he was talking -- he was

17   taking his daughter to school and was not available and so I

18   just signed the application for expediency to get it in.  As I

19   said, presumably we would have, if it was getting approved, got

20   him appointed through our agency, you know, anyhow, but that's

21   a little supposition because this is two years old.  But I

22   remember the part that he was taking his daughter off to

23   school."

24             MS. McCALLUM:  Let's go now to page 72312, line 9.

25   "Q.  Okay.  And what happens -- again, hypothetical right

D9QLBIN2                          Adams - direct

now -- if a client comes to you and says if there's a question

on the application, are you planning to sell the policy, and

the client says yes I am, what is your -- if you can answer

that, what are you going to do or what did you do?

"A.  If a client says they're planning on selling the policy

from the beginning, then I'm going to say if that happens

today, I'm going to say no, I cannot take that application,

sir.  If you tell me you're going to sell it, then I'm not

allowed to take the application, or we can submit it to the

insurance company and get you declined.

"Q.  It's identified on the app that the client has the

intention to sell his policy?

A.  If a client intends to sell the policy, then I'm going to

tell him that we cannot take the application."

          MS. McCALLUM:  Let's go to page 72352, line 7.

"Q.  As part of Binday Concepts or any of the life insurance

business you've been associated with, have you ever had any

programs where you've told the insured that they're not going

to be responsible to pay the premiums that, you know, this

policy can be sold and, you know, whoever is going to buy it

will be obligated to pay the premiums?

"A.  Programs?  No.  I had heard about that a number of years

ago and I don't think I had any conversations with anyone,

although I had heard about that right before the Spitzer letter

came out saying that you couldn't have programs like that.  So

D9QLBIN2                        Adams - direct

1    I don't know if I talked to anyone about it before that Spitzer
2    letter.  I certainly haven't had any conversations with the
3    client saying they're not responsible for premiums after that
4    point.
5    "Q.  Okay.  Well, do you know if any agents you're associated
6    with or, again, consciously trying to keep the face amount of
7    the policy at a certain level so it would not have to go
8    through scrutiny on financial or any other type program that is
9    trying to capture or prohibit life settlements?
10   "A.  So far as I know, every policy that we process has been a
11   good policy in terms of financials.  So I don't know of any
12   that were inappropriate as you're implying.
13   "Q.  Okay.  I hate to be direct but, you know, is there any --
14   because we're going to reach out to the CPA in Florida, you
15   have no knowledge of yourself or any of your referring agents
16   contacting that CPA and saying, look, just give any financials
17   we send you, give it a cursory look and just send it back and
18   say, you know, it looks good to me, you know, they're good
19   numbers?
20   "A.  I have not had a direct conversation with Mr. Kupper.  So
21   I can speak for myself and say that I don't have any knowledge
22   of Mr. Kupper.
23   "Q.  Have you ever had a conversation with any of the referring
24   agents if they were the one that found Mr. Kupper saying let's
25   tell him to say the numbers are good so we can get policies

D9QLBIN2                        Adams - direct

1   issued?

2   "A.  You know, any number that I get presented to me darn well

3   better be a good number or I'm going to be very upset.  So I

4   don't have any knowledge of someone doing anything

5   inappropriate like that.  That's the answer."

6           MS. McCALLUM:  That concludes the reading of that

7   testimony.

8           THE COURT:  Then let's take a little break, folks.

9   It's a lot of reading to listen to.  Don't discuss the case,

10  keep an open mind, and I'll see you in ten minutes.

11          (Recess)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D9QJBIN3                        Krupit - direct

1           THE COURT:  Get the jury.  Do you have a witness?

2           MR. FEINGOLD:  He is walking in right now, your Honor.

3           THE COURT:  I love agent what's his name.

4           MR. FEINGOLD:  Special agent!

5           THE COURT:  Very special!  They're all special!  I

6   have actually have jurors ask me what does that mean?  Is there

7   a regular agent?

8           Get the jurors.

9           THE CLERK:  Yes.

10          (Jury present)

11          THE COURT:  Call your next witness, please.

12          MR. FEINGOLD:  The government calls Paul Krupit.

13   PAUL KRUPIT,

14       called as a witness by the Government,

15       having been duly sworn, testified as follows:

16   DIRECT EXAMINATION

17   BY MR. FEINGOLD:

18   Q.  Mr. Krupit, how old are you?

19   A.  57.

20   Q.  Where do you live?

21   A.  Hollywood, Florida.

22   Q.  What do you do for a living?

23   A.  Insurance sales.

24   Q.  How long have you been in that business?

25   A.  Approximately twelve years.

D9QJBIN3                              Krupit - direct

1   Q.   What type of insurance do you sell?

2   A.   Medicare sales, health insurance, some life insurance and

3   some long-term care insurance.

4   Q.   Where do you work out of?

5   A.   My residence.

6   Q.   Did you go to college?

7   A.   Yes, I did.

8   Q.   Where did you go to college?

9   A.   Eastern Kentucky University.

10  Q.   Did you graduate?

11  A.   Yes, I did.

12  Q.   When did you graduate?

13  A.   1977.

14  Q.   What did you do after college?

15  A.   I managed hotels for approximately 24 years.

16  Q.   Did there come a point in time at which you switched to the

17  insurance business?

18  A.   Yes, approximately September of 2001.

19  Q.   Why did you switch from the hotel business to the insurance

20  business?

21  A.   I had some friends that were doing really well selling

22  final expense and burial experience, and they were just

23  explaining to me it was a better way of make an income, you

24  could make much more.  What I was doing, my income was

25  basically capped.

D9QJBIN3                          Krupit - direct

1   Q.  Did you start your own insurance company?

2   A.  Yes, I did.

3   Q.  What was the name of that company?

4   A.  Insurance Specialties Group, Inc.

5   Q.  What type of insurance did that company start out doing?

6   A.  Final expense and burial plans.

7   Q.  Just explain what final expense and burial insurance is.

8   A.  Final expense basically covers ones final expenses at the

9   time of death.  Typically, these policies are between 5,000 and

10  $15,000.

11  Q.  How much do you, as an insurance agent, make for arranging

12  a final expense or burial policy of that size?

13  A.  Depending on the company that I wrote it through, it was

14  typically between 3 and $500.00 on an average case.

15  Q.  Did you later become involved in large benefit life

16  insurance policies?

17  A.  Yes, I did.

18  Q.  Who introduced you to the large life insurance business?

19  A.  Mark Resnick.

20  Q.  How did you meet Mark Resnick?

21  A.  Mark used the same telemarketer that I used.

22          I was selling mortgage protection insurance at the

23  time and he was selling long-term care insurance through the

24  same telemarketer making the appointments for both of us, and

25  she introduced us in a restaurant meeting I believe it was in

D9QJBIN3                          Krupit - direct

1    Sarasota, Florida in 2005, around that time period.

2    Q.  You said around 2005?

3    A.  Yes, sir.

4    Q.  Where did you live at the time?

5    A.  I lived in Estero, Florida, Southwestern Florida.

6    Q.  Did you know where Mark Resnick lived at the time?

7    A.  Yes, he lived in Orlando, Florida.

8    Q.  How far apart were Orlando and Estero by car?

9    A.  I want to say four to four and a half hours.

10   Q.  Do you know if Mark Resnick has any other residences?

11   A.  I believe he has another residence north of here, of New

12   York City, about an hour and a half north.

13   Q.  How is it that Mark Resnick introduced you to large case

14   life insurance?

15   A.  He introduced me.  We were both selling our insurance with

16   long-term care and mortgage protection.  It was getting harder

17   and harder to get the policies approved.  A lot of them were

18   just falling off the books, and he said there has to be an

19   easier way to do something.  He called me one day and said how

20   would you like to make bigger commissions?  I said well, tell

21   me about it.

22          He explained the commissions on these large case life

23   policies was typically between 15,000 and $25,000.

24   Q.  About when was this phone call?

25   A.  I want to say probably the latter part of 2005.

D9QJBIN3                              Krupit - direct

1    Q.  Did you tell Mark Resnick that you were interested in

2    getting into this type of life insurance business?

3    A.  Yes, I did.

4    Q.  Why?

5    A.  Well, because I wanted to make bigger commissions.

6    Q.  What, if anything, did Mark Resnick tell you in response to

7    your interest in this business?

8    A.  He said he had a friend Kevin Kergil that he sold long-term

9    care with when he was in New York, and he would get him on the

10   phone and we'd do a conference call regarding the large case

11   life policies.

12   Q.  Did you know Kergil at the time?

13   A.  No, I did not.

14   Q.  Did you, in fact, have a conference call with Kevin Kergil

15   and Mark Resnick?

16   A.  Yes, I did.

17   Q.  About how long after your first call with Mark Resnick

18   about the life insurance business did you have the conference

19   call?

20   A.  Probably the same day, I want to say later on that day.

21   Q.  What was discussed on the conference call between you,

22   Kevin Kergil and Mark Resnick, in sum and substance?

23   A.  Well, I wanted to know how this was all set up, and Kevin

24   explained it.  We would take out a large case life insurance

25   policy and immediately it would be sold to an investor.

1    Q.  Did Kevin Kergil explain to you how large the death benefit
2    on these types of life insurance policies would be?
3    A.  Yes, he explained that they would be typically between 3
4    and $4 million.
5    Q.  Did he explain to you why it would be between 3 and $4
6    million?
7    A.  Yes, because he explained that the policies had to stay
8    under the radar.
9    Q.  Did he explain to you what "staying under the radar" meant?
10   A.  Yes, he did.
11   Q.  What did he explain to you?
12   A.  He explained that being under the radar, simply it means
13   that anything over three to four million would require
14   excessive documentation such as tax returns, stock reports,
15   bank statements, that type of thing.
16   Q.  Were you generally aware of the premium amounts that would
17   be required for policies in the three to four million dollar
18   range?
19   A.  Yes, I am.
20   Q.  What was your general knowledge of how much those premiums
21   would be?
22   A.  Again depending on the age of the client, the premiums
23   would be typically from 150,000 to slightly over $200,000 on an
24   annual basis.
25   Q.  Could your clients afford those premiums?

D9QJBIN3                          Krupit - direct

1    A.  No, they could not.

2    Q.  What, if anything, did Kergil tell you about who would pay

3    for those premiums?

4    A.  He told me that investors would pay the premiums.

5    Q.  Did you end up joining Kergil and Resnick in doing this

6    type of life insurance work?

7    A.  Yes, I did.

8    Q.  What did you do next in connection with getting into this

9    line of business?

10   A.  I wanted to hear more details about it and how the

11   financing and all that occurred, what the next step was to go

12   forward.

13   Q.  What was that next step?

14   A.  The next step was for Kevin said he would get an associate

15   on the phone by the name of Michael Binday, and Michael would

16   explain all the details to me.

17   Q.  Did there come a point in time at which you spoke with

18   Michael Binday?

19   A.  Yes, I believe he called me, it may have been a week later

20   or so.

21   Q.  Did you have one call or a series of calls with Michael

22   Binday in the beginning of getting into this type of business?

23   A.  It was a series of calls.

24   Q.  What did Binday tell you on that series of calls?

25   A.  He told me that, first of all, applications would be

1    made -- excuse me -- preliminary applications, the preliminary

2    worksheets would be filled out.  The average age of the client

3    was between 69 and 85 years' old.  They had to be healthy

4    clients, but not too healthy, and that the policies would be

5    typically by anywhere between 2 and $4 million.

6    Q.  Did Mr. Binday explain to you why the clients should be

7    healthy, but not too healthy?

8    A.  Yes, he did.

9    Q.  What did he tell you?

10   A.  He explained that one of the elements of these were that

11   there was a life expectancy report done, and the life

12   expectancy report couldn't be too high.  Typically that was on

13   the up-front cases 13 years, I want to say.  If they were

14   excessive of 17 years, no investor wanted to buy the policy.

15   So they weren't a good candidate, it wasn't a good fit.

16   Q.  Did he explain to you why the range of the three to four

17   million dollars range for the policy was the target range for

18   these types of policies?

19   A.  Yes, because he explained that the policies had to be under

20   the radar, and anything in excess of 4 million would require

21   excessive documentation, stock returns -- stock statements,

22   bank statements and tax returns.

23   Q.  What, if anything, did Binday tell you about the purpose of

24   getting these life insurance policies?

25   A.  The purpose was to sell them to investors on the secondary

D9QJBIN3                          Krupit - direct

1   market.

2   Q.  Now, when Kevin Kergil and Michael Binday were describing

3   this type of insurance to you, did you recognize it as a

4   certain type of insurance?

5   A.  Yes, I did.

6   Q.  What type of insurance did you recognize it as?

7   A.  Stranger initiated life insurance policies or referred to

8   as STOLI policies.

9   Q.  How is it that you were familiar with the term STOLI at the

10  time?

11  A.  I read insurance journals and I see it in the newspaper

12  periodically.

13  Q.  Now, Mr. Krupit, did you eventually meet Binday and Kergil

14  in person?

15  A.  Yes, I did.

16  Q.  You testified earlier you had met Mark Resnick in person.

17  Is that right?

18  A.  Yes.

19  Q.  Do you see Michael Binday, Kevin Kergil and Mark Resnick in

20  the courtroom here today?

21  A.  Yes, I do.

22  Q.  If you could just identify first Mr. Binday, identify where

23  in the courtroom here is.

24  A.  He is the second row back, the third person over with the

25  glasses on and the yellow striped tie.

1            MR. ABRAMOWITZ:  Identification conceded, but not the

2      color of his tie.

3      BY MR. FEINGOLD:

4      Q.  How about Mr. Kergil?

5      A.  He just stood up.

6            THE COURT:  Indicating Mr. Kergil.

7      A.  He has a white shirt and --

8            THE COURT:  It is okay.

9            MR. STAVIS:  We got it.

10     BY MR. FEINGOLD:

11     Q.  Mr. Resnick?

12     A.  He is over on the right side in a striped type.

13           THE COURT:  Indicating Mr. Resnick.

14     BY MR. FEINGOLD:

15     Q.  Mr. Krupit, did you, in fact, meet with your insurance

16     clients to pitch them on STOLI policies?

17     A.  Yes, I did.

18     Q.  Approximately how many clients did you meet with?

19     A.  I want to say probably between 60 and 70 clients.

20     Q.  Did any clients agree to take part in this plan?

21     A.  Yes, they did.

22     Q.  What did you do when a client agreed to participate?

23     A.  The next thing I did was I would take the preliminary

24     worksheets to the client and I would fill out the information

25     on the worksheets along with the financial worksheet and I

1   would have the clients sign the worksheets.

2   Q.  What type of information were you filling out in these

3   worksheets?

4   A.  Biographical, medical information, the type of medications

5   they were taking, their doctors and then some financial

6   information.

7   Q.  Would you fill inaccurate information?

8   A.  Yes, I did.

9   Q.  What would you do with the information after you collected

10  it from your clients?

11  A.  I would fax the medical information, the worksheets, the

12  HIPAA forms to Michael Binday's office and then I would fax the

13  financial worksheet to Kevin Kergil's office.

14  Q.  Why would you send the financial information to Kevin

15  Kergil's office?

16  A.  Because Kevin, in the beginning Kevin told me he was

17  responsible for the financial information and for arranging

18  third-party inspections.

19  Q.  What would happen next in the process after you sent this

20  information to Binday and Kergil's offices?

21  A.  I would wait for a response, an informal offer from the

22  insurance company and the life expectancy report.

23          Although I didn't see the life expectancy report, they

24  had to have a good number to make the policy able to be sold to

25  an investor.  So both of those elements had to be satisfied

1   before I heard any further, more information.

2   Q.  Who told you that that's how the process worked?

3   A.  Michael Binday.

4   Q.  What would happen in the possibility of issuance of a

5   policy on the one hand and sale of the policy to the investor

6   was a possibility?

7   A.  At that point I would receive, typically I would receive an

8   e-mail saying the policies were ready to move forward for an

9   informal offer with the necessary applications from the

10  appropriate insurance companies that would come with trust

11  paperwork, and that would typically come by UPS.

12  Q.  Where would you receive that from?

13  A.  I would receive that from Advocate Brokerage.

14  Q.  The applications that you received, did you fill those out?

15  A.  Most of the time they were already partially filled out,

16  but there were times where I had to fill out information as

17  well.

18  Q.  For the ones that were already filled out, was there false

19  information in those applications?

20  A.  Yes.

21  Q.  What was that false information?

22  A.  The premium financing question that all insurance

23  applications have was always checked incorrectly.  It was

24  checked there was no premium financing involved and,

25  furthermore, there was another question that indicated that the

1    policy would be sold.  That was always checked, "no."

2              The net worth was also inaccurate of the client.

3    Q.  Did you also fill out applications yourself?

4    A.  Yes, I did.

5    Q.  Did you fill out the same sort of false information in

6    those applications?

7    A.  Yes, I did.

8    Q.  Mr. Krupit, do you know Opal Headrick?

9    A.  Yes, I do.

10   Q.  Who is Opal Headrick?

11   A.  Opal Headrick is one of my clients in North Fort Myers,

12   Florida.

13   Q.  Did you approach her to pitch her on this life insurance

14   plan?

15   A.  Yes, I did.

16   Q.  Did she want to try to go forward?

17   A.  Yes, she did.

18             MR. FEINGOLD:  Your Honor, I am assuming the blanket

19   permission given to Ms. Choi yesterday applies today.

20             (Pause)

21   BY MR. FEINGOLD:

22   Q.  Mr. Krupit, you have in front of you what is marked as

23   Government Exhibit 1183.  Do you recognize it?

24   A.  Yes, I do.

25   Q.  What is it?

D9QJBIN3                        Krupit - direct

1    A.   It is a preliminary application for Opal Headrick along

2    with the appropriate HIPAA forms and just the preliminary

3    worksheets that we sent to Michael Binday's office.

4    Q.   Did you fill this out with Ms. Headrick?

5    A.   Yes, I did.

6    Q.   Who provided you this packet to fill out?

7    A.   Michael Binday.

8              MR. FEINGOLD:   The government offers 1183.

9              MR. ABRAMOWITZ:   No objection.

10             THE COURT:   Admitted.

11             (Government Exhibit 1183 received in evidence)

12             MR. FEINGOLD:   Please publish the first page of 1183,

13   please.

14   BY MR. FEINGOLD:

15   Q.   Now, when in the process would you have a client like

16   Ms. Headrick sign these forms?

17   A.   When I met with her to -- after she told me she wanted to

18   move forward with it, I would take the forms and she would sign

19   the forms at that time.

20   Q.   Did you go forward with an application for Ms. Headrick?

21   A.   Yes, I did.

22   Q.   I am showing you what has been marked as 1182, Government

23   1182.   Do you recognize 1182?

24   A.   Yes, I do.

25   Q.   What is it?

D9QJBIN3                        Krupit - direct

```
 1   A.  It is a net worth and income worksheet for Opal Headrick.

 2   Q.  Where did you get this type of net worth and income

 3   worksheet from?

 4   A.  I got this from Kevin Kergil.

 5   Q.  Did Kevin Kergil sent it to you directly?

 6   A.  Yes, he did, by fax.

 7   Q.  Would you receive these from anyone else?

 8   A.  I'm sorry.  I don't understand that.

 9   Q.  Would you get these net worth and income worksheets from

10   anyone else?

11           MR. ABRAMOWITZ:  Is he talking about 1182?

12   BY MR. FEINGOLD:

13   Q.  1182, the type of net worth and income worksheet in 1182?

14   A.  The first form would come to me from Kevin Kergil, but it

15   didn't come with any numbers filled out on it.

16           MR. FEINGOLD:  We offer Government 1182.

17           MR. ABRAMOWITZ:  No objection.

18           THE COURT:  Admitted.

19           (Government Exhibit 1182 received in evidence)

20           MR. FEINGOLD:  Can we put up 1182, please.

21   BY MR. FEINGOLD:

22   Q.  So, Mr. Krupit, are you familiar with this type of

23   document?

24   A.  Yes, I am.

25   Q.  Can you just explain to us when in the process you received
```

1    this type of document.

2    A.   This document came back once, in the typewritten form once

3    the policies were approved or pre-approved, I should say.

4    Q.   Did you also see this type of form without the typed-in

5    numbers?

6    A.   Yes.

7    Q.   When would you get that?

8    A.   I got that when I got the preliminary worksheets, and I

9    would send that by fax to Kevin Kergil.

10   Q.   Would you fill in information in the blank worksheet that

11   you had?

12   A.   Yes, I did.

13   Q.   Would you fill out accurate information?

14   A.   Yes, I did.

15   Q.   When in the process would you receive a net worth and

16   income worksheet that had typed-in numbers?

17   A.   The typed-in numbers came back when we received the UPS

18   packet with the applications from the insurance companies,

19   after we already received the informal offer that they were

20   approved, and that is when I would see this typed worksheet.

21   Q.   Did you ever type in the numbers into these worksheets?

22   A.   Never.

23   Q.   Did you provide the information that appears on the 1182?

24   A.   No, I did not.

25   Q.   Are the numbers accurate?

D9QJBIN3                          Krupit - direct

1    A.  No, they are not.

2    Q.  Were you generally familiar with Ms. Headrick's finances?

3    A.  Yes, I was.

4    Q.  How was that?

5    A.  She was my customer since before 2005.  She lived in North

6    Fort Myers, Florida in a trailer.

7    Q.  Are these numbers close to accurate?

8    A.  No, they were not.

9    Q.  Sir, I am showing you what is admitted as Government 1145.

10           MR. FEINGOLD:  Can you please put up 1145.

11   BY MR. FEINGOLD:

12   Q.  Mr. Krupit, do you know what this is?

13   A.  Yes, I do.

14   Q.  What is it?

15   A.  This is a life insurance application from Union Central for

16   Opal Headrick.

17   Q.  Could you please turn to the last two pages of that

18   application Bates stamped R. Binday SDNY 62885 and 886.

19   A.  Okay.

20   Q.  Did you sign those two pages?

21   A.  Yes, I did.

22   Q.  Could you please go to Page 2 of the application.  It is R.

23   Binday 62881.

24   A.  Okay.

25           MR. FEINGOLD:  Ms. Hayakawa, if you could please zoom

1    in on Question 1 A.

2    BY MR. FEINGOLD:

3    Q.  Mr. Krupit, what is the amount, the death benefit amount

4    being applied for here?

5    A.  $3.5 million.

6    Q.  Go to Question 1 D, please.

7    A.  Okay.

8    Q.  The planned periodic premium.

9    A.  $203,700.00.

10   Q.  Could Ms. Headrick have afforded these premiums?

11   A.  No, she could not.

12   Q.  Can we quickly go to Page 3 and just take a look at

13   Questions 5 B and 5 C regarding income and net worth.

14   A.  Okay.

15        MR. FEINGOLD:  If we can zoom in.

16   BY MR. FEINGOLD:

17   Q.  Mr. Krupit, you testified about these figures.  If we can

18   just zoom in, Mr. Krupit, are these numbers close to or the

19   same as numbers in that typed-in financial worksheet?

20   A.  Yes.

21   Q.  Would you go to Question 6, please.

22   A.  Okay.

23   Q.  Who provided the financial information that we see here in

24   this application?

25   A.  Kevin Kergil.

D9QJBIN3                              Krupit - direct

1   Q.  Question 6, source of premiums, check one or more.  Current

2   income and cash savings.  Did Ms. Headrick have either current

3   income or cash savings sufficient to pay these types of

4   premiums, Mr. Krupit?

5   A.  No, she did not.

6   Q.  Would you go to the last page of this document, R. Binday

7   62886, and if we could zoom in where it says both the policy

8   owner, and then going down to Question 4, please.

9   A.  Okay.

10  Q.  Mr. Krupit, could you read, starting with both the policy

11  owner and read Question 1.

12  A.  "Both the policy owner who is applying for this coverage

13  and the agent must sign this form.  If the face amount of the

14  policy being applied for is $1 million or greater and the

15  proposed insured is age 65 or above, or as otherwise directed

16  by the underwriter.  This form must accompany the life

17  insurance application."

18  Q.  Could you read Question 1.

19  A.  "Do you presently intend to assign or sell the life

20  insurance policy for which you are applying?  Please explain

21  when and to whom," and it is checked, "no."

22  Q.  Was that accurate?

23  A.  No, it was not accurate.

24  Q.  Why not?

25  A.  Because she intended to sell it from the beginning.

D9QJBIN3                          Krupit - direct

1    Q.  How did you know that?

2    A.  Because we had to have a preliminary offer, and once she

3    completed the application, she knew that she wasn't going to

4    get paid from the proceeds of the policy until there was a

5    buyer for the policy, and the buyer from the policy was from

6    day one or I never would have taken her the application.

7    Q.  Can you read Question 2, please.

8    A.  "Have you spoken with an individual or company offering to

9    pay you for life insurance policy?  Please explain when and

10   with whom."  It is checked, "no."

11   Q.  Was that accurate?

12   A.  No, it is not.

13   Q.  Why was that not accurate?

14   A.  Because she spoke to me about the policy, about offering to

15   pay her for the life insurance.

16   Q.  What did you tell Ms. Headrick she could get paid for this

17   life insurance policy?

18   A.  I told her that she would get paid on this particular one,

19   it was slightly below the typical offer was 3 percent.  For

20   some reason she only got $70,000 on this policy, so it was

21   maybe 2 percent or something.  I am not sure of the amount on

22   it, but she agreed to move forward because she was getting

23   $70,000.00.

24   Q.  When you say 2 percent or 3 percent, that is a percentage

25   of what?

D9QJBIN3                        Krupit - direct

1    A.   A percentage of the death benefit.

2    Q.   No. 3, would you read that question, please.

3    A.   "Have you spoken with an individual or company offering you

4    free or no cost insurance?"  It is checked, "no."

5            "If yes, please explain when and with whom."

6    Q.   Was that answered accurately?

7    A.   No, it was not.

8    Q.   Why not?

9    A.   Because she spoke with me, and she wasn't paying for the

10   premiums herself, so in effect it was no cost life insurance to

11   her as far as she was concerned.

12   Q.   Could you read Question 4, please.

13   A.   "Do you anticipate having to complete, or have you

14   completed, any loan papers in connection with your purchase of

15   this life insurance policy, or are the premiums otherwise being

16   financed in any way?"  It is checked, "no."

17           "If yes, please explain when and with whom."

18   Q.   Is that accurate?

19   A.   No, it is not.

20   Q.   Why not?

21   A.   Because I took her a loan packet that she signed for, so

22   there was a loan on the policy from day one.

23   Q.   Have you seen these types of questions in other life

24   insurance company applications?

25   A.   Yes.

D9QJBIN3                         Krupit - direct

1    Q.  Did you answer them falsely in those applications as well?

2    A.  Yes, I did.

3              MR. FEINGOLD:  Look at Government Exhibit 1122 already

4    admitted into evidence.  Would you pull that up, please.

5              Would you zoom in on the top where it says Info-Link

6    down to sources, through sources.  Keep going.  Thank you.

7    BY MR. FEINGOLD:

8    Q.  Mr. Krupit, other than in connection with preparing to

9    testify today, have you seen this document before?

10   A.  No, I have not.

11             MR. FEINGOLD:  We can take that down.  Thank you.

12   BY MR. FEINGOLD:

13   Q.  Have you heard the term third-party inspection report in

14   the course of being involved in the life insurance business?

15   A.  Yes, I have.

16   Q.  Where did you hear it from?

17   A.  I heard it from Kevin Kergil.

18   Q.  What did Kergil tell you about a third-party inspection

19   report?

20   A.  He told me that he was responsible for getting these done.

21   Q.  Did he describe to you what a third-party inspection report

22   was?

23   A.  Yes.  Basically it was a third-party company that would

24   verify the information, the medical information and the

25   financial information of the client.

1   Q.  What, if anything, did he tell you about whether his

2   third-party inspection reports were actually verifying the

3   assets and the information in the application?

4   A.  He told me that these were never done.

5   Q.  When you say "these were never done," what do you mean by

6   these?

7   A.  He said that these reports were never done, this Info-Link

8   report was never actually completed.

9   Q.  When you say it "wasn't completed," meaning it wasn't

10  produced or there wasn't work done to verify the information?

11  A.  That they were just signed off on and no one actually

12  verified it.

13  Q.  Did you ever have any other conversation with Kevin Kergil

14  about false information appearing in insurance company

15  applications?

16  A.  Yes, we had numerous conversations about that.

17  Q.  What was the sum and substance of those conversations?

18  A.  Essentially the information on the net worth, we would

19  discuss that, are these policies, in order to get approved, if

20  in fact these people aren't worth the amount that we indicate

21  on the application, and I was very concerned about it.  He told

22  me not to worry about it.

23  Q.  Did you have similar conversations with Mark Resnick?

24  A.  Yes, I talked to Mark many times about this.

25  Q.  What did Mark Resnick tell you?

D9QJBIN3                           Krupit - direct

1   A.  Mark basically said the same thing, he said, "Paul, there

2   is nothing we can do about it.  If the insurance companies want

3   to approve these policies, it is okay."

4   Q.  What did you mean by that -- withdrawn.

5        What, if anything, did Mark Resnick say about the

6   falsity of the information that was being provided to the

7   insurance companies?

8   A.  He said that it was inaccurate information, and he was just

9   as concerned as I was.

10  Q.  Were policies issued to your clients?

11  A.  Yes, they were.

12  Q.  Did you receive commissions?

13  A.  Yes, I did.

14  Q.  About how much would you receive for each policy that was

15  issued?

16  A.  Depending on the case, anywhere from 15 to $25,000 per

17  case.

18  Q.  Is that 15 to $25,000 the entire commission that was paid

19  out on a policy by the insurance company?

20  A.  No, it was not.

21  Q.  Who else received some of the commissions that were paid

22  out on insurance policies that were issued to your clients?

23  A.  My understanding is there was a three-way split between me,

24  Kevin and Michael, and the investor got everything over that.

25  Q.  How much in total did you receive in commissions?

D9QJBIN3                         Krupit - direct

1   A.   Ballpark, it was slightly over $200,000.

2   Q.   Did you also receive a payment from one of your policies or

3   one of the policies when your client's policy was sold?

4   A.   Yes, I did.

5   Q.   About how much did you receive from that?

6   A.   Ballpark, I want to say $106,000.00.

7   Q.   Did you receive other compensation or other rewards for the

8   business you did with Binday?

9   A.   Yes, I did.

10  Q.   What did you receive from the insurance companies?

11  A.   We went on trips.

12  Q.   About how many trips did you go on?

13  A.   I want to say four, I believe.

14  Q.   To where?

15  A.   I went to Portugal, the Bahamas, San Francisco and Southern

16  California.

17  Q.   Who else went on these trips?

18  A.   Kevin Kergil, Mark Resnick and Michael Binday and our

19  wives.

20  Q.   Was Kevin Kergil married?

21  A.   I believe it was --

22           MR. STAVIS:   Objection, your Honor.

23           THE COURT:   The objection sustained.

24  BY MR. FEINGOLD:

25  Q.   Did you ever discuss your life insurance business that you

D9QJBIN3                        Krupit - direct

1    did with those individuals on these trips?

2    A.  Yes, I did.

3    Q.  Tell us about those conversations.

4            MR. STAVIS:  May we have a time-frame or location,

5    your Honor?

6            THE COURT:  Yes.

7    BY MR. FEINGOLD:

8    Q.  You mentioned you went on trips to Portugal, San

9    Francisco --

10            THE COURT:  Take them one at a time.

11            MR. FEINGOLD:  I was going to narrow it down, if that

12    is okay.

13    BY MR. FEINGOLD:

14    Q.  You mentioned four different locations.

15            Do you recall at which trip, on which trip or which

16    location you had these conversations about the life insurance

17    business you were doing?

18    A.  On every one of the trips we discussed it.

19    Q.  Tell us about your conversations on these trips about the

20    life insurance --

21            MR. STAVIS:  The same objection, your Honor.

22            THE COURT:  Ground?  Overruled.

23            MR. STAVIS:  It is a compound question from four

24    different trips and three different individuals.

25            THE COURT:  That is fine.

D9QJBIN3                          Krupit - direct

1   BY MR. FEINGOLD:

2   Q.  You can answer the question.

3   A.  Okay.  Every time that we started talking about our clients

4   and bringing out the fact of how we were conducting business,

5   we were shushed by Michael.  Michael did not want us to discuss

6   this on these trips.

7   Q.  Do you have an understanding as to why?

8   A.  Yes.

9   Q.  Why?

10          THE COURT:  Not do you have an understanding.

11  BY MR. FEINGOLD:

12  Q.  Did you know why?

13  A.  Yes, I did know why.

14  Q.  Why would you think that Michael Binday was shushing you?

15          THE COURT:  Think, please.  Did Mr. Binday tell you

16  why he didn't want you to discuss these things?

17          THE WITNESS:  He told me not to talk about this

18  because there were insurance company executives at these

19  meetings, your Honor.

20          THE COURT:  That is the answer to the question.  You

21  weren't being asked a proper question.

22  BY MR. FEINGOLD:

23  Q.  Now, did you ever have any conversations about who your

24  clients should or should not talk to about their policies?

25  A.  Yes.

D9QJBIN3                          Krupit - direct

1   Q.  With whom?

2   A.  With Kevin, with Mark and Kevin primarily.

3   Q.  Let's first talk about your conversations with Kevin.

4           What did Kevin tell you about who your clients should

5   or should not talk to about the policies?

6   A.  Kevin told me to tell the clients that if someone from the

7   insurance company ever calls them on the phone, to not discuss

8   any information with them because you don't know who you're

9   talking to on the other end of the phone, and with the problems

10  with identity theft everywhere, you don't want to divulge any

11  information.

12          You don't want your client to divulge any information

13  to the third party, whoever was trying to call them to ask them

14  questions about their particular policy.

15  Q.  Why was Kevin Kergil explaining this to you?

16          MR. STAVIS:  Objection.  It calls for the operation of

17  someone's state of mind, your Honor.

18          THE COURT:  All right.  The objection is sustained.

19  BY MR. FEINGOLD:

20  Q.  I am showing you what has been marked Government 2841.  Do

21  you recognize it?

22  A.  Yes, I do.

23  Q.  What is it?

24  A.  It is an e-mail from Kevin Kergil to me on June 4th, 2008.

25  Q.  Is there an attachment?

1    A.  Yes, there is.

2    Q.  What is the general substance of the attachment?

3    A.  Basically it's the same thing we discussed previously.  If

4    the client --

5            MR. STAVIS:  Objection.  I don't believe it is in

6    evidence.

7            THE COURT:  Please don't read the document.

8            MR. FEINGOLD:  The government offers 2841.

9            MR. STAVIS:  Voir dire, your Honor?

10           THE COURT:  Sure.

11   VOIR DIRE EXAMINATION

12   BY MR. STAVIS:

13   Q.  You testified, Mr. Krupit, that this was an e-mail that you

14   received, correct?

15   A.  Yes.

16   Q.  The e-mail address is the e-mail address you knew came from

17   Kevin Kergil, correct?

18   A.  That's correct.

19   Q.  Is that e-mail address related to any company or just Mr.

20   Kergil's company?

21   A.  This e-mail came from --

22   Q.  Address?

23   A.  -- it came from Kevin Kergil's company.  I know Kevin

24   Kergil was a person.

25           MR. FEINGOLD:  I don't understand the relevance of the

D9QJBIN3                         Krupit - direct

1    voir dire.

2              THE COURT:  Do you want to give me the document here?

3              THE WITNESS:  Here.

4              THE COURT:  Thank you very much.  Is that the subject

5    of your voir dire?  Because if so, it is admitted.

6              (Government Exhibit 2841 received in evidence)

7    DIRECT EXAMINATION continued

8              MR. FEINGOLD:  Can we please put up 2841.  Zoom in on

9    the top of that.  Thank you.

10   BY MR. FEINGOLD:

11   Q.  Mr. Krupit, would you read the -- it is from Kevin Kergil

12   on June 4th, 2008.  Did you have one e-mail address or two

13   e-mail addresses at this time -- withdrawn.

14             How many e-mail addresses did you have in 2008?

15   A.  I believe I only had one at that time.  It was an AOL

16   address.

17   Q.  Let's look at the attachment.

18   A.  Okay.

19             MR. FEINGOLD:  If we could just zoom in on the title

20   and then that first paragraph, please.

21   BY MR. FEINGOLD:

22   Q.  Can you please read that.

23   A.  "Insurance checklist.  To maximize the opportunity of

24   having your application for insurance issued, kindly pay strict

25   attention to these three items."

1              MR. FEINGOLD:  Can we zoom in on No. 3.

2              THE WITNESS:  Okay.  Would you like me to read it?

3      BY MR. FEINGOLD:

4      Q.  After it is zoomed in, please.  Please read No. 3.

5      A.  "Besides the initial phone call from the medical examiner,

6      (doctor/nurse) and upon completion of the medical exam, the

7      only other contact you should have is with the insurance agent.

8              "However, sometimes the insurance company will call

9      you without your authorization and begin asking you personal

10     and financial questions.  This usually ends in the application

11     being denied since they feel the client might not be able to

12     afford the policy and, therefore, was being taken advantage of

13     by the insurance agent.

14             "While the intent of the insurance company may have

15     been justified, intruding into your affairs without knowing the

16     facts we do not agree with.  This can unjustly create problems

17     with the insurance agent who, besides making a living, is

18     trying to do the best he can for you.

19             "If the insurance company has questions, our general

20     agency can assist them.  The proper response for anyone,

21     insurance company or otherwise who is calling you asking

22     personal or financial questions, is thank you, but due to

23     identity theft, kindly mail to me your request in writing and I

24     will respond.  You will be amazed at how little mail you

25     receive!  In an era of identity theft, this should be the

D9QJBIN3                        Krupit - direct

1    response, but many times it is not.  Many an elderly person's

2    identity and fortune have been stolen over the telephone."

3    Q.  Thank you.  You can stop there.

4          Mr. Krupit, did you have conversations with Kevin

5    Kergil about his concerns regarding identity theft for your

6    clients?

7    A.  He wasn't concerned about the identity theft.  He said this

8    was an excuse that would make it plausible for the people to

9    feel not threatened when they get --

10          THE COURT:  Sorry.  You are standing.  Do you want to

11    say something?

12          MR. STAVIS:  Yes, your Honor, but --

13          THE COURT:  Are you objecting to the question?

14          MR. STAVIS:  I am objecting as the answer is not

15    responsive to the question, and I move to strike.

16          THE COURT:  You are moving to strike the answer?

17          MR. STAVIS:  Yes, not the question.

18          THE COURT:  Are you recounting the contents of

19    conversations that you had with Mr. Kergil about the issue of

20    identity theft?

21          THE WITNESS:  It was a bogus --

22          THE COURT:  No.  Say yes or no to me.  Are you

23    recounting conversations that you had with Mr. Kergil about the

24    issue of identity theft?

25          THE WITNESS:  Yes.

D9QJBIN3                        Krupit - direct

1            THE COURT:  Fine.  He is just jumped ahead to the next

2    question.  Go on ahead and finish your answer.

3    BY MR. FEINGOLD:

4    Q.  You can continue, Mr. Krupit.

5    A.  We did not want -- I shouldn't say, "we."

6            The information that Kevin gave me was for me to go

7    over this with the client basically and the reason was given,

8    given the reason of identity theft and that way they won't go

9    into all this stuff about their personal finances when someone

10   tries to call them on the phone to verify the validity of their

11   financial information.  You don't want any of your people

12   talking to any insurance company regarding the information

13   because he knew the information that we gave them was false.

14           THE COURT:  Let me know when it is a good time to

15   stop.

16           MR. FEINGOLD:  This might be a good time.  We are

17   about to go into a new area.

18           THE COURT:  Let's have lunch and I'll see you at 5

19   after 2:00.  Don't discuss the case.  Keep an open mind.

20           (Jury excused)

21           (Luncheon recess)

22           (Continued on next page)

23

24

25

D9QLBIN4                          Krupit – direct

                          AFTERNOON SESSION

 1

 2                              2:07 p.m.

 3              (Jury present)

 4              THE COURT:  You're still under oath.

 5              MR. FEINGOLD:  Thank you, your Honor.

 6    BY MR. FEINGOLD:

 7    Q.  Mr. Krupit, before the lunch break we talked about a client

 8    of yours, Opal Headrick.

 9              Do you recall the series of questions?

10    A.  Yes, I do.

11    Q.  Was a Union Central policy issued to Opal Headrick?

12    A.  Yes, it was.

13    Q.  Are you aware of how the premiums for that policy were

14    paid?

15    A.  Yes.

16    Q.  How were the premiums of that policy paid to Union Central?

17    A.  Through an investor.

18    Q.  Mr. Krupit, I'm showing you what's been marked as

19    Government Exhibit 1166 and 1168.

20              Let's start with 1166.  Have you had a chance to look

21    at 1166?

22    A.  Okay.

23    Q.  Do you recognize 1166?

24    A.  Yes, I do.

25    Q.  What's in 1166, what is it?

D9QLBIN4                          Krupit - direct

1    A.   What is it?  It's an email from Paul Krupit to Michael

2    Binday on December 15, 2008.

3    Q.   Are there additional emails below that email on top?

4    A.   Yes.  There's an email from Michael Binday to Paul Krupit,

5    Mark Resnick, and a copy to Kevin Kergil about the Union

6    Central trips.

7    Q.   What's the date of the email?

8    A.   December 15, 2008.

9              MR. FEINGOLD:  Government offers 1166.

10             MR. STAVIS:  May I have one moment, your Honor.

11             No objection.

12             MR. ABRAMOWITZ:  No objection.

13             THE COURT:  Admitted.

14             (Government's Exhibit 1166 received in evidence)

15   Q.   And take a quick look at 1168, if you can.

16   A.   Okay.

17   Q.   Do you recognize 1168?

18   A.   Yes, I do.

19   Q.   Does 1168 contain a series of emails?

20   A.   Yes, it does.

21   Q.   Among whom?

22   A.   From Michael Binday to Paul Krupit, and a copy to Tracey

23   Robinson, and the subject was Opal Headrick.  This was on

24   January 20, 2009.

25             MR. FEINGOLD:  Government offers 1168.

1            MR. STAVIS:  No objection.

2            MR. ABRAMOWITZ:  No objection.

3            THE COURT:  Admitted.

4            (Government's Exhibit 1168 received in evidence)

5    Q.  Mr. Krupit, let's look at 1166.

6            MR. FEINGOLD:  And, Ms. Hayakawa, if you could pull up

7    1166, please.

8    Q.  Let's first take a look at the bottom half of the page, the

9    email from Michael Binday to you, Mark Resnick, Kevin Kergil,

10   December 14, 2008, subject, Union Central trips.

11   A.  That's correct.

12   Q.  Are these the trips about which you testified earlier?

13   A.  Yes.

14   Q.  The ones that the insurance company sent you on?

15   A.  That's correct.

16           MR. FEINGOLD:  Ms. Hayakawa, if you could go up to the

17   top two emails from Paul Krupit to Michael Binday, then Michael

18   Binday to Paul Krupit.  Thank you.

19   Q.  Can you read the email from Michael Binday to you.  Just

20   read the first sentence of that email, please.

21   A.  I believe I'm reading it from the right place.

22           Need to know whether you can get checks from clients.

23   Q.  That's enough.  Can you please read your response.

24   A.  Michael:  Opal Headrick has a problem with writing check, a

25   check for $153,000 until same is wired into her account.  She

1    has no problem writing check once she knows the money is there.

2    Thanks, Paul Krupit.

3    Q.  Do you recall having conversations with Michael Binday

4    about Opal Headrick writing a check for $153,000?

5    A.  Yes, I do.

6    Q.  And did Michael Binday explain to you why Opal Headrick had

7    to write a check for $153,000?

8              MR. FISCHER:  Objection.

9              THE COURT:  I'm sorry?

10             MR. FISCHER:  Objection.

11             THE COURT:  Overruled.

12   A.  Yes, he did explain it.  He indicated the check had to come

13   from her to the insurance company.

14   Q.  And did he explain why it had to come from her to the

15   insurance company?

16   A.  Yes.

17   Q.  What did he say?

18   A.  He said it was very important that the insurance company

19   had to believe that for us to get the policy in place, in

20   force, that the check had to come from her account.

21   Q.  Was Opal Headrick paying these premiums?

22   A.  No, she was not.

23   Q.  Who was going to pay the premiums for Opal Headrick?

24   A.  A third party investor.

25   Q.  And how would that happen mechanically, how would Opal

1    Headrick be able to write a check for $153,000 -- withdrawn.

2              The reference about until same is wired into her

3    account, what did you mean by that?

4    A.  She was not going to write a bad check.  The money had to

5    be put into her account in order for her -- she didn't have the

6    money.  It's as simple as that.  She did not have the money to

7    pay the premiums on the policy.

8    Q.  Can we turn to 1168, please, and can we blow up the bottom

9    email from Tracey Robinson.  Actually, let's go to the last

10   email on the second page, please, from Michael Binday, sent

11   Tuesday, January 20, 2009, to Paul Krupit, copy to Tracey

12   Robinson, subject, Opal Headrick.

13             Mr. Krupit, can you please read the email.

14   A.  Okay.  Hi Paul:  Both of Ms. Headrick's policies will

15   require an additional month premium paid.  Tracey will let you

16   and me know how much this is for.  We will need you to get

17   checks from her for the appropriate amounts.

18             Once we know how much, we will arrange for the bridge

19   loan in the same amount.

20             In regard to Union Central policy, Tracey said that

21   there was confusion.  Let me clarify:  Two year financing offer

22   is on the table.  Commission split is bad and will cost us both

23   money.

24             Up-front offer is very likely.  We are working on

25   this, but may need additional week.  This would be at normal

1    compensation levels.  We did an internal evaluation and saw

2    that her policy would be a good deal for an up-front fund.

3              MR. FEINGOLD:  Can you please, Ms. Hayakawa, go to the

4    next email in this chain, please.  That's the same one.  Go to

5    the one page 4, please, first page, bottom half of the first

6    page.

7    Q.  Reading from R. Binday SDNY309886, from Tracey Robinson to

8    Michael Binday, January 20, 2009, copy to Paul Krupit, subject

9    Opal Headrick.  Can you please read the text of that email from

10   Tracey Robinson, please.

11   A.  Subject is Opal Headrick.  Michael:  The monthly premium

12   due on the Union Central policy is $9,167.02.  This is due on

13   or before 1/22/09.  The monthly premium due on the Lincoln

14   policy is $11,987.50.  This is due on or before 12/24/09.

15   Thank you, Tracey Robinson.

16   Q.  Can we please go to the next email above that from Michael

17   Binday to Tracey Robinson, copying Paul Krupit, Tuesday,

18   January 20, 2009, subject Opal, Headrick.  Can you please read

19   that email.

20   A.  Yes.  I can get checks.  Please wire a range for bridge

21   loans and wire same into her account.  Thanks, Paul Krupit.

22   Q.  I'm sorry, Mr. Krupit.  I think you're reading from the

23   wrong email.  The email from Michael Binday up on the screen.

24   A.  I didn't look up on the screen.

25   Q.  I'll save the time.

D9QLBIN4                          Krupit - direct

1          Paul, please confirm that you can get two checks to
2     cover this.  One for each policy.  We will arrange bridge loans
3     to her account.  Thank you, Michael Binday.
4          MR. FEINGOLD:  Now, Ms. Hayakawa, can we please look
5     at the top email, the one Mr. Krupit was just reading from.
6     Q.  Mr. Krupit, can you please read what you wrote to Michael
7     Binday in response to his email.
8     A.  Yes, I can get checks.  Please wire arrange for bridge
9     loans and wire same into her account.  Thanks, Paul Krupit.
10    Q.  Did you in fact get checks from Opal Headrick to pay the
11    premiums?
12    A.  Yes, I did.
13    Q.  And were those checks for about the same amount as what was
14    wired into her account?
15    A.  Yes, that's correct.
16    Q.  Now, did Opal Headrick's Union Central policy get sold?
17    A.  Yes, I believe it did.
18    Q.  Was the sale one that happened up-front after issuance or
19    was it a two-year deal?
20    A.  I believe it was an up-front.
21    Q.  Mr. Krupit, who bought Opal Headrick's policy?
22    A.  I believe Michael Binday's family did.
23    Q.  How do you know that?
24    A.  Because I took the documents to her and he told me so.
25    Q.  About when was Opal Headrick's policy sold to Michael

1   Binday's family?

2   A.  I'm sorry, I don't know the exact date.

3   Q.  I'm showing you what's been marked as Government

4   Exhibit 1147.  Do you recognize 1147?

5   A.  Yes, I do.

6   Q.  What is it?

7   A.  These are the closing documents regarding Opal Headrick's

8   policy.

9   Q.  Did you sign some of these documents?

10  A.  Yes, I did.

11  Q.  Did you have your client, Ms. Headrick, sign some of these

12  documents?

13  A.  Yes, I did.

14          MR. FEINGOLD:  Government offers 1147.

15          MR. FISCHER:  No objection.

16          THE COURT:  Admitted.

17          (Government's Exhibit 1147 received in evidence)

18          MR. FEINGOLD:  Can we please pull up 1147.  I think

19  I'll use the Elmo for this since it's a large document.  If we

20  could change the input, please.  Thank you.

21  Q.  Mr. Krupit, can you please turn to the page that is stamped

22  R. Binday SDNY64080.

23  A.  Okay.

24  Q.  Can you read the highlighted part, please.

25  A.  This irrevocable assignment of beneficial interest in

D9QLBIN4                         Krupit - direct

1    trust, this assignment, is entered into by and between Merle

2    Bishop, the assignor, as the designated beneficiary, and B.D.

3    Estate Planning Corp., the assignee, in regards to assignor's

4    interest in the Headrick family irrevocable trust dated

5    November 24, 2008, as first amended and restated March 6, 2009,

6    hereinafter the trust.

7    Q.  Can you just read the first sentence of the next paragraph.

8    A.  The assignor for and in consideration of the amount set

9    forth on Exhibit A attached hereto, the purchase price, which

10   shall be held in escrow by Marino and Associates P.C., the

11   escrow agent, or such other third party, and released on the

12   terms and conditions set forth below, conveys and assigns to

13   assignee all of the assignor's rights, title, interest, powers,

14   privileges, and benefits created or reserved to assignor in the

15   Headrick family irrevocable trust dated November 24, 2008, as

16   first amended and restated March 6, 2009.

17   Q.  Okay.  Now, it says Opal -- I'm sorry -- Merle Bishop, the

18   assignor.  Who is Merle Bishop?

19   A.  Merle Bishop was Opal Headrick's boyfriend.

20   Q.  What role if any did Merle Bishop have in the issuance of

21   the Union Central policy on Opal Headrick's life?

22   A.  He was listed as a beneficiary.

23   Q.  There's an Exhibit A reference.  I just want to show the

24   Exhibit A.  Can you please read -- I'm sorry, it's R. Binday

25   SDNY64086 -- can you just please read the purchase price.

D9QLBIN4                      Krupit - direct

1   A.   The purchase price to be received by the assignor shall be

2   $70,000.00.

3   Q.   Thank you.  So who got the $70,000?

4   A.   Opal Headrick.

5   Q.   Now, did you know what -- it says here the assignee of the

6   beneficial interest in the trust is B.D. Estate Planning.

7   A.   My understanding is it's --

8   Q.   Mr. Krupit, there's not a question pending.

9        Do you know what B.D. Estate Planning is?

10  A.   Yes.

11  Q.   What is it?

12  A.   Michael Binday.

13  Q.   I'm going to put up on the screen R. Binday 64088.  And see

14  where it says B.D. Estate Planning Corp. and then it's defined

15  as the purchaser in the first paragraph, Mr. Krupit?

16  A.   Yes, I do, I see that.

17  Q.   Can you just please read then the first sentence of the

18  second paragraph of this page.

19  A.   Insured does --

20  Q.   You can stop after the address.

21  A.   Insured does hereby agree to keep in contact with

22  purchaser, whose office is at 820 Scarsdale Avenue, Scarsdale,

23  New York 10583, or purchaser's designated --

24  Q.   That's it.

25  A.   You said to stop, sorry.

D9QLBIN4                        Krupit - direct

1   Q.  Did you recognize this address?

2   A.  Yes, I do.

3   Q.  How did you recognize that address?

4   A.  That's the address of Advocate Brokerage.

5   Q.  Now, could you please turn to 64085.

6   A.  All right.

7   Q.  Are you there?

8   A.  Yes.

9   Q.  All right.  Can you please read "on the 13th day," can you

10  please read that paragraph.

11  A.  On the 13th day of March in the year 2009, before me, the

12  undersigned, personally appeared Merle Bishop, personally known

13  to me or proven to me on the basis of satisfactory evidence to

14  be the individual whose name is subscribed to the within

15  instrument and acknowledged to me that he executed the same in

16  his capacity, and that by his signature on this instrument the

17  individual, or the person upon behalf of which the individual

18  acted, executed the instrument, and that such individual made

19  such appearance before the undersigned in North Fort Meyers in

20  Florida.

21  Q.  And do you see a notary stamp and a notary signature on

22  there?

23  A.  Yes, I do.

24  Q.  Who's the notary stamp?

25  A.  Mark Resnick.

D9QLBIN4                         Krupit – direct

1   Q.  And the signature at the bottom, the individual taking the

2   acknowledgment?

3   A.  It's Mark Resnick.

4   Q.  Did Mark Resnick notarize this document?

5   A.  No, he did not.

6   Q.  How do you know that?

7   A.  Because I had an arrangement with him where I gave him my

8   notary stamp and he gave me his notary stamp to notify

9   documents such as this.

10  Q.  And who notarized this with Mark Resnick's stamp?

11  A.  I did.

12  Q.  And who signed Mark Resnick's signature at the bottom

13  there?

14  A.  I did.

15  Q.  Mr. Krupit, I'm showing you what's been marked Government

16  Exhibit 3086.  Do you recognize it?

17  A.  Yes, I do.

18  Q.  What is it?

19  A.  This is Mark Resnick's notary stamp.

20  Q.  Did you use Mark Resnick's notary stamp on more than just

21  this one document that we saw?

22  A.  Yes, I did.

23  Q.  Did you use it on multiple documents related to the life

24  insurance business you were in?

25  A.  Yes, I did.

1          MR. FEINGOLD:  Your Honor, may I publish to the jury?

2          THE COURT:  Yes.

3          MR. FISCHER:  Your Honor.

4          THE COURT:  Is it in evidence?  It's not in evidence.

5          MR. FEINGOLD:  I apologize.  Government offers 3086.

6          MS. MURRAY:  No objection, your Honor.

7          MR. ABRAMOWITZ:  No objection.

8          THE COURT:  Thank you.  It's in evidence.  Now you may

9   show it.  We do have an order to do these things.

10         (Government's Exhibit 3086 received in evidence)

11  Q.  Mr. Krupit, why did you and Mr. Resnick exchange notary

12  stamps?

13  A.  The reason we exchanged notary stamps is because as an

14  agent, if I'm the agent on the policy, I can't notarize my

15  own -- as writing agent, I can't notarize my own application

16  and my own paperwork.

17  Q.  Do you know if Mark Resnick used your notary stamp?

18  A.  Yes, he did.

19  Q.  Did you provide Mark Resnick -- withdrawn.

20         Showing you what's been marked government 1534.

21         MR. FEINGOLD:  Your Honor, government offers 1534

22  pursuant to stipulation that's Government Exhibit 5000.

23         MR. FISCHER:  No objection, your Honor.

24         MS. MURRAY:  No objection, your Honor.

25         THE COURT:  Admitted.

D9QLBIN4                        Krupit - direct

1          (Government's Exhibit 1534 received in evidence)

2          MR. FEINGOLD:  Can we publish -- I'll put it on the

3     Elmo.

4     Q.  Mr. Krupit, can you look at the bottom of 1534.  It says an

5     assignment of replacement trustee for the irrevocable agreement

6     of trust of insurance of Oswald Heaton.

7          Was Oswald Heaton a client of yours, Mr. Krupit?

8     A.  No, he was not.

9     Q.  Does that appear to be your notary stamp, Paul A. Krupit?

10    A.  Yes, it is.

11    Q.  Is that your signature underneath that notary stamp?

12    A.  No, it is not.

13    Q.  Did you notarize this assignment of replacement trustee for

14    the insurance of Oswald Heaton?

15    A.  No, I did not.

16    Q.  Did you provide Mr. Resnick with any other notary stamps?

17    A.  Yes, I did.

18         MR. FEINGOLD:  Your Honor, the government offers 2026,

19    again pursuant to Government Exhibit 5000, the stipulation.

20         MR. FISCHER:  Just a moment.

21         No objection, your Honor.

22         MS. MURRAY:  No objection.

23         THE COURT:  Admitted.

24         (Government's Exhibit 2026 received in evidence)

25    Q.  Besides your notary stamp, whose notary stamp did you also

D9QLBIN4                          Krupit - direct

1   provide to Mr. Resnick?

2   A.  My former daughter-in-law Meredith Krupit.

3   Q.  Putting up on the screen 2026, which is a credit agreement

4   dated as of February 8, 2008, among the Doris P. Riviere

5   irrevocable life insurance trust between the trust and HM Ruby

6   fund.

7           Was Doris Riviere one of your clients, Mr. Krupit?

8   A.  No, she was not.

9   Q.  I just want to read, on this 13th day of February, 2008,

10  before me, the undersigned, a notary public in and for said

11  county and state, personally appeared Doris P. Riviere, who

12  acknowledged his due execution of the foregoing instrument, and

13  it's stamped Meredith Krupit and it appears to be signed by

14  Meredith Krupit.

15          Mr. Krupit, do you know, did Meredith Krupit ever

16  notarize the signature of Doris Riviere?

17  A.  No, she did not.

18  Q.  Mr. Krupit, do you know Lillian Robinson?

19  A.  Yes, I do.

20  Q.  Who is Lillian Robinson?

21  A.  She was one of my clients.

22  Q.  Where did she live?

23  A.  Fort Meyers, Florida.

24  Q.  Did you get STOLI policies for Lillian Robinson?

25  A.  Yes, I did.

D9QLBIN4                    Krupit - direct

1  Q.  Did you sign false applications for Lillian Robinson?

2  A.  Yes, I did.

3  Q.  Did her applications contain false information about her

4  finances?

5  A.  Yes, they did.

6  Q.  Did they have false information about the source of

7  premiums?

8  A.  Yes, it was false information about the source of premiums.

9  Q.  Did Lillian Robinson's applications have false information

10  about Ms. Robinson's intent to sell her life insurance

11  policies?

12  A.  Yes, it did.

13  Q.  Did Lillian Robinson in fact get any STOLI policies?

14  A.  Yes, she did.

15  Q.  Did she get paid for any of those policies?

16  A.  Yes, she did.

17  Q.  Do you recall how much?

18  A.  You know, I don't.  I know it was in the neighborhood of

19  more than $60,000.

20  Q.  Now, Mr. Krupit, do you know Steven Kupper, K-U-P-P-E-R?

21  A.  Yes, I do.

22  Q.  Who is Steven Kupper?

23  A.  He's a CPA in Naples, Florida.

24  Q.  How if at all was Kupper involved in your getting large

25  life insurance policies with Michael Binday?

D9QLBIN4                        Krupit - direct

1    A.  We used Steven Kupper to certify financials of a client, of

2    several clients.

3    Q.  Were the financials accurate?

4    A.  No, they were not.

5    Q.  Did you initially reach out to Steven Kupper to use him in

6    this process?

7    A.  Yes, I did.

8    Q.  Why did you reach out to Steven Kupper?

9    A.  At that particular point in time, the insurance companies

10   that we were dealing with wanted further proof, if you will,

11   that the client in fact did have the appropriate funds to be

12   able to pay for the policy and had to be certified by a

13   public -- certified public accountant or an attorney's letter

14   confirming their estate.  In our policies, we used the CPA.

15   Q.  Mr. Krupit, I'm showing you what's been marked as

16   Government 2612.  Do you recognize 2612, Mr. Krupit?

17   A.  Yes, I do.

18   Q.  What is it?

19   A.  This is an email from Paul Krupit to Michael Binday dated

20   May 1, 2007.

21   Q.  What's the subject?

22   A.  CPA letter examples.

23            MR. FEINGOLD:  Government offers 2612.

24            MR. FISCHER:  No objection.

25            THE COURT:  Admitted.

1              (Government's Exhibit 2612 received in evidence)

2              MR. FEINGOLD:  Please publish 2612.  And can you blow

3      up the text, please.  Blow up the whole email, anything that's

4      in writing.  Thank you.

5      Q.  Mr. Krupit, can you please read your email to Michael

6      Binday?

7      A.  Michael, please email over sample CPA letters that you

8      have.  Thanks, Paul Krupit.

9      Q.  What were you referring to when you said sample CPA

10     letters?

11     A.  Michael, Kevin, and I had several conversations about the

12     type of letter that was required in order to certify the

13     estates of these individuals that we dealt with, and so he sent

14     over an attachment with the samples.

15     Q.  And what did you do with those samples?

16     A.  I took the samples and I sent it to Steven Kupper and I

17     asked him if he would certify these estates of clients we had.

18     Q.  Did he certify false information?

19     A.  Yes, he did.

20     Q.  Mr. Krupit, I'm showing you what's been admitted as

21     Government Exhibit 2308.

22             MR. FEINGOLD:  If you could pull that up, please.  If

23     we could turn to the second page.

24     A.  Okay.

25             MR. FEINGOLD:  Can you blow up the financial

D9QLBIN4                          Krupit - direct

1    information, please, and the Kupper, starting at the Kupper.

2    Thank you.

3    Q.  Mr. Krupit, is this information about Lillian Robinson

4    accurate?

5    A.  No, it is not.

6    Q.  Did Lillian Robinson have anything close to $4.7 million

7    net worth?

8    A.  No, she did not.

9    Q.  She was a client of yours?

10   A.  Yes.

11   Q.  Were you generally familiar with her finances?

12   A.  Yes.

13   Q.  Now, could we please read the bottom of that page that we

14   have compiled?

15   A.  We have compiled the estimated annual income of

16   Mrs. Lillian Robinson as of December 21, 2007, in accordance

17   with the statement of standards for accounting and review

18   services issued by the American Institute of Certified Public

19   Accountants.

20   Q.  Okay.

21         MR. FEINGOLD:  Can you go to the second page.  I'm

22   sorry, the third page, second page of this form.  Thank you.

23   Just blow up the text.

24   Q.  Finish reading.

25   A.  A compilation is limited to presenting information that is

D9QLBIN4                        Krupit - direct

1    the representation of the individual whose financial statements

2    are presented.  We have not audited or reviewed the

3    accompanying statement of financial condition and, accordingly,

4    do not express an opinion or any other form of assurance on it.

5    Q.  Continue, please.

6    A.  Mrs. Lillian Robinson has elected to omit substantially all

7    of the disclosures required by generally accepted accounting

8    principles.  If the omitted disclosures were included in the

9    statement of financial condition, they might influence the

10   user's conclusions about the financial condition of

11   Mrs. Lillian Robinson.  Accordingly, this statement of

12   financial condition is not designed for those who are not

13   informed about such matters.

14        Sincerely, Steven S. Kupper, CPA.

15   Q.  Mr. Krupit, did Lillian Robinson -- you can take that down,

16   thank you -- did Lillian Robinson provide any information to

17   Steven Kupper?

18   A.  No, she did not.

19   Q.  Who provided information to Steven Kupper?

20   A.  Kevin Kergil.

21   Q.  How do you know that?

22   A.  Because he gave it to Steven Kupper.

23   Q.  How do you know that he gave it to Steven Kupper?

24   A.  Because he took the information that I sent him on the

25   financial worksheet and he sent it back to him in a typed form

D9QLBIN4                          Krupit - direct

1   and he, Steven Kupper, extracted the information from the

2   financial worksheet and put it in the form of the CPA letter.

3   Q.  Mr. Krupit, I hand you what's been marked as Government

4   3091.  Do you recognize the two pages that are 3091?

5   A.  Yes, I do.

6   Q.  What is 3091?

7   A.  It's an accountant letter.

8   Q.  For whom?

9   A.  Michael Swords.

10  Q.  Is it for a client of yours?

11  A.  Yes, I'm sorry.  Ms. Cornelia Chestnut.

12  Q.  Who is Michael Swords?

13  A.  He's an accountant in Lehigh Acres, Florida.

14          MR. FEINGOLD:  Government offers 3091, your Honor.

15          MR. FISCHER:  Voir dire, your Honor.

16          THE COURT:  Sure.

17  VOIR DIRE EXAMINATION

18  BY MR. FISCHER:

19  Q.  Mr. Krupit, this letter is from Michael Swords to Cornelia

20  Chestnut; is that correct?

21  A.  Yes.

22  Q.  Did you ever receive a copy of this letter?

23  A.  Yes.

24  Q.  When did you receive a copy of this letter?

25  A.  It's dated March 21.

D9QLBIN4                          Krupit - direct

1                THE COURT:  Did you receive it at or about the date --

2                THE WITNESS:  Yes, that's correct, your Honor.  On or

3       about the date of the letter.

4       Q.  On or about the date of the letter, on or about March 21,

5       2008?

6       A.  Yes.

7                MR. FISCHER:  No objection.

8                THE COURT:  Admitted.

9                (Government's Exhibit 3091 received in evidence)

10               MR. FEINGOLD:  Can you please publish 3091.

11      BY MR. FEINGOLD:

12      Q.  Just quickly, Mr. Krupit, is this the same type of document

13      we just looked at with respect to the Steven Kupper letter for

14      Lillian Robinson?

15      A.  Yes.

16      Q.  And just turning to the second page, you said Cornelia

17      Chestnut was one of your clients?

18      A.  Yes, she was.

19      Q.  Did you get STOLI policies for her?

20      A.  Yes, I did.

21      Q.  Did you get those through Michael Binday?

22      A.  Yes, I did.

23      Q.  Now, it's a little grainy.  Can you make out the total

24      assets figure at the bottom of that page, towards the bottom of

25      the page?

D9QLBIN4                       Krupit - direct

1    A.  Yes.

2    Q.  What is it?

3    A.  $4,292,110.

4    Q.  Did Cornelia Chestnut have anything close to that amount in

5    total assets?

6    A.  No, she did not.

7    Q.  Now, we just looked at CPA letters for Lillian Robinson,

8    for Cornelia Chestnut.  Were other CPA letters done for your

9    clients?

10   A.  I'm not aware of any other ones at this point.  There may

11   have been.  But to my recollection, you know -- there may have

12   been other clients that we had to use this for.  I had over 20

13   policies, so it's hard for me to say.

14   Q.  Were you the one who identified Michael Swords as someone

15   who could provide these letters?

16   A.  Yes.

17   Q.  Were you someone -- were you the one who identified Steve

18   Kupper as a person who could provide these CPA letters?

19   A.  Yes, that's correct.

20   Q.  Did you provide the information for Steven Kupper to anyone

21   else?

22   A.  To Michael Swords and Steven Kupper.

23   Q.  Let me rephrase the question.  In order to get the CPA

24   letters done for any of your clients, did you provide Steven

25   Kupper's information to anyone else?

1   A.  To Kevin Kergil.

2              MR. FISCHER:  Objection to the form, your Honor.

3              MR. FEINGOLD:  I can rephrase.

4   Q.  Who else did you provide Steven Kupper's information to?

5   A.  Kevin Kergil.

6   Q.  Mr. Krupit, I'm showing you what's been marked as

7   Government 2345.  Do you recognize 2345?

8   A.  Yes, I do.

9   Q.  What's 2345?

10  A.  It's a forwarded email from Michael Binday to Paul Krupit

11  and Mark Resnick about Lillian Robinson's policy that lapsed.

12  Q.  Are there attachments to the email?

13  A.  Yes, there are.

14  Q.  What's the general nature of the attachments?

15  A.  The general nature is that Mark was the agent, Mark Resnick

16  was the agent of record, so he had to sign a letter saying that

17  Lillian Robinson did not get the notices on her policy, which

18  caused it to lapse.

19             MR. FEINGOLD:  Government offers 2345.

20             MR. FISCHER:  Just a moment, your Honor.

21             No objection, your Honor.

22             MS. MURRAY:  No objection, your Honor.

23             THE COURT:  Admitted.

24             (Government's Exhibit 2345 received in evidence)

25             MR. FEINGOLD:  Can we please publish 2345.

D9QLBIN4                        Krupit - direct

1    Q.  Can you please read, Mr. Krupit, the email from Michael

2    Binday to you and Mark Resnick dated June 11, 2010.

3    A.  Okay.

4    Q.  If you could wait until we blow that up, please.  Thank

5    you.

6    A.  Okay.  Subject is Lillian Robinson.  Dear Paul and Mark:

7    The Robinson policy lapsed.  The trustee did not inform anyone

8    of the grace notices and our appointments were terminated,

9    preventing us from getting notice or even checking online.

10              We have two objectives:

11              1.  Get policy reinstated without medical.

12              2.  If above does not work, get it reinstated with a

13    reinstatement application.

14              Part 1.  There are three letters attached to

15    accomplish goal No. 1.

16              Letter -- No. 1.  Letter from Mrs. Robinson asking AIG

17    to reinstate.

18              2.  Letter from Ms. Robinson asking Mark, who is her

19    agent, to get address changed from February.

20              Letter from Mark -- No. 3.  Letter from Mark to AIG

21    asking them to change the address from February.

22    Q.  Can you go to the next page, please.

23    A.  Paul.  Can you get these signed by Mrs. Robinson?  Can you

24    get a check from her for $45,900?  I was told that funds will

25    be wired to her account to cover this.

1          Mark, can you sign the letter to AIG.

2          Part 2.  Paul:  We are also attaching a reinstatement

3     application.  Can you get this signed?  While we hope it is

4     unnecessary, best to at least have it available.

5          Thank you, Michael Binday.

6     Q.  Did Lillian Robinson receive an American General policy?

7     A.  Yes, she did.

8     Q.  And then can you please just read your email to Mark

9     Resnick on the very top of the first page, which we'll zoom in

10    on, on June 15, 2010.

11    A.  Mark, please sign letter to AIG and forward to Michael.

12    Thanks.

13    Q.  And are the letters that are attached to this email the

14    same letters that you received from Michael Binday and that you

15    forwarded to Mark Resnick?

16    A.  Yes, they are.

17    Q.  Now, just going to the bottom of the first page, the date

18    of this email is June 11, 2010.  No. 3, if we could zoom in on

19    No. 3 at the bottom.  Actually, No. 2 as well.  I apologize.

20    Letter from Ms. Robinson asking Mark, who is her agent, to get

21    address changed from February.

22          First, was Lillian Robinson your client or Mark

23    Resnick's client?

24    A.  It's my client.  Mark Resnick was the agent of record, but

25    it was my client.

D9QLBIN4                          Krupit - direct

1    Q.  Do you know why he was the agent of record if Lillian

2    Robinson was your client?

3    A.  The reason is because Ms. Robinson applied for multiple

4    policies and there can be only be one agent on a policy.

5    Q.  Why can there only be one agent on a policy?

6    A.  That was my understanding.

7    Q.  You said only one agent on a policy.  Mark Resnick is the

8    agent on this policy.

9    A.  Yes, yes, he is.

10   Q.  You're not the agent on this policy?

11   A.  No, but she was my client.

12   Q.  And it says to get address changed from February -- if we

13   can look at the letter from Ms. Robinson, three pages in, I'm

14   sorry, four pages in -- to Mark Resnick, what's the date on

15   that letter?

16   A.  February 3, 2010.

17              (Continued on next page)

18

19

20

21

22

23

24

25

D9QJBIN5                          Krupit - direct

1    Q.  The e-mail is June 11, 2010.  Going to the last attachment,

2    letter from Mark Resnick to American General, what is the date

3    on that letter?

4    A.  February 5th.

5    Q.  Of what year?

6    A.  2010.

7    Q.  Let's look at those letters.  If you can just look at the

8    first letter, three pages in, June 10, 2010 from Lillian

9    Robinson to American General life.  Today I have been informed

10   my policy has lapsed due to non-payment.  I ask that you please

11   reinstate my policy as I was not informed of your notices in a

12   timely manner.  You have been not able to reach the trustee.

13   As such, I request copies of all correspondence get sent to my

14   home address.  This request was made to my agent during the

15   month of February 2010.  I have not yet received any

16   correspondence.

17          Now, Mr. Krupit, did Lillian Robinson try to reach the

18   trustee for her insurance policy?

19   A.  No, she did not.

20   Q.  Did she request copies, copies from American General of

21   correspondence from American General get sent to her home

22   address?

23   A.  No, she did not.

24   Q.  Did she make a request in February 2010 to her agent that

25   that happen?

D9QJBIN5                          Krupit - direct

1    A.  No, she did not.

2    Q.  Turn to the next letter, please, the next page.  February

3    3rd, 2010, from Lillian Robinson to Mark Resnick.

4            Dear Mark:  I have not been able to reach the trustee

5    of my life insurance policy.  Can you have the address changed

6    so that I receive bills and correspondence?  Please ask AIG to

7    change the address to my home as indicated above.  Kindly,

8    Lillian Robinson.

9            Did Lillian Robinson write this letter, Mr. Krupit?

10   A.  No, she did not.

11   Q.  Turn to the last page, please, February 5, 2010 from Mark

12   Resnick to American General life.  Requesting, I request that

13   you correct -- let me go back.  I am the agent on the above

14   policy.  I am no longer able to access your web site for

15   customer service changes.  I request that you correct this and

16   allow access so that I can provide service to my clients.

17           Attached is a note from one of my clients requesting

18   service.  Please make changes per her request.  Sincerely

19   yours, Mark Resnick.

20           Mr. Krupit, did Mark Resnick make this request in

21   February 2010?

22   A.  No, he did not.

23   Q.  Did you have Ms. Robinson sign the letters for her that

24   were attached?

25   A.  Yes, I did.

D9QJBIN5                          Krupit - direct

1   Q.  Did you know, realize they were back-dated?

2   A.  Yes, I did.

3   Q.  Did you know the information in those letters was false?

4   A.  Yes, I did.

5   Q.  Why were the letters back-dated?

6   A.  It was to deceive the insurance company.

7           (Off-the-record discussion)

8           MR. FEINGOLD:  The government offers 2312 pursuant to

9   the stipulation that is admitted as government 5000.

10          MR. FISCHER:  Just a moment.

11          (Pause)

12          MR. FISCHER:  No objection.

13          MS. MURRAY:  No objection.

14          THE COURT:  Admitted.

15          (Government Exhibit 5000 received in evidence)

16          MR. FEINGOLD:  Can you please publish 2312.  I need

17  you to zoom in on the text right above the time stamp 2010,

18  June 18, please.

19  BY MR. FEINGOLD:

20  Q.  Mr. Krupit, did you have Lillian Robinson sign this letter?

21  A.  Yes, I did.

22  Q.  Is this the same letter that Michael Binday sent you?

23  A.  Yes, it is.

24  Q.  It may be hard to make out, but the first sentence of the

25  third paragraph, along with this notice I have included a check

D9QJBIN5                          Krupit – direct

1    in the amount of $49,900.00 to show good faith and to comply

2    with my obligation to this contract.

3            Did you collect a check for $49,900.00 from Lillian

4    Robinson?

5    A.  Yes, I did.

6    Q.  Would you turn to the second page of this exhibit, please.

7    It is upside down, but is that the check?

8    A.  That's correct, that is the check that I got from Lillian

9    Robinson.

10   Q.  Did Lillian Robinson pay that money herself?

11   A.  No, she did not.

12   Q.  Who paid it?

13   A.  Michael Binday.

14   Q.  If we can then go to the third page of this exhibit.  Does

15   this appear to be the same letter from Mark Resnick to sign

16   that was attached to Michael Binday's e-mail?

17   A.  Yes.

18   Q.  And then just the last page.  Is this the last letter in

19   that e-mail from Michael Binday that Lillian Robinson signed?

20   A.  Yes, that's correct.

21   Q.  Did you have her sign it?

22   A.  Yes, I did have her sign it.

23   Q.  Did you explain to her why you were having her sign it?

24   A.  No.  She trusted me and she has been a customer for years.

25   Q.  Now, Mr. Krupit, did there come a point in time in which

1    you were approached by the FBI?

2    A.   Yes.

3    Q.   Approximately when was that?

4    A.   I believe it was June the 24th of 2010.

5    Q.   At some point after you were initially approached by the

6    FBI, did you later have meetings with the government?

7    A.   Yes, I did.

8    Q.   Who was typically at these meetings?

9    A.   The FBI, the U.S. Attorney and my attorney and me.

10   Q.   At these meetings, did you talk about your work with

11   Binday, Kergil and Resnick?

12   A.   Yes, did.

13   Q.   Did you talk about your own lies?

14   A.   Yes, I did.

15   Q.   Did you talk about your own fraud?

16   A.   Yes, I did.

17   Q.   Have you pled guilty to any criminal charges?

18   A.   Yes, I have.

19   Q.   Now, at the time you pled guilty, did you enter into an

20   agreement with the government?

21   A.   Yes, I did.

22   Q.   Was that agreement in writing?

23   A.   Yes, it was.

24   Q.   I am showing you what has been marked as Government 4005.

25   Do you recognize it?

D9QJBIN5                          Krupit - direct

1    A.  Yes, I do.

2    Q.  What is it?

3    A.  It is a letter from the government to my attorney on the

4    charges that I pled guilty to.

5    Q.  Is it a type of agreement?

6    A.  Yes, it is, it is a cooperation agreement.

7    Q.  Did you sign it?

8    A.  Yes, I did.

9    Q.  Are you familiar with the terms in that agreement?

10   A.  Yes, I am.

11   Q.  Does Government Exhibit 4005 contain the entire agreement

12   between you and the government?

13   A.  Yes, it does.

14   Q.  Now, you testified earlier you pled guilty to crimes.  What

15   crimes did you plead guilty to?

16   A.  Conspiracy to commit mail and wire fraud, mail fraud, wire

17   fraud and conspiracy to destroy records.

18   Q.  Are you familiar with the maximum sentence that you could

19   get for those crimes?

20   A.  Yes, I am.

21   Q.  What is the maximum sentence you could get?

22   A.  80 years in prison.

23   Q.  What is the minimum sentence you could get?

24   A.  A reduced sentence, no sentence, no sentence.

25   Q.  No jail time?

1    A.  Yes, sir.

2    Q.  Have you been sentenced yet for those crimes?

3    A.  No, I have not.

4    Q.  What do you have to do under the terms of your cooperation

5    agreement?

6    A.  Provide assistance when asked for from the government,

7    attend all meetings that I'm requested of to come and talk

8    about the case, and to tell the truth and cooperate.

9    Q.  When are you required to tell the truth, Mr. Krupit?

10   A.  All the time.

11   Q.  How many times, roughly, have you met with the government?

12   A.  Probably 9 times now, approximately.

13   Q.  Now, if you uphold your end of the bargain in that

14   agreement, what does the government have to do to hold up its

15   end of the bargain?

16   A.  They write a letter to the judge on the good things that

17   I've done and the bad things that I've done.

18   Q.  To the sentencing judge?

19   A.  Yes.

20   Q.  Now, when you say the good things that you've done, what do

21   you mean by that?

22   A.  Cooperating with the government.

23   Q.  When you say the bad things that you've done, what do you

24   mean by that?

25   A.  Committing the crimes that I've committed.

D9QJBIN5                          Krupit - direct

1   Q.  Do you know if the letter will contain information about

2   any other bad conduct in addition to the crimes that you've

3   committed in?

4   A.  Yes, I do.

5   Q.  What other bad conduct are you referring to?

6   A.  Approximately November of 2011 I was living in Denver,

7   Colorado, and I did a renewal on a Medicare application from a

8   client in Florida, and I was supposed to see the client, and I

9   did not see the client when I did the renewal.

10  Q.  When you say you did not see the client, what do you mean

11  by that?

12  A.  At that time the law required that we had to actually see

13  the client in person at that time, and I did not.  I had seen

14  him sometime in the past, a year or so ago from that date.

15  Q.  Where did the client live?

16  A.  They lived in Naples, Florida.

17  Q.  Did you see the client at the time of the original

18  application?

19  A.  Yes, I did.

20  Q.  Did you talk to the client on the phone at the time you put

21  in the renewal application?

22  A.  Yes, I did.

23  Q.  But did you certify in the renewal application you had, in

24  fact, seen the client in person as opposed to the phone?

25  A.  Yes, I did.

D9QJBIN5                         Krupit - direct

1    Q.  What happened as a result of your false certification in
2    that renewal application?
3    A.  The insurance company terminated me and I lost in excess of
4    $50,000 renewal commissions on every policy that I've ever
5    written with them.
6    Q.  Do you know if the government became aware of this incident
7    prior to today?
8    A.  Yes, they did.
9    Q.  How so?
10   A.  Because I told them.
11   Q.  Now, do you remember testifying earlier about what the
12   minimum and maximum sentences were for your crimes?
13   A.  Yes, I do.
14   Q.  Now, if the government sends a letter to the judge, a
15   letter you referred to, what sentence can you get?
16   A.  80 years in prison.
17   Q.  What is the lowest sentence you could get?
18   A.  No sentence.
19   Q.  Now, what is your hope of what will happen by getting a
20   letter from the government?
21   A.  I am hoping that I will get no sentence, no jail time.
22   Q.  Has the government made any promises to you about what
23   sentence you'll get if you cooperate fully?
24   A.  No, they have not.
25   Q.  Does the cooperation agreement contain any promises about

1   what sentence you will receive?

2   A.  No, it does not.

3   Q.  Is the government going to recommend any specific sentence

4   to the judge?

5   A.  No, they are not.

6   Q.  Has anyone made any promises to you about what sentence you

7   will receive?

8   A.  No, they have not.

9   Q.  Who determines your sentence, Mr. Krupit?

10  A.  The judge.

11  Q.  Anyone else?

12  A.  No.

13  Q.  Now, Mr. Krupit, in June 2010 do you recall having phone

14  conversations with Mark Resnick about investigators prior to

15  the time that you were approached by the FBI?

16  A.  Yes.

17  Q.  What was the sum and substance of those phone

18  conversations?

19  A.  That one of his clients was approached by investigators and

20  he was very upset and agitated about it.

21  Q.  What did you do after having these phone conversations with

22  Mark Resnick?

23  A.  I called Michael Binday.

24  Q.  Why did you call Michael Binday?

25  A.  Because I knew that I had clients that I wrote up with the

D9QJBIN5                          Krupit - direct

1   same insurance carrier, Lincoln Life.

2   Q.  Is that also Lincoln Financial?

3   A.  Yes, excuse me, Lincoln Financial.

4   Q.  Now, what did Michael Binday tell you on that phone

5   conversation?

6   A.  He told me to get ahold of my clients immediately and tell

7   them that they weren't under any obligation to talk to anyone

8   from the insurance company and certainly it wasn't a good idea

9   to talk to them without the presence of an attorney, and if

10  they had requested any information, if they wanted any

11  information, to get their business card and someone would

12  respond.

13  Q.  You sound a little horse.  I think there is water up there

14  if you need it.

15  A.  Okay.

16  Q.  I am showing you what has been marked as Government 3021,

17  Mr. Krupit.

18  A.  Okay.

19  Q.  Do you recognize it?

20  A.  Yes, I do.

21  Q.  What is it?

22  A.  This is an e-mail from Michael Binday to Paul Krupit and to

23  Mark Resnick, dated June 21st, 2010.

24  Q.  Did you receive this e-mail around the same time you had

25  the phone conversation you just described with Michael Binday?

D9QJBIN5                          Krupit - direct

1    A.  Yes, I did.

2    Q.  Is it about the same general substance?

3    A.  Yes.  The subject is the policies we wrote with Lincoln.

4            MR. FEINGOLD:  The government offers 3021.

5            MS. MURRAY:  No objection.

6            THE COURT:  Admitted.

7            (Government Exhibit 3021 received in evidence)

8            MR. FEINGOLD:  Will you please publish 3021.  If you

9    can blow up everything in writing down through the signature

10   line.

11   BY MR. FEINGOLD:

12   Q.  Mr. Krupit, can you please read the e-mail down to the

13   signature.

14   A.  Okay.  Hi Paul, Mark and Kevin.  Mark just called with news

15   that that an investigator (we are guessing from Lincoln) showed

16   up at a client's home in Florida unannounced.

17           While we believe all policies were 100 percent Kosher,

18   it is possible that they will show up at other homes.  The

19   Lincoln policies that are still contestable include:

20           Robert Haug.  Agent is Paul.  Contestable period ends

21   9-18-2010.

22           Opal Headrick.  Agent is Kevin.  Paul's client.

23   Contestable period ends 9-23-2010.

24           Oswald Heaton.  Agent is Mark.  Contestable period

25   ends 10-1-2010.

1          My recommendation is that they all get phone calls

2     letting them know that someone from the insurance company could

3     knock on the door.  If that happens, they should tell them to

4     leave their card and send any questions in writing.  And state

5     that they will not speak to anyone other than their agent and

6     advisor, and certainly not without their attorney present.

7          Thank you.  Michael Binday.

8     Q.  Now, Mr. Krupit, the e-mail references one of your clients,

9     Opal Headrick, where it says the agent is Kevin.  Do you see

10    Michael Binday's saying we believe all policies were 100

11    percent Kosher.  Was Opal Headrick's Lincoln policy 100 percent

12    Kosher, Mr. Krupit?

13    A.  No, it was not.

14    Q.  Why not?

15    A.  Because it was a STOLI policy.

16    Q.  Was it issued based on false information?

17    A.  Yes, it was.

18    Q.  Did you follow Michael Binday's instructions that he gave

19    you on the phone call and that e-mail?

20    A.  Yes, I did.

21    Q.  Did you speak with your clients who had Lincoln policies

22    that were issued through Michael Binday?

23    A.  Yes, I did.

24    Q.  What did you tell them?

25    A.  I told them not to give any information out to anyone that

1    was calling them or showing up at the door, indicating they

2    were from an insurance company, and they certainly weren't

3    under any obligation to talk to them unless they had an

4    attorney present.

5            The only person they should be speaking to is me about

6    it.  If they needed, whoever came to their residence, they

7    should get their business card and any questions would be

8    directed to them, any answers to the questions they had would

9    be directed to them in writing.

10   Q.  Now, right around this time did you have a phone call with

11   Mark Resnick about Mark Resnick being visited by the FBI?

12   A.  Yes, I did.

13   Q.  What did Mark Resnick tell you about that?

14   A.  Mark called me and told me that the FBI, he was visited by

15   the FBI, and that he invited them in, and they were questioning

16   his Lincoln policies that he wrote.

17   Q.  After the phone call with Mark Resnick, did you have a

18   phone call with Michael Binday about the FBI's visit to Mark

19   Resnick?

20   A.  Yes, I did.

21   Q.  About how long after your conversation with Resnick did you

22   have a conversation with Binday?

23   A.  I called him immediately after I got off the phone with

24   Mark.

25   Q.  What did Michael Binday tell you on that phone call?

1    A.  Michael said that he asked me who came to Mark's residence,

2    and I told them someone by the name of Agent McDonald, and he

3    said that he would call over there, "over there" meaning the

4    FBI office or have someone call, that he couldn't verify, in

5    fact, he was, in fact, was an agent.

6            I should back up a little bit.  Mark questioned the

7    fact that they were even FBI agents that showed up at his

8    house.  He wasn't too sure that they were, even though they

9    presented identification.

10   Q.  Did Michael Binday later verify that Agent McDonald was, in

11   fact, an FBI agent?

12   A.  Yes, he called me later on that day and told me, yes, they

13   do have someone by the name of Agent McDonald that, in fact,

14   works there.

15   Q.  Did you receive an e-mail from Michael Binday at around the

16   same time of this phone conversation, general time-frame?

17   A.  Yes, I did.

18            MR. FEINGOLD:  3023.

19            (Off-the-record discussion)

20   BY MR. FEINGOLD:

21   Q.  Mr. Krupit, do you recognize what is marked as Government

22   Exhibit 3023?

23   A.  Yes, I do.

24   Q.  What are the two items that appear on 3023?

25   A.  It is an e-mail from me to Michael Binday regarding

D9QJBIN5                          Krupit - direct

1    Lincoln, and the other one is an e-mail from Michael to me

2    regarding Lincoln, Lincoln policies.

3    Q.   What are the dates of those e-mails?

4    A.   June 21, 2010 is the one I sent to Michael, and he responds

5    on June 22, 2010.

6              MR. FEINGOLD:  The government offers 3023.

7              MR. FISCHER:  No objection.

8              MS. MURRAY:  No objection.

9              MR. STAVIS:  No objection.

10             THE COURT:  Admitted.

11             (Government Exhibit 3023 received in evidence)

12             MR. FEINGOLD:  Please publish 3023.  Could you please

13   blow up the e-mail from Paul Krupit to Michael Binday.

14   BY MR. FEINGOLD:

15   Q.   You write to Michael, what about Corinne Roscoe and Alma

16   Lapp.  Aren't they both with Lincoln, Paul?

17             Are those clients of yours?

18   A.   Yes, they were both clients of mine.

19   Q.   Did you write that in response to Binday's response,

20   instructions about Lincoln clients?

21   A.   Yes.

22   Q.   Can we look at the top e-mail from Michael Binday to Paul

23   Krupit early on June 22, 2010.  Can you read the first three

24   lines of the e-mail, text e-mail after hi Paul?

25   A.   I just checked and, yes, they are also with Lincoln.  Alma

D9QJBIN5                              Krupit - direct

1    Lapp, contestable until 8-2-2010.

2              Corinne Roscoe, contestable until 9-20-2010.

3    Q.  Now read the next paragraph, please.

4    A.  If the investigators in question show up, I've been told

5    that we can get in trouble for telling people not to speak to

6    them.  It is still good advice to tell them not to speak to any

7    investigator without counsel present.  Nor are they under any

8    obligation to discuss their financial situation and planning.

9              We cannot advise not to speak, yet nothing good can

10   come from any conversation.  That could only lead to policy

11   recision or worse, and worst just became a possibility.

12   Q.  The next paragraph, please.

13   A.  We assume that the fishing expedition is for STOLI and/or

14   financial misrepresentation.  If your clients are so bold as to

15   make any statements, we hope that they would indicate that

16   policies were purchased as part of their estate financial plan.

17   And that their financials were accurately represented, at least

18   for two years ago before things went down the tubes.  And that

19   they had no intent to sell when they bought the policy, though

20   anyone can say that they hear the daily advertisements in

21   Florida and are aware of the option.

22             Our current assumption is that this is limited to

23   Lincoln.  It may be limited to Mark.  In fact, we hope it is

24   limited to just the one insured.  But no way to know unless you

25   hear from clients.  Michael.

D9QJBIN5                         Krupit - direct

1    Q.  Thank you.

2              MR. FEINGOLD:  I don't want to suggestion a schedule

3    for the court, but this might be a good time for a quick break.

4              THE COURT:  I was hoping you would say that since I am

5    supposed to get on a conference call in a minute.  Let's take

6    our afternoon break.  Don't discuss the case and keep an open

7    mind.

8              (Jury excused)

9              (Recess)

10             (Jury present)

11             THE COURT:  Okay.  We'll go for another hour and then

12   I have another conference call.  You're still under oath, sir.

13             THE WITNESS:  Yes.

14             MR. FEINGOLD:  Ms. Hayakawa, can you please pull up

15   3023 again.  Can we please zoom in on the top e-mail again from

16   Michael Binday to Paul Krupit.

17   BY MR. FEINGOLD:

18   Q.  Mr. Krupit, do you see in the paragraph that starts, "If

19   the investigators in question show up, I've been told that we

20   can get in trouble for telling people not to speak to them."

21             Is that different advice than what Michael Binday

22   previously gave you?

23   A.  Yes.

24   Q.  What did he tell you prior to this e-mail?

25   A.  He told us to tell the clients not to talk to the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D9QJBIN5                          Krupit – direct

1   investigators from the insurance company.

2   Q.  Now, "It is still good advice to tell them not to speak to

3   any investigator without counsel present, nor are they under

4   any obligation to discuss their financial situation and

5   planning."

6           Why did Michael Binday tell you that your clients are

7   not under any obligation to discuss their financial situation

8   and planning?

9           MR. FISCHER:  Objection, your Honor; state of mind.

10          THE COURT:  It is a bad question, okay?

11          I don't want to know what his understanding was.  You

12  can argue these points, you know?

13  BY MR. FEINGOLD:

14  Q.  Now, Mr. Krupit, let's go down to the second paragraph.

15  "If your clients are so bold" -- can you blow up that

16  paragraph, please -- "we assume the fishing expedition is for

17  STOLI and/or financial misrepresentation."

18          Mr. Krupit, were the clients referenced here, Corinne

19  Ross and Alma Lapp and Opal Headrick, were they STOLI policies?

20  A.  Yes, they were.

21  Q.  Did the applications for those policies contain financial

22  misrepresentations?

23  A.  Yes, they did.

24  Q.  "If your clients are so bold as to make any statements, we

25  hope that they would indicate that policies were purchased as

1    part of their estate/financial planning."

2              Mr. Krupit, did any of your clients get their STOLI

3    policies as part of an estate plan or financial plan?

4    A.   No, they did not.

5    Q.   Did they do it just to get the buyout money?

6    A.   Yes.

7    Q.   "And that their financials were accurately represented at

8    least for two years ago before things went down the tubes."  I

9    think you have already testified as to that.

10             "And that they had no intent to sell when they bought

11   the policy."  Your clients who got STOLI policies through

12   Michael Binday, did they all have the intent to sell the policy

13   as soon as they got it?

14   A.   Yes.

15             MR. FEINGOLD:  One moment, your Honor.

16             (Off-the-record discussion)

17   BY MR. FEINGOLD:

18   Q.   Now, you testified earlier, Mr. Krupit, that you were also

19   visited by the FBI.  Did you speak with anyone about the fact

20   that the FBI visited your house?

21   A.   Yes.

22   Q.   Who did you speak with?

23   A.   Michael Binday and Kevin Kergil.

24   Q.   Now, when the FBI first visited you in I think you said

25   June 2010, had you start to cooperate with the government

D9QJBIN5                          Krupit - direct

1   immediately?

2   A.  No.

3   Q.  Before you started cooperating with the government, did you

4   have one or multiple calls with Michael Binday?

5   A.  Multiple calls.

6   Q.  One or more multiple calls with Kevin Kergil?

7   A.  Multiple calls.

8   Q.  What did you discuss with Kevin Kergil on those calls after

9   you were visited by the FBI?

10  A.  Kevin told me to get ahold of the clients, the same thing,

11  tell them not to talk to anyone, especially without the

12  presence of a counsel, and to get their business card.

13          I had further calls from Kevin that said to get rid of

14  everything with the name of Advocate Brokerage, Michael

15  Binday's name on it and his name on it and get rid of it.

16  Q.  When you said everything with Michael Binday's name and

17  Advocate Brokerage name and Kevin's name, what did everything,

18  what is everything?

19  A.  E-mails, financial documents, applications, anything with

20  Advocate Brokerage's name or Michael Binday involving the large

21  case life policies that we wrote.

22  Q.  Did there come a point in time after that initial

23  conversation about destroying those types of things, that you

24  had a conversation with Kevin Kergil about your computer?

25  A.  Yes.  He said to get rid of the hard drive.

1  Q.  In these conversations about getting rid of records, what,

2  if anything, did Kergil say about speaking with Mark Resnick

3  about destroying these types of things?

4  A.  He said he tried to talk to Mark about it, but Mark took it

5  lightly.  He didn't understand it.  Apparently he was going on

6  a trip to New York to his other home, and he just wished that

7  he would not take it lightly and he would do what he told him

8  to do.

9  Q.  We'll get to Mark Resnick again in a minute.

10       What did you do in response to Kevin Kergil's

11 instructions?

12 A.  I started deleting e-mails and shredding documents, and

13 then I took the computer to a technician.

14 Q.  What did you tell the technician to do?

15 A.  To get rid of the hard drive.

16 Q.  Were you successful in completely getting rid of your hard

17 drive?

18 A.  No, I was not.

19 Q.  Did you retrieve it before the technician could delete the

20 hard drive?

21 A.  Yes.

22 Q.  Did you have any phone calls with Mark Resnick about Kevin

23 Kergil's instructions to destroy records?

24 A.  Yes, I did.

25 Q.  What did Mark Resnick say on those calls -- withdrawn.

1              Was it one or multiple calls?

2     A.  Multiple calls.

3     Q.  What did Resnick tell you on those calls about Kergil's

4     instructions?

5     A.  He took it lightly, as Kevin indicated, and I told him it

6     was very important, he needed to do what Kevin wanted him to

7     do, and eventually he said he got on a plane and went down to

8     Orlando and got his hard drive replaced.

9     Q.  You testified that at some point you started to cooperate

10    with the government.  Was the cooperation after the phone calls

11    you're just talking about?

12    A.  It was -- no.  It was right then, right before I called

13    Mark, right at that same time I had retained counsel.

14    Q.  After you started cooperating with the government, did you

15    have other phone calls with Kevin Kergil?

16    A.  Yes.

17    Q.  You had phone calls with Mark Resnick?

18    A.  Yes.

19    Q.  Did you record those phone calls with the FBI?

20    A.  Yes, I did.

21    Q.  How is it that you recorded the phone calls with the FBI,

22    just mechanically?

23    A.  Agent McDonald gave me a number to call to identify that a

24    call was being recorded by the FBI.

25    Q.  Did you also attempt to call other people associated with

D9QJBIN5                         Krupit - direct

1    the FBI's investigation?

2    A.  Yes, I did.

3    Q.  Before you called Mark Resnick, did Agent McDonald give you

4    any instructions about what to do?

5    A.  No, he did not.  The only instructions that he gave me was

6    that I could not talk, bring up any questions about attorneys.

7    Q.  What about for your calls to Kevin Kergil, did you talk to

8    Agent McDonald before making those calls?

9    A.  Yes, I did.

10   Q.  What instruction if any did Agent McDonald give you before

11   making the call to Kergil?

12   A.  The same thing, he couldn't direct me in any way, just

13   don't bring up the subject of attorneys.

14   Q.  Did you record a phone call to Kevin Kergil on July 15,

15   2010?

16   A.  Yes, I did.

17   Q.  Did you record phone calls with Mark Resnick on July 23,

18   2010?

19   A.  Yes, I did.

20   Q.  You followed procedures of dialing into the FBI number each

21   time to record the calls?

22   A.  Yes, I did.

23            (off-the-record discussion)

24   BY MR. FEINGOLD:

25   Q.  Mr. Krupit, I am showing you what has been marked as

1  Government 3072.  Do you recognize it?

2  A.  Yes, I do.

3  Q.  What is it?

4  A.  It is a copy of a recording with Kevin Kergil and Mark

5  Resnick.

6  Q.  With both Kevin Kergil and Mark Resnick, or just one?

7  A.  I believe it is both of them.  It is on the same tape.

8  Q.  Well, do you see your initials?

9  A.  Yes, I do.

10 Q.  What do your initials on the government exhibit sticker

11 signify?

12 A.  The initials are my name, that I have received it and

13 listened to it.  It is two tapes.  I thought there was one.

14 Q.  I am showing you Government 3074 that has been marked.

15         Did you listen to each of these discs prior to

16 testifying today?

17 A.  Yes, I did.

18 Q.  Did you identify 3072 as the call you recorded with Kevin

19 Kergil on July 15, 2010?

20 A.  Yes, I did.

21 Q.  Did you identify Government Exhibit 3074 as the call that

22 you recorded with Mark Resnick on July 23, 2010?

23 A.  Yes, I did.

24         MR. FEINGOLD:  The government offers 3072 and 3074.

25         MR. STAVIS:  I have no objection other than previously

D9QJBIN5                         Krupit - direct

1    stated before the court.

2              THE COURT:  Okay.  Subject to prior objection.

3    Admitted.

4              (Government Exhibits 3072 and 3074 received in

5    evidence)

6              MR. FEINGOLD:  At this time the government offers

7    Government Exhibit -- I'll hand it up -- Government Exhibits

8    3073 and 3075 to aid the jury.  I don't believe there is an

9    objection.

10             MS. MURRAY:  No objection.

11             THE COURT:  Admitted.

12             (Government Exhibits 3073 and 3075 received in

13   evidence)

14             THE COURT:  Let me tell you, ladies and gentlemen,

15   these are transcripts of recordings of conversations.  The

16   parties have provided these to help you, if you find them

17   helpful, as you listen to the recordings.  The recordings are

18   the evidence, all right?  These are not the evidence.  The

19   recordings are the evidence.

20             So listen to the recordings, and if you were to

21   perceive a difference between this document and what you hear,

22   it is what you hear that is the evidence in the case, all

23   right?

24             MR. FEINGOLD:  With your Honor's permission, we'll

25   play 3072.

D9QJBIN5                          Krupit - direct

1            THE COURT:  Go right ahead.

2            MR. FEINGOLD:  And pull up 3073.

3            (Tape played)

4    BY MR. FEINGOLD:

5    Q.  Now, Mr. Krupit, do you recognize the first voice on that

6    call?

7    A.  Yes, I do.

8    Q.  Whose voice is that?

9    A.  It is my voice.

10   Q.  And the second voice that came on, whose voice is that?

11   A.  Kevin Kergil.

12           MR. FEINGOLD:  Can we start over, Ms. Hayakawa, and if

13   there is a way to turn the volume up just a tad.

14           (Tape played)

15   BY MR. FEINGOLD:

16   Q.  Mr. Krupit, did you hear on the recording the part where

17   you told Mr. Kergil you had to tell your attorney that it was

18   Kevin who told, called and told me to delete the e-mails?  And

19   then did you hear that part?

20   A.  Yes, I did.

21   Q.  Did you hear the part where Kevin Kergil responds that

22   that's not exactly what he said?  Did you hear that part?

23   A.  Yes, I did.

24   Q.  What exactly did Kevin Kergil tell you to do with your hard

25   drive?

D9QJBIN5                          Krupit - direct

1    A.  He told me --

2              MR. STAVIS:  Objection; asked and answered.

3              THE COURT:  The objection is overruled.

4    A.  -- he told me to get rid of the hard drive.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D9QLBIN6                        Krupit - direct

1        MR. FEINGOLD:  Can we please play 3074 and pull up

2   3075.  We'll just play the first part, please.

3            (Audio recording played)

4        MR. FEINGOLD:  Can you stop playing, please.

5   Q.  Mr. Krupit, do you recognize the first voice on the

6   recording?

7   A.  Yes, I do.

8   Q.  Whose voice is that?

9   A.  That's my voice.

10  Q.  And how about the second voice that appears on the

11  recording?

12  A.  Mark Resnick.  That's his voice.

13       MR. FEINGOLD:  Can we start from the beginning,

14  please, and give me one second.  Thank you.

15           (Audio recording played)

16       MR. FEINGOLD:  No further questions, your Honor.

17       THE COURT:  Mr. Stavis.

18       MR. STAVIS:  Yes, your Honor.

19  CROSS-EXAMINATION

20  BY MR. STAVIS:

21  Q.  Mr. Krupit, you testified just a few moments ago on direct

22  examination when Mr. Feingold asked you about other bad

23  conduct.  Do you recall that question?

24  A.  I told what?  I answered the question.

25  Q.  I asked you if you recall.

1          THE COURT:  Sir, listen to his question and answer

2     what he asks you.

3          THE WITNESS:  Can you repeat the question.

4     Q.  Yes.  Were you asked on direct examination just a short

5     while ago by Mr. Feingold about "other bad conduct"?

6     A.  Yes, I did.

7     Q.  You were asked about that?

8     A.  That's correct.

9     Q.  And your answer was about November 2011, correct?

10    A.  Yes.

11    Q.  When were you living in Denver, correct?

12    A.  That's correct.

13    Q.  And your answer was that you had certified something that

14    you didn't do?

15    A.  That is correct.

16    Q.  And the certification involved swearing to something?

17    A.  I did an application.

18    Q.  Please answer my question.

19    A.  Yes.  I had certified the application.

20    Q.  And you said that was in November of 2011?

21    A.  Approximately.

22    Q.  Didn't you submit the false certification form in December

23    of 2010, almost one year before you said or testified before

24    this jury that you had done that?

25         THE COURT:  I'm sorry, Mr. Stavis?

D9QLBIN6                              Krupit - cross

1  Q.  Didn't you submit the false certification in December of

2  2010?

3  A.  Certification for what?

4         THE COURT:  This policy, sir.

5  Q.  What certification are we speaking about?

6         THE COURT:  I believe he's asking you if this incident

7  about which you testified really happened in December of 2010

8  as opposed to in 2011.

9         Is that your question, Mr. Stavis?

10        MR. STAVIS:  October of 2010 instead of November of

11 2011.

12        THE COURT:  Okay.  Did it happen in October?

13        MR. STAVIS:  Excuse me, December.

14        THE COURT:  Did it happen December 2010 as opposed to

15 in 2011?

16        THE WITNESS:  I wish I had the document in front of

17 me, your Honor, but I lived in Denver for two years, okay.

18        MR. STAVIS:  There's no question before you at the

19 moment.  May I approach?

20        THE COURT:  There is a question before him.  It's your

21 question.  Your question is didn't that really happen in

22 October -- December of 2010.  That's your question.  The

23 question is before him.  He hasn't answered the question yet.

24 Q.  Please answer the question.

25 A.  In my recollection, I moved to Denver in on or about

1    September of 2010.  I got the termination from the insurance

2    company in November of 2011.

3    Q.  And you submitted the false certification in December of

4    2010; isn't that correct?

5    A.  I didn't get terminated until 2011, but I submitted it.

6    You are correct in saying that it was submitted, the

7    application was submitted in 2010.

8    Q.  And it's the application that has the lie in it, correct?

9    A.  Yes.

10   Q.  So your lie and false certification was actually in

11   December of 2010, correct?

12   A.  Yes.

13   Q.  Now, you testified about that lie that you made in December

14   of 2010, you testified that you told that to the government,

15   correct?

16   A.  Yes.

17   Q.  You didn't tell that to the government when you met with

18   the government on December 10, 2012, did you?

19   A.  I don't know what date it was when I met with the

20   government, but I did bring the information forward that I

21   submitted the false application.

22   Q.  You met with the government nine times, didn't you --

23   A.  Approximately nine times.

24   Q.  Please allow me to finish my question.

25           MR. FEINGOLD:  There was a question you asked.

D9QLBIN6                         Krupit - cross

1              MR. STAVIS:  I had not finished formulating my

2       question.

3       Q.  You testified on direct examination that you met with the

4       government nine times; didn't you testify to that?

5       A.  Yes.

6       Q.  Just this day?

7       A.  Yes, I did testify to that.

8       Q.  One of the times that you met with the government was on

9       December 10, December 10 -- you were in court on December 13,

10      2011, entering your guilty plea, as you've testified, correct?

11      A.  That is correct.

12      Q.  On December 13, 2011, right?

13      A.  Yes.

14      Q.  You didn't tell the government when you were in court or

15      before you were in court that day, December 13, 2011, about

16      having lied on that certification in December of 2010, did you?

17      A.  That is not correct.  I did tell the government prior to

18      that date.

19      Q.  Isn't it a fact that the first time that you told the

20      government about -- by the way, this is United Healthcare?

21      A.  That is correct.

22      Q.  And they terminated you for cause, right?  Yes?

23      A.  Yes, they did.

24      Q.  And they did that for lying on the certification, right?

25      A.  That is correct.

D9QLBIN6                        Krupit - cross

1    Q.  And it was submitted in December of 2010, correct?

2    A.  Yes.

3    Q.  And they started asking questions about it in May of 2011,

4    correct?

5    A.  I don't know when they started asking questions.  There was

6    it went over a series -- I heard about it and then it was

7    several months later before I heard about it again.

8    Q.  Didn't you tell the government that they started asking

9    questions about it in May of 2011?

10   A.  People ask questions all the time, okay.

11   Q.  Didn't -- have you completed your answer?

12   A.  No.

13            THE COURT:  Let me suggest something.  I'm going to

14   make a guess here, but it's an informed guess.

15            Mr. Stavis is going to ask you a lot of questions that

16   can be answered yes or no.  You may not want to answer them yes

17   or no.  You may want to say more stuff.  Answer the questions

18   yes or no if they can be answered yes or no.

19            The prosecutor will have an opportunity at the end to

20   ask you additional questions, at which time you may be allowed

21   or may not be allowed -- I don't know -- to clarify your

22   answers.  But if he asks you or one of the other lawyers at the

23   back table asks you a yes or no question, answer it yes or no

24   and say nothing more.

25            THE WITNESS:  Yes, your Honor.

D9QLBIN6                         Krupit - cross

1    Q.  Didn't you tell the government that United Health started

2    asking questions about this false certification in May of 2011?

3    A.  Yes.

4    Q.  And didn't you tell that to the government for the first

5    time -- well, I won't say the government.

6              On February 21 of 2013, you were here in New York at

7    the U.S. Attorney's Office, correct?

8    A.  I was here in February, yes, of 2013.

9    Q.  And you were here with your attorney, correct?

10   A.  Yes.

11   Q.  And Mr. Feingold was here, correct?

12   A.  Yes.

13   Q.  And Ms. McCallum was at that meeting?

14   A.  Yes.

15   Q.  And it was nearby the courthouse at the U.S. Attorney's

16   Office, correct?

17   A.  Yes.

18   Q.  And isn't it a fact that that was the first time, in 2013,

19   that you told these prosecutors about United Healthcare and the

20   fact that you lied on that certification?

21   A.  No, that is not correct.

22   Q.  Now, you testified on direct examination about lying with

23   regard to the notary stamp on Government Exhibit 1147, that big

24   closing statement, right?

25   A.  Yes.

1    Q.  And how long had you been a notary at the time that you

2    lied about the notary stamp?

3    A.  Perhaps a few months.

4    Q.  And what did you have to do in the state of Florida to be a

5    notary?

6    A.  Apply to be a notary by filling out an application.

7    Q.  And that application enables you to have people swear in

8    front of you, right?

9    A.  Yes.

10   Q.  And then once they swear -- and they swear to documents

11   that are very important, correct?

12   A.  Yes.

13   Q.  And once they swear to the documents that are very

14   important, you as the notary sign that they've sweared to this?

15   A.  Yes.

16   Q.  And you did that and you lied and you signed somebody

17   else's name on March 13 of 2009, correct?

18   A.  Yes.

19   Q.  Is that the date?

20   A.  If that's what the date is, yes.

21   Q.  Now, on June 24, 2010, at 8 o'clock, Special Agent Tom

22   McDonald came to your house, correct?

23   A.  Yes.

24   Q.  And he came with another agent, correct?

25   A.  Yes.

D9QLBIN6                         Krupit - cross

1    Q.  That agent was Agent Deloria?

2    A.  I don't recall his name, but it was -- sounds right.

3    Q.  And he questioned you concerning making false statements?

4    A.  Yes.

5    Q.  And you responded, I have done nothing wrong.  Was that

6    your response to Agent McDonald on June 24 of 2010 at 8' clock

7    in the morning?

8    A.  As I recall it, I told him I did not want to talk to him

9    without the presence of an attorney.  That was what I said.

10   Q.  Do you deny telling Agent McDonald that I have done nothing

11   wrong on --

12   A.  I don't recall.

13   Q.  Please allow me to finish the question.

14          Do you deny that you told Agent McDonald on June 24,

15   2010, at 8 o'clock in the morning, at your home in Florida,

16   that I haven't done anything wrong?

17   A.  I do not recall saying that.

18          MR. STAVIS:  May I approach the witness, your Honor?

19          THE COURT:  You may.

20   Q.  I want you to take a look at this and once you've

21   finished -- one moment, your Honor.  I do have a copy.

22          I'm going to ask you to take a look at this and once

23   you've taken a look at it, please look up and I'll have another

24   question for you.

25          MR. STAVIS:  I'm approaching the witness, I guess I

D9QLBIN6                        Krupit - cross

1    need a tab.  What are we up to?

2    Q.  I'm going to approach you with Defense Exhibit 1004, ask

3    you to take a look at it, see if it refreshes your

4    recollection.  After you've taken a look at it, look up and

5    I'll have another question for you.

6    A.  Okay.

7    Q.  Having looked at Defense Exhibit 1004 -- may I have the

8    paper back -- does that refresh your recollection that you told

9    Special Agent McDonald on June 24, 2010, at 8 o'clock, at your

10   home in Florida, that you haven't done anything wrong?

11   A.  Yes.

12   Q.  By the way, are these your handwritten notes that were made

13   on June 24, 2010, at 8 o'clock, of your meeting with Special

14   Agent McDonald?

15            THE COURT:  Is that your handwriting?

16            THE WITNESS:  It appears to be my handwriting, yes.

17            MR. STAVIS:  Your Honor, I offer Defense Exhibit 1004

18   for ID into evidence as Defense Exhibit 1004, the handwritten

19   statement of the witness.

20            MR. FEINGOLD:  Objection.

21            THE COURT:  Objection is sustained.

22   Q.  When you told Special Agent McDonald at your home on

23   June 24, 2010, that you hadn't done anything wrong, that was

24   true, wasn't it?

25   A.  It was not true.

D9QLBIN6                        Krupit - cross

1   Q.  It wasn't true?

2   A.  That is correct.  That's the way I answered it.  It was not

3   true.

4   Q.  It was a lie?

5   A.  I committed crimes.

6   Q.  Was it a lie that you made to Special Agent McDonald on

7   June 24, 2010?

8   A.  At the time --

9           THE COURT:  Sir, did you lie to Agent McDonald when

10   you told him that you had done nothing wrong?

11          THE WITNESS:  Yes.

12          THE COURT:  Thank you.

13   Q.  Now, you testified on direct examination that you had

14   wanted to sell these larger policies so that you could make

15   larger commissions; do you recall that testimony?

16   A.  Yes.

17   Q.  Now, in the period around 2009, you had a mortgage with

18   IndyMac bank, correct?

19   A.  I believe IndyMac bank was the bank.

20   Q.  And that was for $1,060.22 a month?

21   A.  It sounds pretty close.

22   Q.  And you, in March of 2009, you also had a mortgage, a

23   different mortgage with Wachovia for $1,821.42 per month?

24          MR. FEINGOLD:  Objection, your Honor.

25          THE COURT:  Ground?

1              MR. FEINGOLD:  Relevance.

2              THE COURT:  Overruled.  I'll see where it goes.

3   Q.  Did you had another mortgage for another home with Wachovia

4   for $1,821.42?

5   A.  It's been so long ago, it sounds correct.

6   Q.  And also in the period 2008 to 2009, you had a mortgage on

7   a third home with Wells Fargo for $1,432.20, correct?

8   A.  Yes.

9   Q.  Okay.  So which of the mortgages for the three homes was

10  the first mortgage that you got?

11  A.  I believe that one was on Marsh Landing Boulevard in

12  Estero, Florida.

13  Q.  What's the name of the boulevard?

14  A.  Marsh Landing Boulevard.

15  Q.  Marsh Landing, okay.  And which would be the second of the

16  homes that you got a mortgage on?

17  A.  The one on Bell Haven Way.

18  Q.  Do you know which bank was with which mortgage for which

19  house?

20  A.  To be honest with you, I can't remember.  It's so long ago.

21  I'm not real sure.

22  Q.  When you applied -- whichever mortgage -- well, I got Marsh

23  Landing, and what was the other one?

24  A.  Bell Haven Way.  And, by the way, I had two mortgages on

25  that property at Bell Haven.

D9QLBIN6                        Krupit - cross

1    Q.   Bell Haven Way.   So you only had two houses?

2    A.   No, I had three.

3    Q.   You had three houses?

4    A.   That is correct.

5    Q.   You had three houses and four mortgages or three houses and

6    three mortgages?

7    A.   Three mortgages.   There was a second mortgage on the house

8    at Bell Haven.

9    Q.   Okay.   So you had one at Bell Haven one at Marsh Landing

10   and one at your third house, which was where?

11   A.   Lehigh Acres.

12   Q.   Were these houses, three houses that you had, were they

13   purchased in that order, in other words, Marsh Landing, Bell

14   Haven, Lehigh Acres?

15   A.   I'm not sure of the order.   I knew Marsh Landing was first.

16   I do know that.

17   Q.   Okay.

18   A.   The second one was, yeah, yes, I believe it was Bell Haven.

19   And then I purchased a rental property in Lehigh Acres on or

20   around the same time.

21   Q.   Okay.   When you got the mortgage at Bell Haven Way -- by

22   the way, you don't know which bank, you don't know if it was

23   IndyMac, Wachovia, or Wells Fargo for the Bell Haven second

24   house, house No. 2?

25   A.   I do not.   I don't recall.

D9QLBIN6                       Krupit - cross

1    Q.  Well, when you got the mortgage from one of those three

2    banks for Bell Haven, did you tell the bank that loaned you the

3    money that you already had a mortgage on one home at Marsh

4    Landing?

5    A.  Whatever the bank required I gave them.

6    Q.  You didn't lie on that application, did you?

7    A.  No, sir.

8    Q.  And when you got the third of your three homes at Lehigh

9    Acres, did you disclose to that bank -- whether it was IndyMac,

10   Wachovia or Wells Fargo -- that you already had mortgages on

11   Marsh Landing and Bell Haven?

12   A.  Yes, I believe I did.

13   Q.  You disclosed the other two?

14   A.  Yes.

15   Q.  You're sure of that?

16   A.  You're talking about back five years ago.

17   Q.  Yeah.

18   A.  When I fill out an application, I put down what the bank

19   required me to give them.

20   Q.  You didn't lie on any of those applications?

21   A.  No, sir.

22   Q.  Now, you were asked a few questions on direct examination.

23           MR. STAVIS:  Mr. Felsenstein, do you have a clean copy

24   of the cooperation agreement.

25   Q.  Now, Mr. Krupit, it was on December 13, 2011, at

D9QLBIN6                    Krupit - cross

1    12:55 p.m., you appeared before a different judge in this

2    courthouse and you pled guilty to your crimes; is that correct?

3    A.  I don't believe it was this courthouse, but I did plead

4    before a different judge, yes, in this city.

5    Q.  In the Southern District of New York?

6    A.  Yes.

7    Q.  Do you know if it was Judge Buchwald?

8    A.  Yes, it was Judge Buchwald.

9    Q.  And you pled guilty, as you've said, to four counts, right?

10   A.  Yes.

11   Q.  You pled guilty to a conspiracy to commit mail fraud and

12   wire fraud, right?

13   A.  Yes.

14   Q.  Then you pled guilty to mail fraud, right?

15   A.  Yes.

16   Q.  And you pled guilty to wire fraud?

17   A.  Yes.

18   Q.  And then you pled guilty to a conspiracy to destroy

19   records?

20   A.  Yes.

21   Q.  And the total, as you've told Mr. Feingold, the total

22   maximum on all those counts is 80 years' imprisonment?

23   A.  Yes.

24   Q.  And basically what you pled guilty to is insurance fraud;

25   is that your understanding?

D9QLBIN6                        Krupit - cross

1    A.  Yes.

2              MR. STAVIS:  Ms. Hayakawa, can I have the Elmo in

3    working shape.

4              Your Honor, without objection from the government, I

5    would offer Government Exhibit 4005, which is the cooperation

6    agreement executed on December 13, 2011.

7              MR. FEINGOLD:  No objection.

8              THE COURT:  Admitted.

9              (Government's Exhibit 4005 received in evidence)

10             THE COURT:  You've got about seven or eight minutes,

11   Mr. Stavis.

12   Q.  It says here, I'm going to underline it -- not underline --

13   I'm going to highlight it, that this office will file a motion

14   pursuant to section -- if your cooperation is, if the

15   cooperation is substantial, if this office determines that the

16   defendant has provided substantial assistance, okay, it says

17   here on Government Exhibit 4005, then this office will file a

18   motion pursuant to Section 5K1.1 of the United States

19   sentencing guidelines requesting the court to sentence the

20   defendant in light of the factors set forth in Section 5K1.1.

21             What is your understanding of what this office refers

22   to?

23   A.  In the motion, is that what you're asking me?

24   Q.  In the exhibit.

25             THE COURT:  What do the words "this office" refer to?

1    THE WITNESS:  This office means the government.

2   Q.  The people at the table here to my left?

3   A.  That's correct.

4   Q.  So the prosecutors in this case is this office, correct?

5   A.  Yes, the U.S. Attorney's Office, the prosecutors.

6   Q.  And they're the ones that if you provide substantial

7   assistance, they are the ones to file this 5K1 motion, correct?

8   A.  Yes.

9   Q.  Now, what is your understanding of what that 5K1 motion is?

10  A.  They write a letter to the judge about the good things that

11  I've done and about the bad things that I've done.

12  Q.  And what does that motion, that 5K1 motion, potentially do

13  for you as part of this cooperation agreement that you entered

14  into?

15  A.  Potentially it would reduce my sentence.

16  Q.  And you previously indicated that you are hopeful that that

17  sentence would be no jail time whatsoever?

18  A.  Yes, that's correct.

19      MR. STAVIS:  Your Honor, is this a breaking point or

20  do you wish me to go on?

21      THE COURT:  No, I think this is a good breaking point.

22      Folks, it's Thursday, isn't it?  It's Thursday.  That

23  means I'll see you on Monday.

24      Don't communicate about the case with any man or beast

25  or machine anytime over the weekend.  Forget about the case.

D9QLBIN6                         Krupit - cross

1    Don't think about the case.  Keep an open mind.  You haven't

2    heard everything there is to hear yet.

3            Leave those notebooks back in the jury room.  I will

4    see you on Monday morning, same time, same place, and we'll

5    keep on plugging.  And stay well, please.

6            (Jury not present)

7            THE COURT:  Okay.  Is there anything I have to discuss

8    with anybody before I go downstairs -- upstairs -- wherever my

9    chambers are?  No.  I'll see you on Monday.

10           MR. FEINGOLD:  Thank you.

11           MR. ABRAMOWITZ:  Your Honor, could we go to the side

12   bar with one of the government representatives?  I just have

13   something personal I would like to.

14           (At the side bar)

15           MR. ABRAMOWITZ:  Thursday morning my wife is being

16   operated on for cataract surgery.  It's minor surgery but I

17   think --

18           THE COURT:  There is no such thing.

19           MR. ABRAMOWITZ:  It's minor if it's somebody else.

20           It's scheduled to be early, on Long Island, 7:30.  My

21   best guess is if it comes off on time, I can be in around 11 on

22   Thursday.  So I just wanted to alert your Honor to that.

23           THE COURT:  Okay.

24           MR. FEINGOLD:  Jury might have the case by then.

25           MR. ABRAMOWITZ:  The jury might have the case by then.

D9QLBIN6                          Krupit – cross

1              THE COURT:  Really.  Maybe I should look at the draft
2    instructions.
3              MR. ABRAMOWITZ:  Maybe you should.
4              MR. FEINGOLD:  I think depending on cross, I think end
5    of day Monday all of our evidence should be in.
6              THE COURT:  I was told the defense was going to take a
7    week.
8              MR. ABRAMOWITZ:  The defense can be pared down, I
9    think, if the government is reasonable on stipulations.
10              MS. McCALLUM:  Which we have been.
11              MR. ABRAMOWITZ:  You have been so far, but there's a
12    couple more.  Just a couple more.
13              THE COURT:  Okay.  All right.
14              MR. ABRAMOWITZ:  And if that happens, actually,
15    Mr. Feingold is right, that could happen.
16              THE COURT:  We'll see.  All right.
17              MR. ABRAMOWITZ:  Thank you.
18              (Adjourned to Monday, September 30, 2013, at
19    9:30 a.m.)
20
21
22
23
24
25

INDEX OF EXAMINATION

Examination of:                                    Page

SUSAN MACAULEY

Direct By Ms. Choi . . . . . . . . . . . . . 845

Cross By Mr. Felsenstein . . . . . . . . . . 853

Cross By Mr. Fischer . . . . . . . . . . . . 861

Cross By Ms. Murray  . . . . . . . . . . . . 865

Redirect By Ms. Choi . . . . . . . . . . . . 866

RYAN G. ADAMS

Direct By Ms. McCallum . . . . . . . . . . . 867

PAUL KRUPIT

Direct By Mr. Feingold . . . . . . . . . . . 900

Cross By Mr. Stavis  . . . . . . . . . . . . 988

                    GOVERNMENT EXHIBITS

Exhibit No.                                    Received

 144, 151, 154, 156, 117, 119, 134, 135, . . . 839

          136, 158, 159, 121, 137, 139,

          161, 162, 361 and 362

1530     . . . . . . . . . . . . . . . .845

1183     . . . . . . . . . . . . . . . .913

1182     . . . . . . . . . . . . . . . .914

2841     . . . . . . . . . . . . . . . .929

1166     . . . . . . . . . . . . . . . .934

1168     . . . . . . . . . . . . . . . .935

1147     . . . . . . . . . . . . . . . .940

 1    3086 . . . . . . . . . . . . . .945

 2    1534 . . . . . . . . . . . . . .946

 3    2026 . . . . . . . . . . . . . .946

 4    2612 . . . . . . . . . . . . . .950

 5    3091 . . . . . . . . . . . . . .954

 6    2345 . . . . . . . . . . . . . .956

 7    5000 . . . . . . . . . . . . . .962

 8    3021 . . . . . . . . . . . . . .971

 9    3023 . . . . . . . . . . . . . .975

10    3072 and 3074 . . . . . . . . . .985

11    3073 and 3075 . . . . . . . . . .985

12    4005 . . . . . . . . . . . . . 1003

13

14

15

16

17

18

19

20

21

22

23

24

25