UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                              Plaintiff,<br><br>- against -<br><br>MICHAEL BINDAY, et al.,<br><br>                              Defendants. | Criminal Docket No.<br><br>12-CR-152 (CM) |

### DEFENDANT MARK RESNICK'S
### MOTION FOR A JUDGMENT OF ACQUITTAL

JANEANNE MURRAY
MURRAY LAW LLC
  ATTORNEYS FOR DEFENDANT MARK RESNICK
220 SOUTH SIXTH STREET, SUITE 1225
MINNEAPOLIS, MN 55402
(612) 339-5160 (TEL)
(866) 259-7819 (FAX)

# TABLE OF CONTENTS

Page

Introduction ........................................................................................................................ 1

Facts ................................................................................................................................... 2

ARGUMENT ..................................................................................................................... 8

THE EVIDENCE WAS INSUFFICIENT TO SUPPORT MR. RESNICK'S CONVICTION FOR CONSPIRACY TO DESTROY DOCUMENTS ............................................................ 8

    A.    Sufficiency in Conspiracy Cases ............................................................. 8

    B.    The Evidence Was Insufficient to Establish A Conspiratorial Agreement Involving Mr. Resnick ............................................................................. 9

    C.    The Evidence Was Insufficient to Establish the Requisite "Nexus" to any Official Proceeding ............................................................................... 11

CONCLUSION ............................................................................................................... 15

**Introduction**

Mr. Resnick's conviction for obstruction of justice is nothing short of Orwellian. On June 26, 2010, FBI agents questioned Mr. Resnick about his procurement of certain insurance policies for Lincoln Financial Group. There is no evidence that they served him with a grand jury subpoena, advised him that a grand jury had been convened or was about to be convened, or indicated to him that he was the target or subject of a criminal investigation. Days later, Mr. Resnick deposited his computer at the Apple store in Orlando Florida, without subterfuge, instructing Apple to make a forensic copy of his hard-drive and then wipe it. If Mr. Resnick's commitment to preserving evidence required any corroboration, representatives from his lawyer's office contacted Apple on July 2, 2010, to confirm that Apple had created a mirror image of his hard-drive – a process an Apple employee stated at trial is "an established means of retaining original data in its original form." T1097.[1] Indeed, when Mr. Resnick's sole proprietorship, MAR Group, Inc., was later served with a grand jury subpoena, Mr. Resnick produced over 2,000 responsive documents, some of which were introduced at trial as government exhibits.

No rational juror could find that these notorious and painstaking preservation efforts supported a charge of conspiracy to destroy documents relevant to a grand jury proceeding. Even Mr. Resnick's alleged co-conspirators described his commitment to any document destruction scheme as "light." T981; T982. Moreover, nothing in the government's evidence established the "nexus" to an official proceeding necessary for an obstruction charge to be valid. In short, the government's theory of guilt on the obstruction charge was not just unfounded; it was preposterous.

---

[1] References to "T__" refer to the official trial transcript.

**FACTS**

Mr. Resnick was charged by indictment with conspiracy to commit mail and wire fraud, in violation of 18 U.S.C. § 1349 (Count One), substantive counts of mail and wire fraud, in violation of 18 U.S.C. §§ 1341 and 1342 (Counts Two and Three), and conspiracy to destroy documents, in violation of 18 U.S.C. §§1512(c) and (k) (Count Four), arising out of his role in recruiting straw-purchasers of high-value life insurance policies for resale in the life settlement market.  Count Four specifically charged that Mr. Resnick and his co-defendant Kevin Kergil, "upon learning of a criminal investigation, agreed with each other to destroy documents and electronic files relevant to a Federal grand jury investigation regarding the fraudulent procurement of life insurance policies."  Indictment, pp. 28-29.  At a jury trial, begun on September 17, 2013, the government's evidence on the obstruction count consisted primarily of the testimony of cooperating witness Paul Krupit, a consensually-recorded phone-call between Paul Krupit and Mark Resnick, the testimony of an employee at the Apple store in Miami, and documents relating to Mr. Resnick's imaging and wiping of his computer hard-drive in June 2010.

Testimony of Paul Krupit

Paul Krupit, a business associate of both Mr. Resnick and co-defendant Kevin Kergil, testified that in June 2010, Mark Resnick advised him that one of his clients had been visited by investigators.  T969.  Mr. Resnick was upset and agitated.  *Id.*  Shortly thereafter, Resnick told Krupit that he had been visited by the FBI and they "question[ed] his Lincoln policies that he wrote."  T973.  Krupit added "Mark questioned the fact that they were even FBI agents that showed up at his house.  He wasn't too sure that they were, even though they presented identification."  T974.  Immediately after this call, Krupit called Michael Binday, who later

2

confirmed the agents who visited Resnick were indeed FBI agents. *Id.* Around the same time frame, Binday wrote an email to Krupit, dated June 22, 2010, which stated that "worst just became a possibility," and added:

> We assume that the fishing expedition is for STOLI and/or
> financial misrepresentation. . . Our current assumption is that this
> is limited to Lincoln. It may be limited to Mark. In fact, we hope
> it is limited to just the one insured. But no way to know unless you
> hear from clients. Michael.

T974-75; GX3023. The email was not copied to Mark Resnick. GX3023.

Krupit was himself visited by FBI agents on June 24, 2010, but did not testify about the content of his communications with these agents. T674. He advised Binday and Kergil of the visit. T979. Thereafter, he had several phone conversations with Kergil in which the latter told him "to get rid of everything with the name of Advocate Brokerage, Michael Binday's name on it and his [Kergil's] name on it." T980. This direction included "E-mails, financial documents, applications, anything with Advocate Brokerage name or Michael Binday involving the large case life policies that [they] wrote." *Id.* In one conversation, Mr. Kergil told him "to get rid of the hard drive." *Id.* In response to Kergil's instructions, Krupit "started deleting e-mails and shredding documents and then [.] took the computer to a technician . . . to get rid of the hard drive." T981. He retrieved it, however, before the technician could delete it. *Id.* Krupit never testified why he deleted emails and destroyed records, other than to say it was at the direction of Kevin Kergil. He never stated that the destruction was undertaken to thwart any judicial or grand jury proceeding. There was no evidence presented that he (or any of the defendants) had been served with a grand jury subpoena during the period June and July of 2010.

With regard to Mark Resnick, Mr. Kergil told Krupit:

> [H]e tried to talk to Mark [Resnick] about [the document
> destruction] but Mark took it lightly. He didn't understand it.

3

>Apparently he was going on a trip to New York to his other home,
>and he just wished that he would not take it lightly and he would
>do what he told him to do.

T981.  Mr. Krupit stated he had "multiple" phone calls with Mark Resnick regarding the instructions to destroy documents.  T982.  Asked what Resnick told Krupit on those calls, Krupit responded "He took it lightly, as Kevin indicated, and I told him it was very important, he needed to do what Kevin wanted him to do."  *Id.*  Later in a consensually-recorded phone-call on July 23, 2010, Krupit stated that Resnick told him "he got on a plane and went down to Orlando and got his hard-drive replaced."  *Id.*; T1069.

<u>July 23, 2010 Consensually-Recorded Phone-Call</u>

A portion of the July 23, 2010 recorded call was admitted into evidence as Government Exhibit 3074.[2]  The transcript reads as follows:

>PK:  I'm concerned about this, this, this hard drive and these
>emails and everything.
>
>MR:  I don't think that's really, um . . . much of an issue. Um,
>why has he made a big deal about that?
>
>PK:  Yeah.
>
>MR:  Mm. Well, I mean you have . . . they put yours back, right?
>
>PK:  Yeah but still, you know, Kevin, you know, told me to
>delete stuff and I did.
>
>MR:  Right. Right.
>
>PK:  You know? They can get all of that, that from AOL.
>
>MR:  Yeah I think they can put that back. I, I, I don't think that's
>such a big – I mean it doesn't look good that, that, that it was done,
>but, um, you know as far as what's on there, um, you know even if
>you delete something, I think they can pretty well bring it back.

---

[2] This Court denied Mr. Resnick's motion to suppress this recording on the grounds that it was the product of a violation of the prosecutor's ethical duties and Mr. Resnick's right to counsel.

    And um . . . I think they can get everything they want, you know from Michael's records. Michael has, I'm sure, complete records of everything. So, um . . .

PK:    Yeah, but still, I went in there and deleted stuff because he told me to.

MR:    Right, right. Yeah, pretty much everything Kevin told us was wrong . . . so . . .

PK:    Yeah, I mean it . . . I can't belie . . . you know, I mean, I would have, I would have never done that. I, I, I questioned it when I did it. (V/O)

MR:    Me either. Yeah, me, me, me too. Hey Paul, I got back on a plane and came back here the next - you know went, went back home the next day and, and did it so . . . Um, it was stupid to do, and, and it, it, it makes us look uh . . . you know, that we did something, but, um . . .

PK:    Right.

GX3074. At the time this call was recorded, both Mr. Resnick and Mr. Krupit were represented by counsel and Mr. Resnick knew that Krupit was represented by counsel. T1066; T1070.

Testimony of Joey Massoni

    Joey Massoni, who worked as a sales specialist at the Apple Store in Orlando, Florida, in July 2010, testified that Mr. Resnick brought in his Apple desktop computer to the store on June 26, 2010, seeking to have the hard-drive imaged onto a portable drive, and wiped. T1087, T1088; GX3077 (indicating that the service order was as follows: "Backup data onto eGo 320 17 GB, then wiping hard drive"). Mr. Resnick deposited his computer with the service department at the Apple store, using his own name, e-mail address, phone number and residential address, and paying with his own credit card. T1099. Massoni confirmed that the Apple Store does not perform the service of removing a hard-drive from a computer. T1096. Thus, if a customer wanted an exact replica of a hard drive in their computer, the only way to do it would be "to clone it or make a mirror image." *Id.* And that is precisely what happened with respect to Mr.

5

Resnick's computer. *Id.* Moreover, this process would result in duplicating everything that was on the hard drive, including data, meta-data, times, dates, deleted materials, and the operating system itself. T1096-7. Massoni confirmed that "cloning is an established means of retaining original data in its original form." T1097. The testimony continues:

> Q. [I]f your goal is to preserve a hard drive in its original, its material in its original form, the only way to go is either take that hard drive out or clone it, correct?
>
> A. Yes . . .
>
> Q. If you continued using a computer and didn't make a clone or a mirror image at a moment in time, potentially you will be destroying data as you continue to use your computer. Is that right?
>
> A. Yes.

T1097-98.

On July 2, 2010, a representative from a law firm of which Mr. Resnick was a client called Apple "requesting information regarding specific services [Apple] had performed on Mr. Resnick's computer." T1092; GX3077. Apple confirmed the "data transfer method" with Mr. Resnick and the law firm representative. T1093-4; *see also* GX3077 ("Verified GB that data transfer performed as a disk image (cloned)").

Mr. Resnick's desktop computer consisted of a 24" screen that weighed about 25 pounds. T1094. The portable drive onto which Mr. Resnick had imaged his computer hard-drive measured 6 inches by 2 or 3 inches. *Id.*

MAR Group's Production of Documents

At trial, a stipulation was read to the jury that provided in part:

> At all times relevant, MAR Group, Inc., MAR Group, was a Florida corporation whose chief executive officer was Mark Resnick, the defendant. The corporate address of MAR group was

6

> 684 Rosemere Circle, Orlando, Florida.  If called to testify at trial, a custodian of records of MAR Group would state that all documents with a Bates number prefix "MR" in the bottom right-hand corner are true and correct copies of documents or records maintained by MAR Group and produced pursuant to a grand jury subpoena.

T67.  The government admitted several documents at trial with the Bates number prefix "MR."

Summations

On summation, the government argued that Mr. Resnick and Mr. Krupit had "schemed to destroy evidence," noting that Resnick had flown "all the way from New York to Orlando to retrieve his desktop computer and bring it into the Apple store where he got the hard drive wiped and the data transferred to a portable device, something that could be hidden."  T1426-7.  Counsel for Resnick pointed out in summation that Mr. Resnick's company had produced documents to the government in response to a grand jury subpoena, some of which had been introduced at trial as government exhibits.  T1506.  One of these exhibits was GX2177, an email from Mark Resnick to Michael Binday, dated June 23 2010, Bates-numbered MR2058.  Defense counsel argued based on that Bates number that Mr. Resnick's company had produced more than 2,000 documents.  T1507.[3]

On rebuttal, the government highlighted several government exhibits consisting of emails to and from Mark Resnick that it advised the jury had not been included in the MAR Group production.  T1537-39.  Defense counsel moved for a mistrial on the grounds that the government had improperly utilized the rebuttal summation to introduce facts not in evidence.  The Court denied the motion, but gave the following additional instruction to the jury:

---

[3] In fact, Mr. Resnick had produced over 3,000 documents, but the highest Bates-number on documents introduced by the government was MR2058.  This Court denied Mr. Resnick's motion to quash the grand jury subpoena on the grounds that it represented a misuse by the government of the grand jury process to prepare for trial.

> You are instructed that there is no evidence in the record showing the universe of what Mr. Resnick's company, MAR Group, produced in response to the grand jury subpoena. You, therefore, cannot infer that every e-mail to or from or copying Mark Resnick that was introduced into evidence in this case was produced in some form by MAR Group, nor can you infer that any such e-mail was not produced by MAR Group.

T1094.

## ARGUMENT

### THE EVIDENCE WAS INSUFFICIENT TO SUPPORT MR. RESNICK'S CONVICTION FOR CONSPIRACY TO DESTROY DOCUMENTS

A.   Sufficiency in Conspiracy Cases

"A conspiracy conviction cannot be sustained unless the government established beyond a reasonable doubt that the defendant had the *specific intent* to violate the substantive statute," *United States v. Lorenzo*, 534 F.3d 153, 159 (2d Cir. 2008) (quotation omitted), in this case, the violation of 18 U.S.C. § 1512(c)(1).  The defendant "must in some sense promote the[] venture himself, make it his own, have a stake in its outcome." *United States v. Parker*, 554 F.3d 230, 234 (2d Cir. 2009) (quotation omitted).  Of course, "mere presence at the scene of a criminal act or association with conspirators does not constitute intentional participation in [a] conspiracy, even if the defendant has knowledge of the conspiracy." *Lorenzo,* 534 F.3d at 159.  In addition, mere knowledge of a criminal objective is not enough by itself to make a person a conspirator. *Id.*  Rather, when a person possessing such knowledge agrees to facilitate or actually facilitates the crime, a jury may reasonably infer from this combination of knowledge and action that the defendant has adopted the known goal of the crime as his own.  *See Salinas v. United States*, 522 U.S. 52, 65 (1997); *United States v. Santos*, 541 F.3d 63, 73 (2d Cir.2008) (observing that in conspiracy case jury may "infer intent and agreement from knowledge," particularly in context of defendant's interested cooperation or stake in scheme).

8

A fundamental tenet of conspiracy law is that "if the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt." *United States v. Coplan*, 703 F.3d 46, 69 (2d Cir. 2012) (reversing conspiracy conviction where evidence, when viewed in light most favorable to the government "remains, at best, in equipoise") (*quoting United States v. Huezo*, 546 F.3d 174, 193 (2d Cir.2008)); *see also United States v. D'Amato*, 39 F.3d 1249, 1256 (2d Cir.1994) ("[T]he government must do more than introduce evidence at least as consistent with innocence as with guilt") (internal quotation marks omitted).[4]

> B. The Evidence Was Insufficient to Establish A Conspiratorial
>    Agreement Involving Mr. Resnick

The government's evidence failed to establish beyond a reasonable doubt that Mr. Resnick joined in a conspiracy with the specific intent to destroy or otherwise make documents unavailable in a grand jury proceeding or other official proceeding. *Cf. Lorenzo*, 534 F.3d at 159.

First, even Mr. Resnick's alleged co-conspirators did not believe he had embraced the objective. As Krupit testified, both he and Mr. Kergil viewed Mr. Resnick as taking the matter "lightly." T981; T982.

---

[4] Proof beyond a reasonable doubt may not be based "on inferences no more valid than others equally supported by reason and experience." *United States v. Mulheren*, 938 F.2d 364, 372 (2d Cir. 1991); *see also United States v. Berger*, 224 F.3d 107, 116 (2d Cir. 2000). "[A] conviction based on speculation and surmise alone cannot stand." *United States v. D'Amato*, 39 F.3d 1249, 1256 (2d Cir.1994) (citing *United States v. Wiley*, 846 F.2d 150, 155 (2d Cir.1988)). *See United States v. Starr*, 816 F.2d 94, 99 (2d.Cir. 1987)(" Although all reasonable inferences must be drawn in favor of the government on this appeal, we are convinced that the jury must have resorted to rank speculation in finding fraudulent intent here."). "The jury may not be permitted to conjecture merely, or to conclude upon pure speculation." *United States v. Autuori*, 212 F.3d 105, 120 (2d Cir. 2000) (citations and quotations omitted).

9

Second, while Mr. Resnick may have had knowledge of the conspiracy, his actions thwarted rather than facilitated it. *Cf. Salinas*, 522 U.S. at 65. Mr. Resnick openly and without subterfuge deposited his computer at the Apple store in Orlando with the direction to image the hard-drive, a process that the Apple witness confirmed is "an established means of retaining original data in its original form." T1097. Notably, Mr. Resnick was unable to remove his hard-drive to preserve it for posterity because Apple did not offer the service of removing hard-drives. He thus did the next best thing: he imaged the hard-drive and then wiped the original clean.

Third, underlining the preservation purpose of Mr. Resnick's acts, a representative from his lawyer's office called Apple to confirm the data transfer method used. The only reasonable inference to draw from this evidence was that Mr. Resnick sought only to secure, not destroy, his documents, and did so at the direction of his attorneys, or with a view to handing it over to his attorneys' custody for safe-keeping. As the government noted in its summation, Mr. Resnick transferred his data to "a portable device," making delivery to his lawyers that much easier. The government's explanation – that a portable device is more easily hidden – is rank speculation and far less plausible.

Finally, it was undisputed at trial that Mr. Resnick – through his company of which he was the sole proprietor – produced documents in response to a grand jury subpoena, including documents that were introduced at trial as government exhibits. Again, the government's destruction theory is negated by Mr. Resnick's preservation of documents the government deemed incriminating.

That Mr. Resnick wiped his original is of no matter. Given that he had already made a forensic copy, it was entirely appropriate for him to clean his hard-drive for future use. Indeed, had he not cleaned his hard-drive, any use of the computer would have resulted in the over-

writing (i.e. deletion) of original meta-data. T1098. The course Mr. Resnick adopted – imaging and wiping – was a prudent one that compartmentalized his data in discrete units and permitted Mr. Resnick to continue using his computer without fear of an accusation that he was destroying records. In addition, Mr. Resnick's recorded conversation with Paul Krupit adds nothing to support the government's theory of guilt. At this time, all parties were represented by counsel and it was entirely reasonable for Mr. Resnick to conceal from Mr. Krupit (and Krupit's attorney) that he had preserved a complete copy of his hard-drive.

In sum, the evidence here was not simply in equipoise, between guilt and innocence. *Cf. Coplan*, 703 F.3d at 69. The government's theory of guilt was far-fetched and wholly unfounded.

### C. The Evidence Was Insufficient to Establish a Nexus to Any Official Proceeding

The evidence was also insufficient to establish the additional intent element in §1512(c) that Mr. Resnick acted "corruptly," that is with the "'wrongful' or 'immoral' intent to obstruct the grand jury's administration of justice." *United States v. Quattrone*, 441 F.3d 153, 173 (2d Cir. 2006) (*quoting United States v. Aguilar*, 515 U.S. 593, 599 (1995)) (discussing the interpretation of the word "corruptly" in §1503); *see also Arthur Andersen LLP v. United States*, 544 U.S. 696, 705 (2005) (the word corruptly as used in the obstruction statute is "normally associated with wrongful, immoral, depraved, or evil"); *United States v. Thompson*, 76 F.3d 442, 452 (2d Cir. 1996) (a prohibition against corrupt acts "is clearly limited to ... constitutionally unprotected and purportedly illicit activity") (*quoting United States v. Jeter*, 775 F.2d 670, 679 (6th Cir.1985)) (construing §1512(b)).

Proof of wrongful or corrupt intent is articulated through a "nexus limitation" – a requirement of "a nexus in time, causation, or logic between the act and judicial proceedings,"

11

which "limits criminal liability to cases *where the defendant has notice that his wrongful conduct will affect the administration of justice*, because false information will be provided to a grand jury or otherwise pertinent information known to be called for by a grand jury may be placed beyond its reach." *Quattrone*, 441 F.3d at 171 (emphasis added). The Second Circuit has applied the nexus requirement to prosecutions under § 1512(c). *See United States v. Desposito*, 704 F.3d 221, 230 (2d Cir. 2013).

In *Quattrone*, the Court found the requisite nexus where the defendant endorsed a direction to destroy documents, knowing that such documents would be responsive to a grand jury subpoena that had *already been* issued. *Id.* at 172. *See also Desposito*, 704 F.3d at 231-32 (finding it where defendant wrote fifteen letters to his family asking them to implement his scheme to fabricate evidence for his criminal trial); *United States v. Simels*, 654 F.3d 161, 174 (2d Cir. 2011) (nexus found where Simels attempted to intimidate or bribe witnesses whom he expected would be witnesses at his client's criminal trial); *United States v. Triumph Capital Group, Inc.*, 544 F.3d 149, 169 (2d Cir. 2008) (nexus found where defendant aware of grand jury investigation and likelihood that the documents he deleted from his laptop would be subpoenaed). If proceedings have not been instituted, the Second Circuit has found the requisite nexus where the defendant is on notice that proceedings are likely to be instituted, by for example, knowing he is the target of a criminal investigation. *See*, *e.g.*, *United States v. Kumar*, 617 F.3d 612, 621 (2d Cir. 2010) (corrupt intent established where defendant lied to S.E.C. knowing that the government has "predicted" that criminal charges would be brought against him); *United States v. Persico*, 645 F.3d 85, 108 (2d Cir 2011) (nexus established where Persico

had been informed by the government that he was the target of an investigation and grand jury proceeding foreseeable).[5]

Here, the government failed to establish at trial *any* nexus between Mr. Resnick's conduct and an official proceeding, whether judicial or one involving a grand jury. All that was established was that agents had questioned Mr. Resnick about his Lincoln policies. There was no evidence of any mention of the word "grand jury" to Mr. Resnick in June 2010, much less, that he was advised that a grand jury would be convened to investigate his conduct. There was no evidence that he had been served with a grand jury subpoena during the period set forth for this count in the indictment (June through July 2010).[6] There was no evidence that the agents advised him that he was the target or subject of a criminal investigation, or even that they told him they were conducting a criminal – as opposed to some kind of regulatory – investigation. A lay person cannot be expected to leap to the conclusion that a grand jury will be convened simply because FBI agents are asking questions about one's business activities.

But such conclusion would be particularly prescient here, where the charged conduct resonates more in the civil than the criminal sphere. After defense counsel contacted the government in July 2010, it was almost twenty months later before the government unveiled its speaking indictment that went to great lengths to set forth the government's theory of criminal liability. The indictment was then the subject of a lengthy motion to dismiss on the grounds that

---

[5] In addition to the authority cited above that the official proceeding must at least be foreseeable, the Ninth Circuit has concluded in a carefully-analyzed decision, reviewing both the statutory language and broader purposes of the statutory scheme, that "official proceeding" as used in §1512(c) connotes a "formal hearing before a tribunal," and as such, does not include a mere criminal investigation. *See United States v. Ermoian*, 727 F.3d 894, 901 (9th Cir. 2013); *cf. United States v. Gonzalez*, 922 F.2d 1044, 1055–56 (2d Cir.1991) (interpreting "official proceeding" in the venue provision for § 1512 prosecutions to include investigations).

[6] Indeed, it would be another 18 months before his company received a grand jury subpoena.

it did not state a criminal offense. If experienced criminal defense lawyers do not see an automatic connection between the defendants' business activities and a criminal indictment, how can a non-lawyer be expected to reach that conclusion? Here, there was no "nexus in time, causation, or logic between the [alleged destructive] act and judicial proceedings," *Quattrone*, 441 F.3d. at 171, where the indictment was based on a complex and unique theory, and was not unsealed for another twenty months.

      The government is essentially suggesting that a mere FBI inquiry is the equivalent of an "official proceeding" under the statute, because a grand jury proceeding can *always* be foreseeable from any such encounter. That is a proposition that has no basis in fact, and essentially writes the words "official proceeding" out of the statute entirely. *Cf. Ermoian*, 727 F.3d at 902 ("if we were to read the phrase 'official proceeding' to include an FBI investigation, as the Government urges us to do, this subsection of the statute would work to criminalize actions taken before an investigation was even 'pending or about to be instituted'") (citation omitted).

      In short, the government failed to establish that Mr. Resnick had "notice that his wrongful conduct w[ould] affect the administration of justice," *Quattrone*, 441 F.3d at 171, and thus failed to meet the nexus requirement in obstruction prosecutions.

## **CONCLUSION**

For the foregoing reasons, defendant Mark Resnick respectfully requests that the Court grant his motion for a judgment of acquittal as to count four.

                                                                Respectfully Submitted.

Date:   New York, New York
           December 5, 2013

*/s/ Janeanne Murray*

JANEANNE MURRAY
Murray Law LLC
Attorneys For Mark Resnick
220 South Sixth Street, Suite 1225
Minneapolis, MN 55402
Tel.  (612) 339-5160