USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 2/8/17

RECEIVED
JAN 09 2017
CHAMBERS OF
WILLIAM H. PAULEY
U.S.D.J.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| James Kevin Kergil, )<br>Petitioner )<br> )<br>v. )<br> )<br>United States of America, )<br>Respondent. )<br>_____ ) | Case No. 12-cr-00152-CM |

**PETITIONER JAMES KEVIN KERGIL'S MOTION FOR
A JUDGMENT OF ACQUITTAL**

**I.  PRELIMINARY STATEMENT**

In a recent decision vacating a wire fraud conviction, the Eleventh Circuit gives a detailed analysis of the Second Circuit's interpretation of the wire fraud statute and adopts the Second Circuit's interpretation of what a "scheme to defraud" is as opposed to a "scheme to deceive", to satisfy that requirement under the Federal fraud statutes. See *United States v. Takhalov*, ___ F.3d ___, 2016 U.S. App. LEXIS 12664 (11th Cir. 2016). If the Eleventh Circuit's analysis of the Second Circuit's law is correct, then the indictment in the Binday case failed to state a federal offense, and therefore this Court lacked jurisdiction and Your Honor should enter a Judgment of Acquittal as to Mr. Kergil on all counts.

To explain the difference between a "scheme to defraud" which is illegal under the wire fraud statute, and a "scheme to deceive" which may be morally wrong but is not conduct prohibited by the mail and wire fraud statutes, the Eleventh Circuit uses what might be called the "Parable of the Deceitful Neighbor." The court considers two scenarios. In the first, a man calls his neighbor saying that his child is very ill, and the neighbor responds by rushing over to see if she can help. The man asks her to give him change for a dollar, which the helpful neighbor

1

gladly gives him. She later learns that the neighbor's child was not sick at all. The second scenario is identical to the first, except that now the deceitful neighbor gives the woman a counterfeit dollar in exchange for the four quarters. The first scenario is not wire fraud, but the second one is, despite the fact that the woman would not have rushed over in the first scenario had she known that the child was not really sick.

In determining the difference between a "scheme to defraud" and a mere "scheme to deceive" which is not illegal, the Eleventh Circuit has adopted the Second Circuit's interpretation of the law in that: "a schemer who tricks someone to enter into a transaction has not "schemed to defraud" so long as he does not intend to harm the person he intends to trick. Thus, deceiving is a necessary condition of defrauding but not a sufficient one. Put another way, one who defrauds always deceives, but one can deceive without defrauding. This is so even if the transaction had not occurred but for the trick. For if there is no intent to harm, there can only be a "scheme to deceive", but not one *to defraud*. (Emphasis in original) See *Takhalov* at *9-10.

Because the *Takhalov* case involves "Bar-Girls" luring businessmen and tourists to the bar to buy them drinks, the Eleventh Circuit distinguishes between a high end rare premium whisky and a cheap bar brand. The fact that the bar-girl works for the bar does not matter because the businessman got what he bargained for which is the opportunity to buy a pretty young woman a drink. That is merely a scheme to deceive. But, if they substituted a cheap whisky for an expensive whisky or added bogus charges to the credit card bill, that would be a scheme to defraud. Once again, based on the Parable of the Deceitful Neighbor, the fact that the deceitful neighbor gave her a real dollar for the four quarters was merely a scheme to deceive, but in the scenario where he gives her a counterfeit dollar, that is wire fraud because he intended to harm and obtain her real four quarters in exchange for the bogus dollar and he used the phone

2

to deceive her. Therefore, he has now committed a "scheme to defraud" with the intent to harm someone and obtain their money or property through trickery or deceit.

To be a "Scheme to Defraud" the schemer has to lie about the material nature of the bargain; not just that his child is ill or that they are a long-lost relative. This is important to Mr. Kergil's case because the Binday scheme was merely a scheme to deceive and the misrepresentations were merely to get the insurance carriers to issue the policies. Binday had every intention to use investor funds to pay premiums to the day the insured died, so clearly Binday intended to honor the essence of the insurance bargain. You pay the premiums on the policy and the carrier pays the claim when the insured dies. The fact that you said the insured wanted the policy for "estate planning purposes" rather than to do a life settlement with investors is not an essential part of the insurance bargain. At no time did Binday lie about gender, age, or health, nor is that alleged in the indictment. The only misrepresentations that Binday made were about the reason for purchasing the insurance or the wealth of the insured, just like the Deceitful Neighbor lied about his child being ill, but Binday did not lie about the essential elements of the life insurance bargain which are gender, age, and health.

In describing and adopting the law of the Second Circuit, the difference between a "scheme to deceive" and a "scheme to defraud" that is prohibited by the mail and wire fraud statutes, the Eleventh Circuit stated the following:

> The Second Circuit has interpreted the wire-fraud statute in precisely this way. Their cases have "drawn a fine line between schemes that do no more than cause their victims to enter into transactions that they would otherwise avoid—which do not violate the mail or wire fraud statutes—and schemes that depend for their completion on a misrepresentation of an essential element of the bargain—which do violate the mail and wire fraud statutes." *United States v. Shellef*, 507 F.3d 82, 108 (2d Cir. 2007); *see also United States v. Starr*, 816 F.2d 94, 98 (2d Cir. 1987) ("Misrepresentations amounting only to a deceit are insufficient to maintain a mail or wire fraud prosecution. Instead, the deceit must be coupled with a contemplated harm to the victim [that] affect[s] the very nature of the bargain itself. Such harm is apparent where there exists a discrepancy

3

between benefits reasonably anticipated because of the misleading representations and the actual benefits which the defendant delivered, or intended to deliver.") (internal quotation marks omitted); *United States v. Regent Office Supply Co.*, 421 F.2d 1174, 1182 (2d Cir. 1970) ("[W]e conclude that the defendants intended to deceive their customers but they did not intend to defraud them, because the falsity of their representations was not shown to be capable of affecting the customer's understanding of the bargain nor of influencing his assessment of the value of the bargain to him, and thus no injury was shown to flow from the deception."). Moreover, the Second Circuit's interpretation of the wire-fraud statute is not a parochial interpretation of an ambiguous provision of federal law. Their interpretation follows as a matter of logic from Congress's decision to use the phrase "scheme to defraud" rather than "scheme" or "scheme to deceive." We therefore adopt that interpretation as our own. A jury cannot convict a defendant of wire fraud, then, based on "misrepresentations amounting only to a deceit." *Shellef*, 507 F.3d at 108. Thus, even if a defendant lies, and even if the victim made a purchase because of that lie, a wire-fraud case must end in an acquittal if the jury nevertheless believes that the alleged victims "received exactly what they paid for." *Takhalov* at *13-14, citing *Shellef*, 507 F.3d at 108.

This statement by the Eleventh Circuit mirrors the command from the Second Circuit that without the "intent to harm" there can be no scheme to defraud. See *United States v. Rossomando*, 144 F.3d 197, 201 (2d Cir. 1998) (conviction for Mail Fraud reversed because government must show that the defendant actually intended and contemplated "concrete harm" to his victims). Therefore, based on the Eleventh Circuit's description of the law of mail and wire fraud in the Second Circuit, and a "scheme to deceive" versus a "scheme to defraud", it is clear that Binday's scheme was one to deceive and not defraud as described in the Supreme Court's famous cases such as *Neder v. United States*, 527 U.S. 1 (1999) and *Skilling v. United States*, 561 U.S. 358 (2010). Since it is clear that there was no conspiracy here, and no harm contemplated, this Court should grant a Judgment of Acquittal on all counts based on the government's failure to properly allege federal fraud and to prove it beyond a reasonable doubt at trial based on famous Second Circuit precedents and going back to the Supreme Court's 1896 decision in *Durland v. United States*, 161 U.S. 306 (1896).

## II. LEGAL STANDARD

Rule 60(b) provides, in relevant part, that a "court may relieve a party or its legal representative from a final judgment, order, or proceeding for…: (6) any … reason that justifies relief." FED. R. CIV. P. 60(b)(6). As the Second Circuit has explained, Rule 60(b)(6) "constitutes a grand reservoir of equitable power to do justice in a particular case" (see e.g. *United States v. Cirami*, 563 F.2d 26, 32 (2d Cir. 1977), and *Matarese v. Lefevre*, 801 F.2d 98, 106 (2d Cir. 1986)), and is designed to balance 'the sanctity of final judgments' and the command 'that justice be done in light of all the facts.' *Paddington Partners v. Bouchard*, 34 F.3d 1132, 1144 (2d Cir. 1994) (*citing Bankers Mortgage Co. v. United States*, 423 F.2d 73, 77 (5th Cir. 1970)). It has been often noted that Rule 60(b)(6) 'confers broad discretion on the trial court to grant relief when appropriate to accomplish justice.' *Burkett v. Cunningham*, 826 F.2d 1208 (3d Cir. 1987) "exceptional circumstances justify relief under Rule 60(b) for diligent, incarcerated habeas petitioner." A district court's discretion is "especially broad under subdivision (6)." *Int'l Controls Corp. v. Vesco*, 556 F.2d 665, 670 (2d Cir. 1977).

A motion for reconsideration also serves a valuable function where the court "**has patently misunderstood a party**, or has made a decision outside the adversarial issues presented to the Court by the parties, or has made an error not of reasoning but of apprehension." *Caisse Nationale de Credit Agricole v. CBI Indus., Inc.*, 90 F.3d 1264, 1269-70 (7th Cir. 1996). A court may "reconsider an earlier decision when it is confronted with an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." See *United States v. Becker*, 502 F .3d 122, 127 (2d Cir. 2007), *quoting United States v. Tenzer*, 213 F.3d 34, 39 (2d Cir. 2000). "[W]hen reconsideration of an earlier ruling is requested, the district court should place great emphasis on the 'interests of justice.'"

5

*United States v. Roberts*, 978 F.2d 17, 21 (1st Cir. 1992). *See United States v. Siciliano*, 578 F.3d 61, 72 (1st Cir. 2009)("When faced with a motion for reconsideration, district courts should apply an interests-of-justice test"). "This is so...because such requests for reconsideration rely, in the last analysis, on the trial court's inherent power to afford relief from interlocutory decisions 'as justice requires.'" *Roberts*, 978 F.2d at 21. Alternatively, the Court should amend the judgment pursuant to Rule 60(b)(6). Subsection (b)(6)—the catch-all provision of Rule 60(b)— "allows courts to vacate judgments whenever necessary to accomplish justice...." *Aczel v. Labonia*, 584 F.3d 52, 61 (2d Cir. 2009) (*citing Liljeberg v. Health Serv. Acquisition Corp.*, 486 U.S. 847, 863 (1988)).

Moreover, most courts have long recognized the "inherent equitable powers of courts of law over their own process, to prevent abuses, oppression, and injustices." *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 35 (1984) (internal quotations omitted). It seems beyond peradventure that those inherent powers of the court must include a judge's power to correct his own decisions when they are clearly based on the government's misrepresentation of the law and/or the facts of any given situation.

Absent a meaningful and substantive review of this matter, manifest injustice will occur because Mr. Kergil's convictions are fatally undermined in light of the Eleventh Circuit's decision in *Takhalov* describing the law of the Second Circuit. Accordingly, "extraordinary circumstances" exist to warrant reconsideration of this Court's order denying Mr. Kergil's motion for a judgment of acquittal. *See Gonzalez v. Crosby*, 545 U.S. 524, 535 (2005) ("our cases have required a movant seeking relief under Rule 60(b)(6) to show 'extraordinary circumstances' justifying the reopening of a final judgment."); *Pichardo v. Ashcroft*, 374 F.3d 46, 52 (2d Cir. 2004) (reversing district's court's denial of alien's post-judgment motion for

reconsideration and reversing deportation order based on an intervening change in the law).

### III. A JUDGMENT OF ACQUITTAL AS TO ALL COUNTS MUST BE ENTERED IN THIS CASE AS THE DEFECTIVE INDICTMENT FAILED TO INVOKE THIS COURT'S FEDERAL JURISDICTION

A challenge to the district court's jurisdiction to hear a given case can never be waived or forfeited. *Arbaugh v. Y&H Corp.*, 546 U.S. 500 (2006). Certain constitutional challenges asserting a "right not to be haled into court" cannot be waived even through a guilty plea. *Blackledge v. Perry*, 417 U.S. 21, 31 (1974).

Mr. Kergil respectfully suggests that this Court did not have jurisdiction over him because the indictment against him failed to state a federal offense, if it even states a crime at all, since the federal mail and wire fraud statutes do not purport to reach **all frauds**, but only those "limited instances in which the use of the mails is a part of the execution of the fraud, leaving **all other** cases to be dealt with by appropriate state law." *Kann v. United States*, 323 U.S. 88 (1944) (emphasis added). *See also United States v. Maze*, 414 U.S. 395 (1974). In *Maze*, the Supreme Court reversed the mail fraud conviction, concluding that the success of Maze's scheme did not depend in any way on the mailings at issue, focusing on "the more difficult question [of] whether [the] mailings were sufficiently closely related to [Maze's] scheme to bring his conduct within the statute." *Maze*, 414 U.S. at 399, 402. Here, as in *Maze*, the success of the alleged insurance application scheme clearly did not depend in any way on the use of mails or wires by Mr. Kergil, as the alleged uses all occurred **after** the alleged fraud was **complete**, and the insurance policies had been issued based on the allegedly false information. As discussed in detail above, the Eleventh Circuit's decision in *Takhalov* clearly shows that the "Binday scheme" was merely a "scheme to deceive" just as in the Parable of the Deceitful Neighbor and not a

"scheme to defraud" that would give this Court jurisdiction to prosecute a case of mail and wire fraud.

Moreover, as discussed above in describing the *Takhalov* case, if the Eleventh Circuit is correct in its description of the law in the Second Circuit, which clearly shows that Binday's scheme was merely a "scheme to deceive" as in the Parable of the Deceitful Neighbor and not a "scheme to defraud" that is prohibited by the mail and wire fraud statutes, then respectfully, Your Honor lacked jurisdiction and my judgment and conviction are void as a matter of law. Please see *United States v. Peter*, 310 F.3d 709 (11th Cir. 2002), another mail and wire fraud case where his conviction was overturned after the Supreme Court's decision in *Cleveland v. United States*, 531 U.S. 12 (2000), stating that licenses were not "money or property" protected by the mail and wire fraud statutes:

> "... it is clear under these circumstances that the Government's proof of the alleged conduct, no matter how overwhelming, would have brought it no closer to showing the crime charged than would have no proof at all. The problem is not that the Government's case left unanswered a question as to whether its evidence would encompass a particular fact or element. Rather, it is that the Government affirmatively alleged a specific course of conduct that is outside the reach of the mail fraud statute. Peter's innocence of the charged offense appears from the very allegations made in the superseding information, not from the omission of an allegation requisite to liability. In this circumstance, the rule of *Meacham*, that a district court lacks jurisdiction when an indictment alleges only a non-offense, controls. The district court had no jurisdiction to accept a plea to conduct that does not constitute mail fraud, and the doctrine of procedural default therefore does not bar Peter's present challenge....When a court without jurisdiction convicts and sentences a defendant the conviction and sentence are void from their inception and remain void long after a defendant has fully suffered their direct force." *Peter*, at 713-15, *citing United States v. Morgan*, 346 U.S. 502 (1954).

So, even assuming *arguendo* that some answers on the insurance applications were incorrect, virtually all those insurance applications were all submitted between 2006 and 2008 by people other than Mr. Kergil, and so the alleged scheme had already come to fruition when the insurance carriers issued the policies. None of the counts of the indictment concerning Mr.

8

Kergil list any mailings and wires that have anything to do with the allegedly fraudulent filling out of the insurance applications. ("Congress could have drafted the mail fraud statute so as to require only that the mails be in fact used as a result of the fraudulent scheme. But it did not do this. . . ."). *Maze, supra* at 405 (footnote omitted); *see also United States v. Tackett*, 646 F.2d 1240, 1244 (8th Cir. 1981) ("The statute does not reach all mailings resulting from a fraudulent scheme, but only those which are in <u>furtherance</u> of the scheme.") (Emphasis added). See, also, the *Takhalov* case described above. Accordingly, the federal mail and wire fraud statutes have not been properly invoked in this case, and this Court lacked jurisdiction just as in *United States v. Aleynikov*, 676 F.3d 71 (2d Cir. 2012) and other cases cited by the Second Circuit in the *Aleynikov* decision, and a Judgment of Acquittal should be entered as to all counts for Mr. Kergil.

In his highly regarded report to Congress on mail and wire fraud dated July 21, 2011, Charles Doyle of the Congressional Research Service, states that the elements of mail and wire fraud that **must** be alleged in an indictment and proven beyond a reasonable doubt are that the defendant(s):

(1) Used either mail or wire communications in the foreseeable furtherance,

(2) of a scheme to defraud,

(3) involving a material deception,

(4) with the intent to deprive another of,

(5) either property or honest services.

See report to Congress on the elements of mail and wire fraud by the Congressional Research Service, CRS Report R41931, Mail and Wire Fraud: An Abridged Overview of Federal Criminal Law, by Charles Doyle, July 21, 2011. Failure to properly allege each and every one of these

9

elements with sufficient facts renders an indictment facially invalid. "Where guilt depends so crucially upon such a specific identification of fact, our cases have uniformly held that an indictment must do more than simply repeat the language of the criminal statute." *United States v. Russell*, 369 U.S. 749, 764 (1962).

As stated, an indictment that fails to allege each and every material element of a crime is defective on its face and must be dismissed as a matter of law. *United States v. Kurtz*, 2008 WL 1820903 (W.D.N.Y. April 21, 2008). Specifically, the Indictment must be dismissed because (1) it fails to allege that the insurance carriers as "victims" were deprived of any "property" within the meaning of the mail and wire fraud statutes; (2) it fails to allege that Mr. Kergil had the *mens rea* or "specific intent" to defraud the carriers of any property; and (3) it alleges no mailing or wiring that was actually in the furtherance of the scheme to defraud or that was a necessary part of the fraud, as required by the Supreme Court in *Parr v. United States*, 363 U.S. 370 (1960), *Maze, supra*, and *Kann, supra*. For these reasons, as written, the Indictment is fatally defective and insufficient on its face. It must be dismissed. Moreover, it is not enough to show that the insurance carriers might have been "deceived" into doing a deal that they might not normally do, as in this case, issue an alleged "Stranger Originated Life Insurance" (STOLI) policy. Even assuming *arguendo* the truth of the government's STOLI allegations, none of which were proven at trial, deceiving an insurance carrier into issuing an insurance contract does not create mail or wire fraud. As explained by the Second Circuit's "Shellef Doctrine", which still survives the Second Circuit's decision in *United States v. Binday*, 804 F.3d 558 (2d Cir. 2015):

> As in *Starr*, the indictment here does not allege…that there was a "discrepancy between benefits reasonably anticipated" and actual benefits received. And as in *Regent Office*, it fails to allege that [the defendant] misrepresented "the nature of the bargain." Instead, **the indictment states only that [the defendant's] misrepresentation induced [the insurance carrier] to enter into a transaction it would otherwise have avoided. Because it does not assert that [the defendant's] misrepresentation had "relevance**

10

**to the object of the contract," we do not think it is legally sufficient** (emphasis added). *United States v. Shellef*, 507 F.3d 82, 109 (2d Cir. 2007).

Mr. Kergil also did not cause any of the life insurance applications to be sent in the mail or any wires to be sent in regard to the insurance applications. Tracy Robinson of the Binday Agency did all of that at Binday's request. Therefore, there is a gaping void in "causation" in this case as to Mr. Kergil and none of the mailings or wires were done in the furtherance of a "scheme to defraud" as opposed to Binday's "scheme to deceive", which clearly Mr. Kergil was not a knowing party to, nor was any evidence adduced at trial that showed he was a knowing participant in the Binday scheme or that he had any criminal intent to harm the carriers. Despite this fact, Mr. Kergil's life, career, and reputation have been destroyed by numerous defamatory press releases made by the government. As Supreme Court Justice Kennedy noted, just being indicted by the government is a life-changing experience, because in the time period between indictment and trial, the accused may suffer ruinous consequences to his reputation, his employment, and his current and future business opportunities from which he may never recover, even if he is later acquitted. See *Gentile v. Nevada*, 501 U.S. 1030 (1991). For this reason alone, Mr. Kergil respectfully moves this Court to grant his Motion to Reconsider and grant a Judgment of Acquittal as to all charges.

The government's claim that STOLI policies are not as profitable as regular universal life insurance policies sold by the carriers is not true. The reason for this is obvious, in that whether policies are STOLI policies which are premium-financed policies or ones that are self-financed, the insurance carrier takes the same risk and makes the same profits if the insured does not die. Therefore, none of these allegations go to the **materiality** of the risk or to the elements of the bargain. This is exactly why the district court in *United States v. Kurtz*, 2008 WL 1820903 (W.D.N.Y. April 21, 2008), dismissed the indictment against a scientist accused of mail and wire

11

fraud for allegedly stealing biological materials and selling them based on the Second Circuit's decision in *Shellef*:

> "Our cases have drawn a fine line between schemes that do no more than cause their victims to enter into transactions they would otherwise avoid-which do not violate the mail or wire fraud statutes-and schemes that depend for their completion on a misrepresentation of an essential element of the bargain-which do violate the mail and wire fraud statutes. In *United States v. Regent Office Supply Co.*, 421 F.2d 1174 (2d Cir.1970), the defendants sold stationery, *id.* at 1176. The defendants' scheme consisted of directing their sales personnel to misrepresent their identities to prospective customers so that the customers would be willing to entertain their offers. *See id.* (noting, as an example, that the sales personnel fraudulently claimed that they had been referred by a friend of the customer or an officer of the customer's firm). We concluded that no conviction under the mail fraud statute could stand where the misrepresentation was "not directed to the quality, adequacy or price of goods to be sold, or otherwise to the nature of the bargain." *See id.* at 1179. *United States v. Starr*, 816 F.2d 94 (2d Cir.1987), is similar. The defendants there collected bulk mailings from their customers and then sent them through the post office. *See id.* at 95-96. At the post office, however, they hid high-rate mail in low-rate mail packages, and paid the low-rate price for the entire shipments. *Id.* at 96. The defendants nonetheless charged their customers as if the mailings were high-rate, and produced and mailed false invoices to show that the high-rate price had in fact been paid. *Id.* We decided that "[t]he misappropriation of funds simply ha[d] no relevance to the object of the contract; namely, the delivery of mail to the appropriate destination in a timely fashion." *Id.* at 100. Because "[m]isrepresentations amounting only to a deceit are insufficient to maintain a mail or wire fraud prosecution," we concluded that such a charge can not apply to situations where the alleged victims "received exactly what they paid for" and "there was no discrepancy between benefits reasonably anticipated and actual benefits received." *Id.* at 98-99 (internal quotation marks and citation omitted); *cf. id.* at 102 (Newman, J., concurring) ("An indictment for defrauding the Postal Service would have led to a conviction that would surely have been affirmed. However, the indictment for defrauding the customers has led to a conviction that must be reversed."). *Shellef*, 507 F.3d at 107-109. *Kurtz* at *10.

Mr. Kergil respectfully asks this Court to replace the word "customers" with the word "carriers" and to immediately grant a Judgment of Acquittal as to all counts, as there is nothing that the government can say or do or argue that can save this facially and fatally defective indictment. Mr. Kergil requests that the Court follow the Second Circuit's analysis in *Shellef*, where the Second Circuit concluded:

12

As in *Starr*, the indictment here does not allege, pursuant to the government's "no-sale" theory, that there was a "discrepancy between benefits reasonably anticipated" and actual benefits received. And as in *Regent Office*, it fails to allege that [the defendant] misrepresented "the nature of the bargain." Instead, the indictment states only that [the defendant's] misrepresentation induced [the manufacturer] to enter into a transaction it would otherwise have avoided. Because it does not assert that [the defendant's] misrepresentation had "relevance to the object of the contract," we do not think it is legally sufficient. *Shellef*, 507 F.3d at 109 (citations omitted). *Kurtz, 2008 WL at \*4-\*6.*

Just as in *Kurtz*, the Indictment here is constitutionally infirm and is defective on its face because it fails to sufficiently allege specific intent to defraud the insurance carriers out of their property, through the use of mailings and wires in furtherance of the scheme to defraud. As discussed below, the government's "scheme to defraud" theory is legally invalid. For the purposes of the Court's analysis, suffice it to say the Indictment is deficient on its face for not only not properly alleging all five elements of mail and wire fraud, but for not even attempting to explain how paying premiums to an insurance carrier somehow defrauds the insurance carrier of its money or its property. Mr. Kergil did not receive any commissions as Mr. Binday was alleged to have done.

Thus, it was impossible to have any fraud committed by Mr. Kergil against the carriers based on the facts alleged in the indictment or proven at trial. Therefore, it is respectfully suggested that this Honorable Court lacked federal jurisdiction because of the deficiencies in the indictment and so Your Honor should therefore grant his Motion for Reconsider and then enter a Judgment of Acquittal for Mr. Kergil as to all counts.

## IV. THE SUPREME COURT'S UNANIMOUS DECISION IN *SKILLING* MANDATES MR. KERGIL'S ACQUITTAL ON ALL CHARGES

Mr. Kergil's indictment claiming fraud does not square with recent unanimous Supreme Court decisions like *Skilling v. United States*, 561 U.S. 358 (2010), or *Bullock v. BankChampaign, N.A.*, 133 S.Ct. 1754 (2013).

The allegations in Mr. Kergil's indictment also do not fit with the paradigm of fraud as explained by the Supreme Court that "the victim's loss of money or property suppl[ying] the defendant's gain," *Skilling* at 400. Indeed, though Mr. Kergil was originally indicted for mail and wire fraud, that was never proven at trial, and the government s arguments at trial resembled the type of "scheme of nondisclosure" that *Skilling* held was "outside the bounds" of the fraud statutes. *Skilling* at 410. In fact, the unanimous definition of federal fraud by the Supreme Court in *Skilling* requires a deprivation of property and occurs only when "the victim's loss of money or property supplied the defendant's gain, with one the mirror image of the other." *Skilling* at 400. This is totally inconsistent with the government's theory of the case, which is that Mr. Kergil did not inform the carriers that there were fraudulent representations on the applications, and is not even vaguely alluded to in the indictment because at no time did any money end up in his pocket. Even more significant is that the Supreme Court's description of the "mirror image of fraud" theory is based on the Second Circuit's decision in *United States v. Starr*, 816 F.2d 94 (2d Cir. 1987):

> "Unlike fraud in which the victim's loss of money or property supplied the defendant's gain, with one the mirror image of the other, see, e.g., *United States v. Starr*, 816 F.2d 94, 101] (CA2 1987), the honest-services theory targeted corruption that lacked similar symmetry. While the offender profited, the betrayed party suffered no deprivation of money or property; instead, a third party, who had not been deceived, provided the enrichment. For example, if a city mayor (the offender) accepted a bribe from a third party in exchange for awarding that party a city contract, yet the contract terms were the same as any that could have been negotiated at arm's length, the city (the betrayed party) would suffer no tangible loss. *Cf. McNally*, 483 U.S. at 360. Even if the scheme

14

occasioned a money or property gain for the betrayed party, courts reasoned, actionable harm lay in the denial of that party's right to the offender's "honest services." See, e.g., *United States v. Dixon*, 536 F.2d 1388, 1400 (CA2 1976)." *Skilling* at 400.

Similarly, in *Bullock*, the Supreme Court stated that for there to be fraud "there must be both a material misrepresentation and that the defendant obtained the property." Mr. Kergil did not deceive anyone, nor did he make any misrepresentations to anyone, material or otherwise, the property certainly did not end up in his pocket, and not only was he not aware of any fraud being perpetrated on the carriers, money from this scheme ended up in the carrier's pockets, not Mr. Kergil's. Therefore, no federal fraud or federal mail and wire fraud was properly alleged in his Indictment, or proven at his trial.

Mr. Kergil's indictment is also devoid of any specific intent to defraud. In fact, the words "mens rea," "scienter," and even the "specific intent to defraud" are nowhere to be found in the Indictment, even though those words are required by the US Attorney's Manual. USAM Chapter 9-43.000, Criminal Resource Manual at 948. This fact alone renders the Indictment defective especially when considering the Supreme Court's recent decisions on *mens rea* and criminal intent like *Elonis v. United States*, 135 S. Ct. 2001 (2015). Just reciting the basic elements of mail and wire fraud are not enough. The government must allege specific facts in an indictment that comprise a crime.

Mr. Kergil's Judgment of Acquittal should be granted on all Counts, and the indictment should be dismissed because it fails to allege any "knowledge" on his part that he was willfully participating in a conspiracy or a scheme to defraud, nor was any crime or conspiracy proven at trial. One of the elements which has been considered indispensable to an indictment for any type of crime is knowledge; e.g., knowledge that a law was broken. In *Pettibone v. United States*, 148

U.S. 197 (1893), the defendants were charged with encouraging mine workers to disobey an injunction, and the Supreme Court, in reversing their conviction, stated:

> It seems clear that an indictment against a person must charge a knowledge or notice, on the part of the accused. Unless that fact exists, the statutory offense cannot be committed and without such knowledge or notice, the evil intent is lacking. *Id.* at 206-207.

This requirement of a direct and explicit allegation of knowledge of breaking the law in an indictment was reiterated in *Direct Sales Co. v. United States*, 319 U.S. 703 (1943), where the Supreme Court affirmed the position it had taken in the *Pettibone* case fifty years prior and stated:

> Without the knowledge, the intent cannot exist. Furthermore, to establish the intent, the evidence of knowledge must be clear, not equivocal. This, because charges are not to be made out by piling inference on inference, thus fashioning a dragnet to draw in all substantive crimes. *Direct Sales,* at 711.

Moreover, as the Supreme Court has recently summarized in *Elonis* by citing cases like *Liparota v. United States*, 471 U.S. 419 (1985) and *Morissette*; for there to be a crime in American Jurisprudence, an evil act must be concurrent with an evil mind. "Crime, as a compound concept, generally constituted only from concurrence of an evil-meaning mind with an evil-doing hand," quoting Justice Holmes famous observation that "[e]ven a dog distinguishes between being stumbled over and being kicked." *Id.* at 251-52.

Furthermore, nowhere does the indictment allege that Mr. Kergil had the "evil intent" or "*mens rea*" or scienter or the "specific intent to defraud" anyone that is required by law to make ordinary business conduct criminal especially in the case of mail and wire fraud since every business in America uses the mail, the internet, telephones, fax machines, or bank wires to conduct business. There must be some "concurrence" between an evil meaning mind and an evil act to create a crime. See *Morissette v. United States*, 342 U.S. 246 (1952). See also description of *Morissette* in *United States v. Manatau*, and the Clarifying Amendment 791 in the Sentencing

16

Guidelines. In Mr. Kergil's case, there is no knowledge of committing any crime and no "concurrence" of any evil act with any evil meaning mind.

The reason Mr. Kergil's indictment fails to articulate any particular "scheme to defraud" or even the words "specific intent to defraud" is because the very facts of the case belie the existence of ANY "scheme to defraud" by anyone. But more importantly, no scheme to defraud was articulated in his indictment, so it was fatally defective under the Sixth Amendment Notice Clause and *Russell*, 369 U.S. 749. Even deceitfully breaching a contract is not a crime; something more than "deceit" is required to make a case for mail and wire fraud. See, e.g., *United States v. Shellef*, 507 F.3d 82, 107-9 (2d Cir. 2007), *United States v. Starr*, 816 F.2d 94 (2d Cir. 1987), and *United States v. Regent Office Supply Co.*, 421 F.2d 1174 (2d Cir. 1970); all of which are cited above in *Takhalov* by the 11th Circuit describing the law of mail and wire fraud in the Second Circuit.

The indictment is filled with speculation and theories about possible fraud, but there is no specific claim of actual fraud, or allegations that Mr. Kergil intended any of the Carriers to suffer any "actual concrete" harm, which is the sine qua non of mail and wire fraud, and Mr. Kergil certainly did not intend for anyone to lose money or be harmed. See, e.g., *United States v. Rossomando*, 144 F.3d 197 (2d Cir. 1998) (mail fraud conviction vacated because there was no proof that the defendant intended any harm to the victim so that the defendant's good faith was unimpaired despite the jury's verdict). See, also, the dispositive quote from *Takhalov* about harm:

> From that conclusion, a corollary follows: a schemer who tricks someone to enter into a transaction has not "schemed to defraud" so long as he does not intend to harm the person he intends to trick. And this is so even if the transaction would not have occurred but for the trick. For if there is no intent to harm, there can only be a scheme to *deceive*, but not one to *defraud. Takhalov* at *9.

17

In fact, in construing the Supreme Court's mirror image theory of fraud in *Skilling*, the government's case is exactly backwards. The fact that the fraud was caused by the licensed agents of the carriers who filled out the applications for the Binday Agency and received the commissions, not Mr. Kergil, mandates an acquittal of Mr. Kergil on all counts, but especially of any crime involving fraud because any fraud in this case was committed by the carriers' agents, and not by Mr. Kergil against any carrier. Moreover, it is hornbook law that the knowledge of the agent is attributed to the principal as a matter of law, but especially in the world of life insurance applications. See, e.g., the Supreme Court's decision in *Stipcich v. Metropolitan Life*, 277 U.S. 311 (1928), where revelations about the insured's health, given to the insurance carrier's agent were attributed to the carrier, proving that knowledge that the carrier's agent had, should be ascribed to the Carriers just as the agent's knowledge in *Stipcich* was attributed to Metropolitan Life. See, also, *Stockwell v. United States*, 80 U.S. 531 (1871) ("It is not seriously denied that in civil transactions a principal or a partnership is affected by the knowledge of the agent or copartner, and that the knowledge of the agent is in law attributed to his principal ").

Here, not only did the carriers want and desire this very profitable block of business, the carriers' own licensed agents thrived on this business and brought it to the carriers knowing full well what Binday and others in the Life Settlement business were all about and what he was up to with his investors and the STOLI market place and the active Life Settlement business that they were all involved in at that time. Therefore, "the knowledge of the insurance agent is attributable to the carrier" under *Stipcich*, and there was no "scheme to defraud" in this case and, therefore, Your Honor must dismiss my indictment and enter a Judgment of Acquittal in my case as to all counts because Your Honor's Court lacked federal jurisdiction as there was no federal crime here. Because there was no evidence of any fraudulent activity on the part of Mr. Kergil,

18

and there was clearly no fraud on the alleged victim carriers that ended up in Mr. Kergil's pocket as required by the Supreme Court in *Skilling*, which in turn is based largely on the Second Circuit's decision in *Starr*, he must be acquitted on all counts as a matter of law.

## CONCLUSION

For the above reasons, Mr. Kergil respectfully asks this Court to grant his Motion for Reconsideration and grant the Judgement of Acquittal as to all charges.

Respectfully Submitted,

/s/ James Kevin Kergil
James Kevin Kergil
Reg. No. 66387-054
Petitioner *Pro Se*
Incarcerated Inmate
FPC Canaan
P.O. Box 200
Waymart, PA 18472